No. 25-2107

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

ARLINGTON SCHOOL BOARD,

*Plaintiff-Appellant,*

v.

LINDA McMAHON, in her official capacity as Secretary of Education of the United States, and the UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia

### BRIEF OF AMICUS CURIAE COMMONWEALTH OF VIRGINIA IN SUPPORT OF DEFENDANTS-APPELLEES

| | |
|---|---|
| JASON S. MIYARES<br>*Attorney General* | KEVIN M. GALLAGHER<br>*Solicitor General*<br><br>Office of the Attorney General<br>202 North Ninth Street<br>Richmond, Virginia 23219<br>(804) 786-2071 – Telephone<br>(804) 371-0200 – Facsimile |
| September 25, 2025 | *Counsel for the Commonwealth of Virginia* |

# CORPORATE DISCLOSURE STATEMENT

As a governmental party, amicus curiae is not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION .....................................................................................................1

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................2

ARGUMENT .............................................................................................................2

    I.   APS's policy is not required by *Grimm* .....................................3

        A.   APS cannot use *Grimm* as a shield .................................3

        B.   *Skrmetti* restricts *Grimm*'s application here ..................6

    II.  APS has not established irreparable harm ............................ 10

CONCLUSION ....................................................................................... 12

CERTIFICATE OF COMPLIANCE......................................................... 13

CERTIFICATE OF SERVICE................................................................. 14

ii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adams by and through Kasper v. School Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ........................................................... 6, 8

*Canedy v. Boardman*,
  16 F.3d 183 (7th Cir. 1994) ..................................................................... 6

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ................................................................. 10

*Department of Educ. v. Louisiana*,
  603 U.S. 866 (2024) ................................................................................. 2

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020) ......................................................... *passim*

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ................................................................................. 8

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................................. 8

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ........................................................... 10, 11

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 2

*Respect Maine PAC v. McKee*,
  562 U.S. 996 (2010) ................................................................................. 3

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) .................................................................. 8

*Tennessee v. Cardona*,
  762 F. Supp. 3d 615 (E.D. Ky. 2025) ...................................................... 8

*United States v. Skrmetti*,
　145 S. Ct. 1816 (2025) ................................................................. 3, 7, 9

*Veronia Sch. Dist. 47J v. Acton*,
　515 U.S. 646 (1995) ............................................................................ 6

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1
　Bd. of Educ.*,
　858 F.3d 1034 (7th Cir. 2017) ............................................................. 5

*Winter v. Natural Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ......................................................................... 2, 10

## Other Authorities

11A Charles Alan Wright & Arthur R. Miller, Federal
　Practice & Procedure § 2949 (3d ed. 2019) ........................................ 10

Federal Rule of Appellate Procedure 29 .................................................... 2

Nick Minock, *Child sex offender visited 2 schools, 2 rec
　centers in Arlington and Fairfax counties*, CBS Austin
　(Feb. 5, 2025), https://tinyurl.com/4p5b3k4x ....................................... 1

Ryan Belmore, *Alexandria Schools Clarify No Federal Funds
　Despite 'High-Risk' Status*, ALXnow (Sept. 17, 2025),
　https://tinyurl.com/y8fb8ekw ............................................................ 11

iv

# INTRODUCTION

Arlington Public Schools (APS) allowed a registered child sex offender (a biological male who self-identifies as transgender) access to the women's locker rooms at its public high schools—culminating in numerous criminal charges after the man exposed himself to women.[1] APS's sweeping policy allowing anyone expressing a different gender identity to use the facility of their choice enabled these harrowing experiences. And this is not the first incident like this.

APS claims, however, that its policy is *required* by this Court's holding in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). Not so. *Grimm* cannot be used as a shield for an expansive policy that clearly violates Title IX. The Department of Education rightly recognized that reality by putting APS on "high risk" status, and the district court rightly dismissed APS's complaint. Now, APS seeks an emergency injunction so that it can retain its harmful policy without facing the consequences. This Court should reject APS's plea.

---

[1] Nick Minock, *Child sex offender visited 2 schools, 2 rec centers in Arlington and Fairfax counties*, CBS Austin (Feb. 5, 2025), https://tinyurl.com/4p5b3k4x.

1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[2]

*Amicus curiae* the Commonwealth of Virginia has a strong interest in protecting the privacy and safety of its citizens, especially its schoolchildren. It also has an interest in preventing localities from violating federal law, including Title IX. The Commonwealth therefore files this brief *amicus curiae* in support of Defendants to argue that APS's motion should be denied.

## ARGUMENT

This Court considers four factors in deciding whether to issue a preliminary injunction pending appeal: that the petitioner "is likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief," that the "balance of equities tips" in its favor, and "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The party seeking the injunction bears the burden of demonstrating that the factors are met. *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024). Because an injunction pending appeal "does not simply suspend judicial

---

[2] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2).

2

alteration of the status quo but grants judicial intervention that has been withheld by lower courts," a request for an injunction "demands a significantly higher justification than a request for a stay." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (mem.) (quotation marks omitted).

## I. APS's policy is not required by *Grimm*

APS contends that it is likely to succeed on the merits of its Title IX claim "because, under *Grimm*, Title IX bars a school board from prohibiting a student who identified as male from using a high school's sex-separated male bathroom" and APS's "regulation implements that holding." Mot. 24–25; see also *id.* at 20 (arguing that APS "is bound by this Court's holding that Title IX does not *forbid* policies like APS's but *requires* them"). That is not an accurate statement of the law. *Grimm* is a narrow decision that cannot be used as a shield for APS's expansive policy. And even if *Grimm* were as boundless as APS claims, the Supreme Court's recent holding in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), limits *Grimm*'s application in situations like this.

### A. APS cannot use *Grimm* as a shield

APS believes that *Grimm* requires its sweeping policy, which allows anyone who expresses a different gender identity to use any school

3

facility of their choice. But *Grimm* applied to a particular transgender student concerning a particular bathroom policy. It does not dictate that *all* schools must allow *all* transgender-identifying students to use *all* facilities (including locker rooms and changing facilities).

In *Grimm*, a biological female who identified as transgender sued a school board for its policy limiting the use of single-sex bathrooms "to the corresponding biological genders." *Grimm*, 972 F.3d at 597–99. As relevant here, this Court held that, as applied to the plaintiff, the bathroom policy violated Title IX of the Education Amendments of 1972. *Id.* at 607, 616, 619. Specifically, this Court held that "[a]fter the Supreme Court's recent decision in *Bostock* [*v. Clayton County*, 590 U.S. 644 (2020)], we have little difficulty holding that a bathroom policy precluding Grimm from using the boys restrooms" discriminated on the basis of sex because "[t]he Board could not exclude Grimm from the boys bathrooms without referencing his 'biological gender' under the policy." *Id.* at 616.

Significantly, however, this Court emphasized at every turn that Grimm's challenge was as-applied. *E.g.*, *Grimm*, 972 F.3d at 609 ("[W]e hold that the Board's policy constitutes sex-based discrimination *as to*

4

*Grimm*." (emphasis added)). Indeed, the question in *Grimm* was "limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *Id.* at 596. This is significant in two primary ways.

First, *Grimm* has little to say about transgender students who have *not* "consistently, persistently, and insistently express a binary gender." *Grimm*, 972 F.3d at 596 (quotation marks omitted). Courts have recognized a difference between cases involving students who have progressed in a sex transition versus cases "where a student has merely announced that he is a different gender." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017). Thus, *Grimm* cannot possibly require a sweeping policy allowing students to use facilities "that correspond with their gender identities," Mot. 4, when that policy defines "gender identity" to encompass a student's "sense of self as male, female, or an alternative gender," R.1 ¶ 40.

Second, *Grimm* expressly applied only to bathrooms, because "[a]lthough the Board's policy similarly applie[d] to locker room facilities, Grimm d[id] not need to use the locker rooms and never challenged that

5

aspect of the policy." *Grimm*, 972 F.3d at 601. Although students have privacy interests in both bathrooms and locker rooms, the privacy interests are different. It is "not difficult" to understand why schools have long provided different locker rooms and changing facilities for members of each sex—students of all ages have a legitimate interest in "shielding their bodies from the opposite sex." *Adams by and through Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022); see *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (having "one's naked body viewed by a member of the opposite sex" is an "invasion" of privacy). Indeed, "[p]ublic school locker rooms . . . are not notable for the privacy they afford." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). Thus, *Grimm* also does not require APS to apply its policy to all "sex-segregated facilities—including locker rooms and restrooms" as it currently does. Mot. 4.

### B. *Skrmetti* restricts *Grimm*'s application here

Beyond the nature of *Grimm* itself, the United States Supreme Court's recent decision in *Skrmetti* also demonstrates that *Grimm* does not justify the sweeping policy at issue in this case.

6

First, *Skrmetti* calls into question this Court's conclusion that the policy in *Grimm* discriminated on the basis of sex because "[t]he Board could not exclude Grimm from the boys bathrooms without referencing his 'biological gender' under the policy." *Grimm*, 972 F.3d at 616. In *Skrmetti*, the Court noted that, in the Equal Protection Clause context, it "has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, 145 S. Ct. at 1829. Thus, after *Skrmetti*, "mere reference to sex" is likely insufficient to establish discrimination on the basis of sex.

This is especially the case because *Grimm* relied on *Bostock* to reach its Title IX conclusion. See *Grimm*, 972 F.3d at 616 ("After the Supreme Court's recent decision in *Bostock*, we have little difficulty holding that a bathroom policy precluding Grimm from using the boys restrooms" discriminated on the basis of sex). In *Skrmetti*, the Court explained that it has never held that "*Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. And as Justice Thomas explained in his concurrence, there are significant reasons why *Bostock* does not extend beyond the Title VII context. See *id.* at 1838–39 (Thomas, J., concurring).

7

Among those reasons is that, unlike Title VII, Congress enacted Title IX under its Spending Clause powers. See *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005). To comply with the Spending Clause's limitations, Congress must provide the States "with unambiguous notice of the conditions they are assuming when they accept" funding. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 637 (1999) (cleaned up). But when "Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.,* discrimination between males and females." *Adams*, 57 F.4th at 812. It should thus come as no surprise that courts around the country have concluded that the Spending Clause prevents conditioning of Title IX funds on prohibiting discrimination based on "gender identity" as opposed to biological sex. *E.g.*, *Roe v. Critchfield*, 137 F.4th 912, 929 (9th Cir. 2025) (holding that a party had "failed to establish that Defendants had adequate notice, when they accepted federal funding, that Title IX prohibits the exclusion of transgender students from restrooms, locker rooms, shower facilities, and overnight lodging corresponding to their gender identity"); *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626 (E.D.

8

Ky. 2025) ("Title IX does not unambiguously condition the receipt of funds on the prohibition of gender identity discrimination.").

Besides, this Court's assumption that *Bostock* "guides [the Court's] evaluation of claims under Title IX," *Grimm*, 972 F.3d at 616, cannot survive *Skrmetti*. Under *Bostock*, "an employer who fires a homosexual male employee for being attracted to men while retaining the employee's straight female colleague has discriminated on the basis of sex because it has penalized the male employee for a trait (attraction to men) that it tolerates in the female employee." *Skrmetti*, 145 S. Ct. at 1835. In *Skrmetti*, however, *Bostock*'s logic did not apply to Tennessee's law regulating gender-transition procedures for minors because changing a minor's sex would not "automatically change" the operation of that law. *Ibid*. *Bostock* requires sex to be the "but for" cause of an outcome, not merely a factor "at play." *Id.* at 1834. But cases like *Grimm* do not challenge policies of maintaining separate bathrooms for boys and girls. Indeed, the plaintiff in *Grimm* explicitly *disclaimed* such a challenge. See *Grimm*, 972 F.3d at 618 ("But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself

9

from the sex-separated restroom matching his gender identity."). *Bostock* therefore provides no guidance here.

## II. APS has not established irreparable harm

A party seeking a preliminary injunction must "*demonstrate* a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. "To establish irreparable harm, the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation marks omitted). "[E]vidence that goes beyond unverified allegations of the pleadings and motion papers must be presented to support . . . a preliminary injunction." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2949 (3d ed. 2019) (collecting cases); see also, *e.g.*, *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm . . . A plaintiff must demonstrate immediate threatened injury as a prerequisite to

10

preliminary injunctive relief.").

As the basis for its claim of irreparable injury, APS contends that it "will lack resources to meaningfully serve their most vulnerable student populations" and that "Defendants' actions strip APS of $23 million in federal funds Congress appropriated." Mot. 25. But APS supports those propositions by citing *the Complaint*. See *ibid.* (citing R.1 ¶¶ 57–58, 97 and 56–64). APS has provided no *evidence* that it has lost—or will lose—any federal funding. See *Mountain Valley Pipeline*, 915 F.3d at 216 (requiring a "clear showing" of irreparable injury).

By contrast, Defendants submitted *a declaration* showing that the Board is *not* being "stripped" of its funds. Indeed, the declaration explains that the "high risk" designation "do[es] not freeze or cut off an entity's access to federal funds." R. 19-1, ¶ 4. In fact, another school district in Northern Virginia—one that is curiously attempting to intervene in this proceeding—has clarified that no federal funds have been withheld despite its "high-risk" status. See Ryan Belmore, *Alexandria Schools Clarify No Federal Funds Despite 'High-Risk' Status*, ALXnow (Sept. 17, 2025), https://tinyurl.com/y8fb8ekw. APS thus falls well short of the mark for establishing irreparable harm.

11

## CONCLUSION

This Court should deny the motion for an injunction pending appeal.

Respectfully submitted,

THE COMMONWEALTH OF VIRGINIA

By: /s/ Kevin M. Gallagher
Kevin M. Gallagher
*Solicitor General*

JASON S. MIYARES
  *Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 371-0200 – Facsimile

*Counsel for the Commonwealth of Virginia*

September 25, 2025

12

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 2,178 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher

## CERTIFICATE OF SERVICE

    I certify that on September 25, 2025, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher

14