Case Number Record No. 25-2107

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**ARLINGTON SCHOOL BOARD**
**Appellant**

**v.**

**LINDA McMAHON, in her official capacity as Secretary of Education of the United States, and UNITED STATES DEPARTMENT OF EDUCATION,**
**Appellees.**

**Emergency Intervenor Motion for**
**Temporary Restraining Order (TRO)**
**And Preliminary Injunction**

**From the U.S. District Court for the Eastern District of Virginia**
**Civil Action No. 1:25-cv-01434-RDA-LRV**

**Rossie D. Alston, Jr., Federal District Judge**

Major Mike Webb
3445 Washington Boulevard
Apartment # 306
Arlington, VA 22201
Phone: (856) 220-1354
Email: Mike.Webb84@Gmail.com
Petitioner-Appellant in *Pro Se*

-i-

RECEIVED

2025 OCT -6 P 2:38

U.S. COURT OF APPEALS
FOURTH CIRCUIT

# TABLE OF CONTENTS

Table of Contents..................................................................................................i

Emergency Intervenor Motion for Temporary Restraining Order (TRO) & Preliminary Injunction...................................................................................2

  Statement of Facts........................................................................................2

    Unconditional Right..................................................................................6

  Conditions for Grant of Leave to Intervene.........................................23

  Temporary Restraining Order (TRO)....................................................24

  Preliminary Injunction...............................................................................25

    Irreparable Injury.......................................................................................28

    Inadequacy of Monetary Damages........................................................34

    Balance of Hardships and Public Interest...........................................39

  Conclusion...................................................................................................41

Table of Exhibits.........................................................................................45

  Exhibit A......................................................................................................45

Certificate of Service.................................................................................46

.

## EMERGENCY INTERVENOR MOTION FOR TEMPORARY RESTRAINING ORDER (TRO) & PRELIMINARY INJUNCTION

Proposed Intervenor, Major Mike Webb (legal name), also known as Michael D. Webb, hereby moves, pursuant to Fed.R.Civ.P. 24(a), for an emergency intervention, as of right, pursuant to Fed.R.Civ.P. 65, for preliminary injunctive relief and issue of a temporary restraining order (TRO), in the above referenced matter.

### Statement of Facts

"[O]ur experience has been that those princes who have done great things have held good faith of little account, and have known how to circumvent the intellect of men by craft, and in the end have overcome those who have relied on their word", and "it is unnecessary for a prince to have all the good qualities. . . , but it is very necessary to appear to have them." Nicolo Machiavelli, *The Prince (Trans. W. K. Marriott)*, "Chapter XVIII: Concerning the Way in Which Princes Should Keep Faith," The Guttenberg Project eBook #1232, March 1998, *updated* July 1, 2022. Similarly, some experts, upon whom even the former Virginia Governor had relied, had thought during a recent public health emergency that "[r]itual and solidarity are important in human societies and can combine with visible signals to shape new societal behaviors [footnotes omitted]", and that "[u]niversal mask wearing could serve as a visible signal and reminder of the pandemic." Jeremy Howard, *et al.*, *Face Masks Against COVID-19: An Evidence*

2

*Review,* Preprints, May 13, 2020.

Indeed, "[s]ignaling participation in health behaviors by wearing a mask as well as visible enforcement can increase compliance with public mask wearing, but also other important preventative behaviors [footnote omitted]", and quite "[h]istorically, epidemics are a time of fear, confusion, and helplessness [footnotes omitted]." Hence, it had been their thought that "[m]ask wearing, and even mask making or distribution, can provide feelings of empowerment and self-efficacy [footnote omitted]", because "[h]ealth is a form of public good in that everyone else's health behaviors improve the health odds of everyone else [footnotes omitted]." *Id.* "This can make masks symbols of altruism and solidarity [footnote omitted]", and "[v]iewing masks as a social practice, governed by sociocultural norms, instead of a medical intervention, has also been proposed to enhance longer-term uptake [footnotes]." *Id.*

Hence, it is of at least probative value, that, like the present litigation, during a contested election, in which "[a] new poll shows the Virginia gubernatorial race tightening, with Republican Lieutenant Governor Winsome Earle-Sears cutting into Democrat Abigail Spanberger's lead and bringing the contest within just a few points", Martha McHardy, "GOP chances of winning Virginia Governor election get major boost: poll," *Newsweek*, October 1, 2025, during a midterm election season, it had been reported, in February 2022, that "[a]n Arlington judge. . .

3

barred enforcement of Gov. Glenn Youngkin's mask-optional order for schools —
a major victory for the seven school boards that sued to stop it, and a sharp rebuke
for the new governor", and "[i]n her 10-page order, Arlington Circuit Court Judge
Louise DiMatteo offered a check to Youngkin's assertion of gubernatorial
authority, writing that the Virginia Constitution gives authority to local school
boards to make safety and health decisions — including masking — for their
students", stating "that a state law passed over the summer requiring school
districts to comply with federal health guidance makes Youngkin's mask-optional
order impossible to carry out, because it, too, delegates authority over decisions
such as masking to local school boards." Hannah Natanson, Rachel Weiner &
Justin Jouvenal, "Judge temporarily halts Youngkin order making masks optional
in Va. schools after lawsuit from school boards," *Washington Post*, February 4,
2022[1].

In January 2022, "led by the board for Fairfax County Public Schools, the
largest, most prominent district in the state" the Alexandria City Public Schools,
Arlington Public Schools, Falls Church City Public Schools, Hampton City
Schools, Prince William County Public Schools and Richmond Public Schools, all

---

[1] "'The single issue before the Court is whether the Governor, via his emergency
powers, can override the decision of local school boards delegated to them,'
DiMatteo wrote in the ruling granting a temporary restraining order. 'On this
pivotal point, the Court concludes that the Governor cannot.'" *Id.*

4

of which then still mandated the use of nonmedical grade facial coverings, a distinction with a difference, had "argue[d] that Youngkin's order violates the *Virginia Constitution*", and "[t]heir lawsuit. . . ask[ed] for an immediate injunction barring enforcement of the order, which seeks to leave masking decisions to parents, contravening federal health guidance and the masking mandates that most Virginia school districts have maintained throughout the coronavirus pandemic." Hannah Natanson & Nicole Asbury, " Seven school boards sue to stop Gov. Youngkin's mask-optional order on the day it takes effect," *Washington Post*, January 24, 2022.

However, it is not "subject to reasonable dispute", Fed.R.Evid. 201(b), that, a decade before, in the Obama Administration, in a rigorous. simulated challenge study, over a decade before the pandemic, NIOSH officials, a subdivision of CDC, had definitively determined, utilizing the same diagnostic equipment that is used to rate the N95, that "[t]he penetration levels of these fabric materials against both polydisperse and monodisperse aerosols were *much higher than the penetrations for the control N95 respirator filter media*", and that "[r]esults obtained in the study show that common fabric materials may provide [only] marginal protection against nanoparticles including those in the size ranges of virus-containing

5

particles in exhaled breath."[2]  Had that rigorous examination validated nonmedical

grade substitutes for effective respiratory protection, there would have been no

necessity for "evolving science"[3].

### ***Unconditional Right***

"The highest standard, strict scrutiny, applies where '[w]here certain

'fundamental rights' ' are involved, and requires that legislation or actions

'limiting these rights may be justified only by a 'compelling state interest,' '

requiring legislation and action 'must be narrowly drawn to express only the

legitimate state interests at stake.'" *Hawkins v. Grese*, 68 Va. App. 462 (Va. Ct.

App. 2018) (quoting *Roe v. Wade*, 410 U.S. 113 (1973)). Moreover, "[s]uch

fundamental rights include not only those listed in the *Bill of Rights* but additional

implied rights protected by the *Fourteenth Amendment*." *Id.* Further, it is clear that

"'[a] statute challenged on equal protection grounds is evaluated under 'strict

---

[2] Samy Rengasamy, *et al.*, *Simple Respiratory Protection—Evaluation of the Filtration Performance of Cloth Masks and Common Fabric Materials Against 20–1000 nm Size Particles*, 54 Ann. Occup. Hyg. 7, pp. 789–798 (2010); *Derek K. Chu, et al., Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis*, 395 Lancet 10242, pp. 1973-1987, June 27, 2020, *epub.* June 1, 2020. *But see Webb v. McDonough*, Civil Action No. 1:23-cv-0134-APM (D.C. March 7, 2024). *Webb v. Northam*, Civil Action No. 3:20CV497 (E.D.Va. August 25, 2020).
[3] Gregory S. Schneider & Laura Vozzella, "Despite Northam's public health credentials, some Virginians question his leadership during pandemic," *Washington Post*, May 30, 2020.

scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class.'" *Gray v. Commonwealth*, 274 Va. 290 (2007) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988)).

"While *Tinker* stands for the proposition that a student in a public school has First Amendment rights which he may freely exercise, it likewise stands for the proposition that, in exercising those rights, he may not do so in a manner which would materially and substantially interfere with discipline and good order in the operation of the school of with the rights of others." *Commonwealth v. Pleasants*, 214 Va. 646 (March 4, 1974). "'[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the *Constitution*'". *Jacobson*, 197 U.S. at 11 (citing cases). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein", *West Virginia State Bd. of Educ. v. Barnett*, 319 U.S. 624 (1943), and "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds". *Stanley v. Georgia*, 394 U.S. 557 (1969).

Furthermore, "[w]hen the Supreme Court has invalidated a statute because of an illegitimate purpose, '[i]n each case, the government's action was held unconstitutional only because *openly available data supported a commonsense conclusion that a religious objective permeated the government's action.*" *Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009), *aff'd* 624 F.3d 157 (5th Cir. 2010) (quoting *McCreary County v. ACLU*, 545 U.S. 844 (2005)) (emphasis added). Nonetheless, "[t]he purpose requirement is rarely determinative, 'presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion.'" *Id.* (quoting *Ibid.*). "Whenever. . . an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the *[F]ourteenth* or *[F]ifteenth [A]mendment* . . . the *court shall authorize* the appointment of Federal observers by the Director of the Office of Personnel Management". 52 U.S.C. § 10302(A) (emphasis added). Moreover, under the *Noerr-Pennington* doctrine, "[a] party who petitions the government for redress generally is immune from. . . liability", *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965), and "[t]his immunity extends to persons who petition all types of government entities — legislatures, administrative agencies, and courts." *Id.* citing *California Motor Transport Co. v. Trucking*

8

*Unlimited*, 404 U.S. 508 (1972)[4]). "[W]hat is at stake here is loss of an opportunity to express . . . one's dissatisfaction with the laws and policies." *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).

"The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote", and "[t]hat these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted." *San Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). "This case. . .raises issues not less than basic to a democratic society"; accordingly, an "[a]ppreciation of the circumstances that begot this statute is necessary for its understanding, and understanding of it is necessary for adjudication of the legal problems before us." *U.S. v. Auto. Workers*, 352 U.S. 567 (1957). ). "We have previously acknowledged that the *Noerr-Pennington* doctrine", as here, "is concerned with efforts to affect the decisions of legislative, judicial, and executive bodies in the field of public policy matters." ". *Titan Am. v. Riverton Inv. Corp.*, 264 Va. 292 (September 13, 2002) (citing *Lockheed Info. Mgmt. Sys. Co., Inc. v. Maximus, Inc.*, 259 Va. 92 (2000) (citing *F. Buddie Contracting, Inc. v. Seawright*, 595 F. Supp. 422 (N.D. Ohio 1984)).

Yet, of progressive boast, with respect to Intervenor, "analysts will refer to

---

[4] "The right of access to the courts is indeed but one aspect of the right of petition." *Id.*

the determined and wildly successful Arlington Democrats in battle-hardened

military terms", and "[o]nslaught, commando, and scorched earth come to mind",

"usually employed in relation to the fall campaign when yet another Republican,

an 'independent' who is really a Republican, or a real independent (often a pesky

candidate who finds a way onto the ballot almost every year) is about to be

drubbed in an election in the small but intensely political county just across the

Potomac from the nation's capital. Cragg Hines, "Arlington Dems Pour It On,

Boost "Regular" Dem Mary Kadera to Big Victory in School Board Caucus Over

"Insurgent Candidate," *Blue Virginia*, May 26, 2021.

Intervenor, along with James "Vell" Rives IV and Monique "Moe" Bryant

"are vying for the seat of Mary Kadera, who is not seeking re-election and whose

seat is the only one up for election this year." Scott McCaffery, "School Board

candidates tackle budget and impact of Trump administration," *ARL Now*,

September 4, 2025. And, "[o]n timely motion, the court must permit anyone to

intervene who: (1) is given an unconditional right to intervene by a federal statute".

Fed.R.Civ.P. 24(a). "All persons. . . shall have the same right in every State and

Territory. . . , and to the full and equal benefit of all laws and proceedings for the

security of persons and property as is enjoyed by white citizens", 42 U.S.C. §

1981(a), and "[t]he rights protected by this section are protected against

impairment by nongovernmental discrimination and impairment under color of

State law". 42 U.S.C. § 1981(c). *See generally* 18 U.S.C. §§ 241 and 242.

<u>*Section 1985(2) & (3)*</u>

According to local press reports, Intervenor "acknowledged he was in the race mostly to provide a forum for his views, largely focused on the response to the Covid pandemic." Scott McCaffery, "School Board candidates tackle budget and impact of Trump administration," *supra*. Yet, expressly limited to the at least partisan-charged context of "'strongly disagree[ing] with the U.S. DOE's assertion that our policy violates Title IX'", Superintendent Durán, has affirmed that "APS has a duty to our community of students, families and educators to defend the resources they deserve, and policies designed to protect students of all backgrounds". Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra*.

However, "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice. . . , with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws. . . , whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or

11

deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(2).

Intervenor is qualified "as a candidate for any office of the Commonwealth," being both registered, "qualified to vote for and hold. . . office", and he has "been a resident of the Commonwealth for one year next preceding his election and be qualified to vote for that office." Va. Code § 24.2-500. And, as of January 2025, he has, as "a candidate for. . . elected school board of any county or city," obtained the required "125 signatures". Va. Code § 24.2-506(A)(5). "Procedural due process. . . extends potentially to any statutorily conferred benefit, whether or not it can be properly construed as a liberty or property interest", *Dilbert v. Newsom*, No. C096274 (Cal. Ct. App. Apr. 8, 2024) (citing *Conejo Wellness Center, Inc. v. City of Agoura Hills* 214 Cal.App.4th 1534 (2013)); "[b]ut, 'it still requires the deprivation of some statutorily conferred benefit before it is implicated'". *Id.* (quoting *Ibid.*).

In exercise of his statutorily conferred right, by letter, dated March 25, 2024, Intervenor had communicated to APS that "the State Health Commissioner declared COVID-19 a disease of public health threat on February 7, 2020". Mohammed Norman Oliver, *Order of Public Health Emergency*, June 8, 2020. Further, in exercise of his statutorily conferred right, Intervenor had reminded APS, with respect to "a CBRN agent or agents", 85 Fed. Reg. 63, *supra*, later confirmed, upon Intervenor's specific request, as in evidence at Exhibit **A**, to be a

12

"chimeric virus", 42 CFR 73, November 17, 2021; *see also* Elizabeth W. Wells & Michael T. Parker, *Chimeric Viruses Containing Select Agents: The Biology Behind Their Creation, Attenuation, and Exclusion From Regulation*, 21 Health Secur. 5, pp. 384-391 (September-October 2023), *epub.* September 13, 2023, that, "to allow students to safely resume in-person instruction and progress in their education", the State Health Commissioner had issued an "Order requiring every public school division and preK-12 private school in Virginia, before reopening in accordance with Phase II and III guidelines, to submit to the Virginia Department of Education a plan outlining their strategies for mitigating the spread and public health risk of COVID-19 and consistent with the Centers for Disease Control and Prevention and Virginia Department of Health mitigation recommendations", and "[s]uch plans shall include policies and procedures for the use of face coverings; health screenings of staff and students; physical distancing measures; enhanced hygiene practices for staff and students; isolation of symptomatic cases; and cleaning and disinfecting procedures and other topics as outlined in the Phased Guidance for Virginia Schools." Mohammed Norman Oliver, *Order of Public Health Emergency*, June 8, 2020.

"Dual-use research of concern (DURC) is scientific research with significant potential for generating information that could be used to harm national security, the public health, or the environment." Daniel Patrone, David Resnik, and Lisa

13

Chin, *Biosecurity and the Review and Publication of Dual-Use Research of Concern*, 10 Biosecur, Bioterror 3, pp. 290-298, (September 2012), *ePub*. August 7, 2012. "The working definition of the term 'chimera' is a new hybrid microorganism created by joining nucleic acid fragments from two or more different microorganisms in which each of at least two of the fragments contain essential genes necessary for replication", and "[f]or these types of microorganisms, the term 'Chimera' will be used in the True Name in the place of 'Vector'". Richard E. Hill, Jr., *Center for Veterinary Biologics Notice No. 05-23*, December 8, 2005. Appellant has offered no public statements on these life impacting matters, while the press has also exercised a right to remain silent, while the present litigation, brought for an illegitimate purposes, and poised during the early election period, has become the only publicly debated question in the school board race.

Additionally, "[i]f two or more persons. . . conspire. . . , for the purpose of depriving. . . any person *or class of persons* of the equal protection of the laws. . . or for the purpose of preventing or hindering the constituted authorities. . . from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or

14

deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3)[5].

"[S]peech serves many valuable purposes," *Murthy v. Missouri*, Record No. 23-411, 603 U.S. ____ (June 26, 2024) (Alito, J. dissenting, joined by Thomas, J. & Gorsuch, J.), "[s]peech involves *a matter of public concern* when it involves an issue of social, political, or other interest to the community", *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440 (4th Cir. 2004) (emphasis added). And, "[i]n order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of 'paramount

---

[5] Further, "if two or more persons conspire to prevent. . . any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person. . . as a Member of Congress of the United States. . . , whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators", 42 U.S.C. § 1985(3), and Intervenor, during the relevant period, has been a candidate for Congress, registered with the Federal Election Commission (FEC). *See Webb v. FEC*, Civil Action No. 3:2022cv00047 (E.D.Va. 2022); *Webb v. Dep't of Treas.*, Civil Action No. 1:2022cv02034 (D.C. 2022); *Webb v. SBE*, Case No. CL20-2459-00 (Richmond Cir. 2020); *In re: Major Mike Webb*, Civil Action No. 3:20CV734 (E.D.Va. 2020); *In re: Mike Webb*, No. 20-1997 (4th Cir. 2021). *But see also Webb v. Lopez*, Civil Action No. 1:2023cv01239 (D.C. 2023), *aff'd* Record No. 23-7072 (D.C.C. 2023).

importance or national scope.'" *Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009) (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997).

Broadly, "as a general matter, the *First Amendment* means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564 (2002) (internal quotation marks omitted). And where content is deemed to have been "'presumptively invalid,'. . . the Government bears the burden to rebut that presumption." *U.S. v. Stevens*, 559 U.S. 460 (2010) (quoting *U.S.* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000) (quoting *R. A. V.* v. *St. Paul*, 505 U.S. 377 (1992)). "The mere fact that. . . [one] may not approve of publications. . . , or may not desire. . . to discuss. . . [another's] activities or publish. . . [another's] spoken words, does not give rise to an action cognizable under the law", and "[t]he *First Amendment* freedoms of speech and press are too precious to be eroded or undermined by the likes and dislikes of persons who invite attention and publicity by their own voluntary actions", *Falwell v. Penthouse Int'l, Ltd.*, 521 F. Supp. 1204 (W.D. Va. 1981). And Courts have warned that "cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the [proper] scope of the *First Amendment*," *Stevens*, 559 U.S. at 460.

However, where a "policy violates the *Establishment Clause* because its

16

purpose is 'the promotion of Christianity' and its primary effect is 'advancing religion by conveying a message of endorsement to elementary school children'", it will not survive a litigation challenge. *Roark v. South Iron R-1 School Dist.*, 573 F.3d 556 (2009) (quoting *Roark v. S. Iron R–1 Sch. Dist.,* 540 F.Supp.2d 1047 (E.D.Mo.2008)). While the *Religious Freedom Restoration Act (RFRA)* "prohibits the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means", *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (citing 107 Stat. 1488, 42 U.S.C. §2000bb *et seq.*), even a "court's decision that the prior practice of distributing Bibles in fifth grade classrooms should be permanently enjoined as violative of the *Establishment Clause*, [is] a ruling consistent with our discussion of the merits of this issue". *Roark*, 573 F.3d at 556 (citing *Doe v. S. Iron R–1 Sch. Dist.,* 498 F.3d 878 (8th Cir.2007)).

The Appellant has argued strenuously in other matters that, with respect "specifically [to] protections of an individual's right to freedom of speech, Plaintiff's allegations that certain Board members [had] personally displayed or supported LGBT causes do not, and cannot, as a matter of law, form the basis of a claim asserting a violation of freedom of speech", The Board Demurrer, *Webb v. Washington Post*, Case No. CL24002622-00, p. 3 (Richmond Cir. July 3, 2025), and, "[t]o the extent the Complaint asserts a claim for violation of the *First*

17

*Amendment. . .Establishment Clause*, Plaintiff's Allegations that certain Board members personally displayed or supported lesbian, gay, bisexual and transexual ('LGBT') causes do not, and cannot, as a matter of law, form the basis of an *Establishment Clause* claim." *Id.*, p.2, *supra*.

   "The Supreme Court has not settled the question whether a concern about a possible *Establishment Clause* violation can justify viewpoint discrimination", Child Evangelism Fellowship of New Jersey Inc. v. Stafford *Twp. Sch. Dist.*, 386 F.3d 514 (2004) (citing *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98 (2001)), "[t]he Supreme Court has repeatedly 'rejected the position that the *Establishment Clause* even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design.'" *Id.* (quoting." *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995)). Considering not private actors, but State Action, where "[a] poster of the *Ten Commandments* hangs prominently in a gilded frame in a Court of Common Pleas in Richland County, Ohio", on the issue of "whether this display violates the *Establishment Clause* of the *First Amendment* to the *United States Constitution*", "[t]he Court holds that it does." *ACLU of Ohio Foundation, Inc. v. Ashbrook*, 211 F.Supp.2d 873 (N.D. Oh. June 11, 2002). Where simply "an elementary school's class practice and scheduled performance of a song entitled 'In God We Still Trust'", "set to be performed at an end-of-the-year

18

assembly", even "Defendants' declaration that it has no intention of resuming classroom practices or Assembly performance of the Song does not strip Plaintiffs' of their standing to move for a preliminary injunction barring such conduct." *S.D. v. St. Johns Cy. Sch. Dist.*, 632 F.Supp.2d 1085 (2009).

While "[f]rom colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom", *Marsh v. Chambers,* 463 U.S. 783 (1983): *see also Cnty. of Allegheny v. ACLU,* 492 U.S. 573 (1989), "the general principles animating the *Establishment Clause* remain relevant even in the context of legislative prayer." *Lund v. Rowan Cy., North Carolina*, 863 F.3d 268 (2017). "First, the *Constitution* 'affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668 (1984)). "Second, the government 'may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.* (quoting *Lee v. Weisman*, 505 U.S. 577 (1992) (quoting *Lynch*, 465 U.S. at 668)). "By 'ensuring governmental neutrality in matters of religion,'" *Id.* (quoting *Gillette v. U.S.*, 401 U.S. 437 (1971)), "the *Establishment Clause* safeguards religious liberty and wards off 'political division along religious lines'". *Id.* (quoting *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). "An instrument of social peace, the

*Establishment Clause* does not become less so when social rancor runs exceptionally high." *Id.*

"That nearly all of the congregations in town turned out to be Christian does not reflect *an aversion or bias on the part of town leaders against minority faiths.* So long as the town maintains *a policy of nondiscrimination*, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Town of Greece v. Galloway*, 572 U.S. 565 (2014)). The relevant inquiry revolves around "allowing some individuals to give prayers at a legislative session but not others due to 'an aversion or bias ... against minority faiths' or other 'impermissible motive' is discrimination in violation of the *Establishment Clause*." *Satanic Temple, Inc. v. City of Boston*, 684 F.Supp.3d 21 (2023) (quoting *Ibid.*; Marsh, 463 U.S. 783).

"An executed person has indeed 'lost the right to have rights.'" *Furman v. Georgia*, 408 U.S. 238 (1972). "We know that the Framers did not envision 'so narrow a role for this basic guaranty of human rights.'" *Id.* (citing Goldberg & Dershowitz, *Declaring the Death Penalty Unconstitutional*, 83 Harv.L.Rev. 1773, 1782 (1970)). "The right to be free of cruel and unusual punishments, like the other guarantees of the *Bill of Rights*, 'may not be submitted to vote; [it] depend[s] on the outcome of no elections.'" *Id.* "The very purpose of a *Bill of Rights* was to withdraw certain subjects from the vicissitudes of political controversy, to place

20

them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *Barnette*, 319 U.S. at 624.

"'Weapon of terrorism' means any device or material that is designed, intended or used to cause death, bodily injury or serious bodily harm, through the release, dissemination, or impact of (i) poisonous chemicals; (ii) an infectious biological substance; or (iii) release of radiation or radioactivity." Va. Code § 18.2-46.4. While an "'[a]ct of violence, force, or threat' means any act involving violence, force, or threat that results in bodily injury or places one in reasonable apprehension of death, sexual assault, or bodily injury", Va. Code § 19.2-152.7:1, an "'[a]ct of terrorism' means an act of violence as defined in clause (i) of subdivision A of § 19.2-297.1", Va. Code § 18.2-46.4, which may include "[f]irst and second degree murder and voluntary manslaughter under Article 1 (§ 18.2-30 *et seq.*)", Va. Code § 19.2-297.1(A)(i)(a), "[a]ny malicious felonious assault or malicious bodily wounding under Article 4 (§ 18.2-51 *et seq.*)", Va. Code § 19.2-297.1(A)(i)(d), "conspiracy to commit any of the violations enumerated in clause (i) of this section", Va. Code § 19.2-297.1(A)(ii), and "violations as a principal in the second degree or accessory before the fact of the provisions enumerated in clause (i) of this section." Va. Code § 19.2-297.1(A)(iii). Additionally, "'[a]ct of terrorism' means. . . an act that would be an act of violence if committed within the Commonwealth committed within or outside the Commonwealth with the intent to

21

(i) intimidate a civilian population at large or (ii) influence the conduct or activities of a government, including the government of the United States, a state, or a locality, through intimidation." Va. Code § 18.2-46.4.

"*Nolle prosequi* shall be entered only in the discretion of the court, upon motion of the Commonwealth with good cause therefor shown", Va. Code § 19.2-265.3. Accordingly, Intervenor had filed a sworn affidavit with the Office of the Commonwealth's Attorney, in accordance with Va. Code § 19.2-217, Intervenor had presented a sworn affidavit with the Office of the Commonwealth's Attorney for the City of Norfolk, *see Webb v. Fatehi*, Case No. CL24-6029 (Norfolk Cir. 2024), as well as similar sworn affidavits to the Commonwealth's Attorney for the County of Arlington, *see Webb v. Dehghani-Tafti*, Civil Action Number 0132400074500 (Arlington Cir. 2024), *on appeal* Record Number 240599 (Va. 2024); *Webb v. Virginia State Bar*, Case No. 25-830 (Arlington Cir. 2025), *on appeal* Record No. TBD, and to the Commonwealth's Attorney for the City of Richmond, *see Webb v. Virginia League of Planned Parenthood (VLPP)*, Case No. CL24003707-00 (Richmond Cir. 2024), with respect to "a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a CBRN agent or agents, or a disease or condition that may be attributable to such agent or agents", 85 Fed.

22

Reg. 63, April 1, 2020. While these litigations have not reported in the free press, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office", *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971).

It is not "subject to reasonable dispute", Fed.R.Evid. 201(b), that, "[t]he term CBRN stands for 'chemical, biological, radiological and nuclear', and relates to specific hazards that may be encountered during an incident", and "[t]he term CBRN is *generally reserved for the deliberate release of a hazardous material* such as in a terrorist attack, whereas the term Hazmat is used for accidental release or exposure to toxic industrial material." Antony Calder & Steven Bland, *Chemical, biological, radiological and nuclear considerations in a major incident*, 33 Surg. (Oxf.) 9, pp. 442–448, August 6, 2015 (emphasis added).

### Conditions for Grant of Leave to Intervene

Pursuant to Fed.R.Civ.P. 24(a), "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Pursuant to Fed.R.Civ.P. 24(b), "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a

23

conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."

Pursuant to Fed.R.Civ.P. 24(b)(3), "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." "The Court must consider three factors to determine whether an application to intervene is timely: (1) the stage of the proceedings; (2) the reason for any delay in moving to intervene; and (3) whether the parties would be prejudiced." *EEOC v. ABM Indus. Inc.*, 249 F.R.D. 588 (E.D.Cal. March 5, 2008) (citing *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir.1996)). Furthermore, "[a] motion to intervene must be served on the parties as provided in Rule 5" and "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c).

### Temporary Restraining Order (TRO)

While a "court may issue a preliminary injunction only on notice to the adverse party", Fed. R. Civ. P. 65(a)(1), "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney

24

certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). "Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record." Fed. R. Civ. P. 65(b)(2). And, "[t]he order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." *Id.* "The reasons for an extension must be entered in the record." *Id.*

"If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character." Fed.R.Civ. P. 65(b)(3). "At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order." *Id.* "On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order." Fed.R.Civ.P. 65(b)(3). "The court must then hear and decide the motion as promptly as justice requires." *Id.*

### Preliminary Injunction

"In the course of representing a client a lawyer shall not knowingly: make a

25

false statement of fact or law; or fail to disclose a fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client." Rule of Professional Responsibility 4.1. "The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action." *Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. June 20, 1984). "Section 1985(3) similarly must be read in light of the principle that damages are designed to *compensate* persons for actual injuries." *Id.* (emphasis in original). Moreover, "[t]he fundamental requisite of due process of law is the opportunity to be heard", and *Grannis v. Ordean*, 234 U.S. 385 (1914), and that should occur "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545 (1965).

The historic injunctive process was designed to deter, not to punish." *Hecht Co. v. Bowles*, 321 U.S. 321 (1944). For this reason, granting exception in one matter with a "protracted history", *Webb v. Executive Office of the President (EOP)*, Civil Action No. 1:23-cv-00816 (D.D.C. May 14, 2024), the Congress had deemed it prudent, when creating "an express private right of action", *Citizens for Responsibility & Ethics in Washington v. DOJ* ("*CREW I*"), 846 F.3d 1235 (D.C. Cir. 2017)", to enact provisions in which, simply "[o]n complaint," a "district court. . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the

complainant." 5 U.S.C. § 552(a)(4)(B). Hence, "[i]t goes without saying that an injunction is an equitable remedy", and "[i]t 'is not a remedy which issues as of course,'" *Bowles*, 321 U.S. at 321 (quoting *Harrisonville v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334 (1933)), "or 'to restrain an act the injurious consequences of which are merely trifling.'" *Id.* (quoting *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296 (1900)).

"According to well-established principles of equity," some courts have articulated that a plaintiff seeking a permanent injunction. . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982); *Amoco Production Co.* v. *Gambell*, 480 U.S. 531 (1987). Other jurisdictions have determined, rather, that an aggrieved party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Nonetheless, "[t]he decision to grant or deny permanent injunctive relief is an act

of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *MercExchange, L.L.C.*, 547 U.S. at 388 (citing *Romero-Barcelo*, 456 U. S. at 305).

### *Irreparable Injury*

#### *Standing*

Claiming "an interest relating to the property or transaction", Fed. R. Civ. P. 24(a), with "a claim or defense that shares with the main action a common question of law or fact", Fed.R.Civ.P. 24(b), Intervenor is currently in an action, *see Webb v. Virginia State Bar*, Case No. CL25-830 (Arlington Cir. 2025), *on appeal*, Record No. 1556-25-4 (Va.App. 2025), naming the school board as a defendant, with respect to their purported "duty to our community of students, families and educators to defend the resources they deserve, and policies designed to protect students of all backgrounds". Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra*, and their refusal to respond to a request for documents, by letter, dated March 25, 2024, in which Intervenor had communicated to that "the State Health Commissioner declared COVID-19 a disease of public health threat on February 7, 2020". Mohammed Norman Oliver, *Order of Public Health Emergency*, June 8, 2020. And, as noted above, in exercise of his statutorily conferred right, Intervenor had reminded APS, with respect to "a CBRN agent or agents", 85 Fed. Reg. 63, *supra*, later confirmed to be a "chimeric virus", 42 CFR 73, November 17, 2021; *see also* Elizabeth W.

28

Wells & Michael T. Parker, *Chimeric Viruses Containing Select Agents: The Biology Behind Their Creation, Attenuation, and Exclusion From Regulation*, 21 *supra*, that, "to allow students to safely resume in-person instruction and progress in their education", the State Health Commissioner had issued an "Order requiring every public school division and preK-12 private school in Virginia, before reopening in accordance with Phase II and III guidelines, to submit to the Virginia Department of Education a plan outlining their strategies for mitigating the spread and public health risk of COVID-19 and consistent with the Centers for Disease Control and Prevention and Virginia Department of Health mitigation recommendations", and "[s]uch plans shall include policies and procedures for the use of face coverings; health screenings of staff and students; physical distancing measures; enhanced hygiene practices for staff and students; isolation of symptomatic cases; and cleaning and disinfecting procedures and other topics as outlined in the Phased Guidance for Virginia Schools." Mohammed Norman Oliver, *Order of Public Health Emergency*, June 8, 2020.

Similarly, claiming "an interest relating to the property or transaction", Fed. R. Civ. P. 24(a), with "a claim or defense that shares with the main action a common question of law or fact", Fed.R.Civ.P. 24(b), Intervenor is currently in a display action, under the *Establishment Clause*, directly challenging a decision, purportedly an exercise of free speech, when a staff member had presented a

29

briefing on the nonbinary student policy at a regularly scheduled meeting of the school board. *See Webb v. Washington Post,* Case No. CL24002622-00 (Richmond Cir. 2024), *on appeal* Record No. TBD (Va. App. 2025).

In the interim, "[a] federal judge [had] dismissed lawsuits against the U.S. Department of Education by two Virginia school districts over transgender bathroom policies, citing procedural issues and setting an uncertain path forward for the debate." Karina Elwood, "Judge dismisses Va. school districts' lawsuits against Education Dept.," *Washington Post*, September 6, 2025. And, while the Trial Court had "'unconditionally recognize[d] that *Grimm* 'remains the law of this Circuit'"", *Id.*, "'[t]he court [had] denie[d] plaintiffs' motions and dismisse[d] the complaints for lack of subject matter jurisdiction because, pursuant to the *Tucker* Act, jurisdiction appropriately lies with the Court of Federal Claims,' Judge Rossie D. Alston Jr. wrote." Dan Egitto, "Federal judge dismisses APS lawsuit over Education Dept. funding," September 8, 2025.

Still, just as "[t]oday, education is perhaps the most important function of state and local governments", *Brown*, 347 U.S. at 483, "[s]tanding 'is perhaps the most important of jurisdictional doctrines'". T*aitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at \*1–32 (S.D. Miss. Mar. 31, 2015) (quoting *U.S. v. Hays*, 515 U.S. 737 (1995) (internal citations omitted)). "Standing is a threshold requirement because it derives from the

30

*Constitution's* limit on. . . courts' authority to resolve 'cases' and 'controversies.'"

*Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274 (7th Cir. 2020) (quoting

*Const.*, Art. III, § 2, Cl. 1). "Standing is 'essential;' without it, . . . courts have no

subject-matter jurisdiction over a case", *Maly v. Pritzker*, 22-cv-04778 (N.D. Ill.

Sep. 30, 2024), and "there is no exception to the necessity of standing, even if the

plaintiffs argue that a government action would otherwise be exempt from

challenge." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013))[6].

"'As an incident to the elaboration of' the case-or-controversy requirement,

'[we have] always required that a litigant have 'standing' to challenge the action

sought to be adjudicated in the lawsuit.'" *Barber v. Bryant*, 860 F.3d 345 (2017)

(quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church &

State, Inc.*, 454 U.S. 464 (1982)). "The Judicial Branch may not 'accept for

adjudication claims of constitutional violation ... where the claimant has not

suffered cognizable injury.'" *Id.* (quoting *Ibid.*)

Hence, "the irreducible constitutional minimum of standing contains three

elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). "First, the plaintiff

must have suffered an injury in fact—an invasion of a legally protected interest

---

[6] "[T]he assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Id.* (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)).

which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical", and "[s]econd, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Id.* "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber*, 860 F.3d at 345 (quoting *Winter*, 555 U.S. at 7). And where plaintiffs demonstrate no "injury-in-fact", of operational necessity, "[i]t follows that '[w]e do not—indeed, we may not—reach the merits of the parties' [constitutional] arguments.'" *Id.* (quoting *Hotze v. Burwell*, 784 F.3d 984 (5th Cir. 2015).

"Any parent, custodian, or legal guardian of a pupil attending the public schools in a school division who is aggrieved by an action of the school board may, within thirty days after such action, petition the circuit court having jurisdiction in the school division to review the action of the school board". Va. Code § 22.1-87. No person with standing had brought suit on the issue of school closures, nonmedical grade facial coverings mandates or even the "the

32

authorization of emergency use of drugs and biological products during the COVID–19 pandemic, pursuant to section 564 of the *FD&C Act*". 85 Fed. Reg. 63, *supra*.

"The question of whether a. . . [person], standing *in loco parentis*, may claim parental immunity from liability for personal injuries sustained", in this context "is a matter of first impression with this court", and prior to *Smith v. Kauffman, Adm'r.*, 212 Va. 181 (1971), "parental immunity had been a complete defense to any personal injury action brought by a child against his parent." *Lyles v. Jackson*, 216 Va. 797 873 (April 23, 1976) (citing *Norfolk Southern R. R. v. Gretakis*, 162 Va. 597 (1934)). "The basis for the rule was that litigation by a child against his parent would tend to disturb the peace and tranquility of the home or disrupt the family finances"; "[m]oreover, such litigation might tend to promote collusion and corruption." *Id.* "This same reasoning applies to one standing *in loco parentis*." *Id. See also Fountain v. Fountain*, 214 Va. 347 (1973).

Nonetheless, had such been timely challenged by any parent, custodian or legal guardian, "[s]uch review shall proceed upon the petition, the minutes of the meeting at which the school board's action was taken, the orders, if any, of the school board, an attested copy of the transcript, if any, of any hearing before the school board, and any other evidence found relevant to the issues on appeal by the court", and "[t]he action of the school board shall be sustained unless the school

33

board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion." *Id.*

However, when the Office for Civil Rights (OCR) had "called for APS, Fairfax County Public Schools, Alexandria City Public Schools, Loudoun County Public Schools and Prince William County Public Schools to take. . . actions", "Arlington Public Schools spokesperson Frank Bellavia" had issued a statement: "'APS remains committed to providing all students with safe, supportive and inclusive learning environments.'" Dan Egitto, "Education Department pushes APS to strike transgender policy, alleging Title IX discrimination," *ARL Now*, July 25, 2025.

### *Inadequacy of Monetary Damages*

Like Appellant, Intervenor is not a "parent, custodian, or legal guardian of a pupil attending the public schools in a school division". Va. Code § 22.1-87. Nor, unlike Appellant, does he claim he possesses cognizably "a duty to our community of students, families and educators to defend the resources they deserve, and policies designed to protect students of all backgrounds". Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra*. However, under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), "[f]or the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society", and "[s]ome occupy

34

positions of such persuasive power and influence that they are deemed public figures for all purposes"; however, far "[m]ore commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved", and "they invite attention and comment." *Id.* (citation omitted).

While it may be sufficient for voters, and in political fundraising appeals, "[t]he mere fact that. . . [a person] spoke twice in public hearings. . . is not determinative", especially where "his use of the public forum substantially resulted from his desire to protect his private interests." *Id.* "In *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), the Court held that resort to the judicial process in order to vindicate private rights did not make the plaintiff a public figure", and "[t]his reasoning appears equally applicable" where a person had only "resorted to an administrative body in order to protect the value of his own residence", or his own personal interests. *Id.*

Courts have also found of at least probative value instances where persons had "discussed the. . . proposal with the media", or had "attempt[ed] to organize or lead opposition". *Id.* (citing *Wolston v. Reader's Digest, Inc.*, 443 U.S. 157 (1979). It is well established that Relator is a political candidate, who, of report, who has "floated around the periphery of the Northern Virginia political scene for nearly the past decade". Scott Broadbeck, "Morning Notes: Candidate Adds Military

35

Rank to His Name," *ARL Now*, June 10, 2021. *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007), articulates a timing/knowledge test to determine whether conduct is retaliatory, and, under this rule, the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time of [the same]". *Id.*

Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor". *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)). Moreover, "[o]nce the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

Actual malice, "exists when the defendant knowingly" commits misconduct, or when engaged in action with "reckless disregard", *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and "mere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding it." *Luteran v. U.S.*, 93 F.2d 395 (8th Cir. 1937)

36

(citing *Burkhardt v. U.S.*, 13 F.2d 841 (6th Cir. 1926)). "A defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of 'withdrawal, abandonment, or defeat of the conspiratorial purpose.'" *U.S. v. Heard*, 709 F.3d 413 (5th Cir. 2013) (citation omitted), and "[m]ere cessation of activity in furtherance of the conspiracy is not sufficient to show withdrawal." *Id. (citing U.S. v. Torres*, 114 F.3d 520 (5th Cir.1997) (citing *U.S. v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)). Moreover, "evidence of . . . flight. . . [is] admissible even if offered solely to prove his consciousness of guilt as to that predicate act", *U.S. v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990); *see also* Sherry Gaba, "Understanding Fight, Flight, Freeze and the Fawn Response," *Psychology Today*, August 22, 2020[7].

"The distinguishing mark of a 'manifestly unlawful order' should fly like a black flag above the given order, as a warning reading 'Prohibited!'" *General of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of Israel, 1961) (quoting *Chief Military Prosecutor v. Melinki, et al.* (13 Pesakim Mehoziim, p. 90)), and "[i]t is to be pointed out here that even the jurists of the Third Reich did not dare to put on paper that obedience to orders is above all". *Id.* "[I]f the gentleman[, or lady,] had

---

[7] Medical science has determined that "[t]he most well-known responses to trauma are the fight, flight, or freeze responses", and science has evolved to recognize "a fourth possible response, the so-called fawn response." Id. Moreover, "[f]light includes running or fleeing the situation, fight is to become aggressive, and freeze is to literally become incapable of moving or making a choice." *Id.*

37

believed this decision to be favorable to him [or her], we should have heard of it in the beginning. . . , for the path of inquiry in which he was led him directly to it". *U.S. v. Burr*, 25 F. Cas. 55 (C.C.D. Va. 1807).

"A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth". *Com. v. Manigo*, 2010 WL 468084 (Va.Cir.Ct. 2010). "[T]he ultimate purpose of the judicial process is to determine the truth", *Caldor, Inc. v. Bowden*, 330 Md. 632 (1993), and "[w]e who are seeking truth and not victory, whether right or wrong, have no reason to turn our eyes from any source of light which presents itself, and least of all from a source so high and so respectable as the decision of the supreme court of the United States." *Burr*, 25 F. Cas. at 55. "The term 'moral turpitude' refers to behavior 'that shocks the public conscience as being inherently base, vile, or depraved'," *Uribe v. Sessions*, 855 F.3d 622 (4th Cir. 2017) (quoting *Mohamed v. Holder*, 769 F.3d 885, 888 (4th Cir. 2014)(citations omitted).

On similar facts, one tribunal considering crimes against humanity had concluded that "[t]he excuse given by the Accused in his evidence (Session 81, Vol. IV, p. xxxx5), that all he did was to pass on a message which he received from Cracow, is not plausible," concluding that "undoubtedly he knew the value of the tale about 'administration of tonics,' to which he put his signature." *Eichmann*,

38

36 I.L.R. at 5. "All we say to America is to be true to what you said on paper." Martin Luther King, Jr., *I've Been to the Mountaintop*, April 3, 1968.

### *Balance of Hardships and Public Interest*

"No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts", and "[t]he imminence of such a prosecution, even though alleged to be unauthorized, and, hence, unlawful, is not, alone, ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid", *Beal v. Missouri Pacific Railroad Corp.*, 312 U.S. 45 (1941). "[F]reedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hard-headed fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subjects to proselying (*sic*) pressures." *Hall v. Commonwealth*, 188 Va. 72 (1948).

The *First Amendment*, applicable to the States through the *Fourteenth Amendment*, commands that Congress shall make no law abridging the freedom of speech or freedom of assembly", *Norfolk 2nd Amendment Preservation Coalition v. City of Norfolk*, 106 Va. Cir. 215 (October 30, 2020) (citation omitted), and "[t]o establish a *First Amendment* freedom of speech or freedom of assembly violation against the government, the plaintiff must prove that government action prohibited the plaintiff from speaking or assembling." *Id.* (citing *Ibid.*). However, "when the

39

Government has intentionally designated a place or means of communication as a public forum", ", like an election, "speakers cannot be excluded without a compelling governmental interest", *Cornelius v. NAACP Leg. Def. and Educ. Fund*, 473 U.S. 788 (1985); "[a]ccess to a nonpublic forum, however, can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37 (1983)).

"A person shall be immune from tort liability if the tort claim is based solely on statements (i) regarding matters of public concern that would be protected under the *First Amendment* to the *Constitution* of the United States made by that person that are communicated to a third party," Va. Code § 8.01-223.2(A), and such "immunity provided by this section shall not apply to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." Va. Code § 8.01-223.2(B). Even if Appellant may possess "strongly held opinions", merely "beliefs cannot support his lawsuit for negligence and fraud, among other claims against The Post." WAPO Demurrer, *Webb v. Washington Post*, Case No. CL24002622-00, p. 2 ¶ 3 (Richmond Cir. June 30, 2025). *A priori*, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office", *Monitor Patriot Co.*, 401 U.S. at 265.

40

And, in irreparable harm, "[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", *Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d at 823 (quoting *Burns*, 427 U.S. at 347).

## Conclusion

"[T]he court shall expedite the consideration of. . . any action for temporary or preliminary injunctive relief," while, "[f]or purposes of this subsection, 'good cause' is shown if a right under the *Constitution of the United States* or a Federal Statute. . . would be maintained in a factual context that indicates that *a request for expedited consideration has merit*." 28 U.S.C. § 1657(a) (emphasis added). "'The lack of subject matter jurisdiction cannot be waived,' 'cannot be conferred on a court by the litigants,' and 'may be raised at any time.'" *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors*, 285 Va. 87 (Va. 2013) (quoting *Virginian–Pilot Media Cos., LLC v. Dow Jones & Co., Inc.*, 280 Va. 464 (2010). "[T]he want of such jurisdiction of the trial court will be noticed by this [C]ourt *ex mero motu*", *Afzall v. Commonwealth*, 273 Va. 226 (2007); "[a] judgment or order entered by a court that lacks jurisdiction of the subject matter is a nullity." *Virginian–Pilot*, 280 Va. at 464.

"On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)",

41

Fed.R.Civ.P. 11(c), but the Court has not done so. "A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)", and "must be served under Rule 5 , but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed.R.Civ.P. 11(c)(2). In actual notice, in the Trial Court action, Intervenor had advised Appellant with respect to its conduct, which Appellant brazenly ignored.

Pursuant to Fed.R.Civ.P. 24(a), "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Pursuant to Fed.R.Civ.P. 24(b), "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."

Pursuant to Fed.R.Civ.P. 24(b)(3), "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." "The Court must consider three factors

to determine whether an application to intervene is timely: (1) the stage of the proceedings; (2) the reason for any delay in moving to intervene; and (3) whether the parties would be prejudiced." *EEOC v. ABM Indus. Inc.*, 249 F.R.D. 588 (E.D.Cal. March 5, 2008) (citing *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir.1996)). Furthermore, "[a] motion to intervene must be served on the parties as provided in Rule 5" and "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c). In unconditional right, or, in the alternative, with the Court's discretion, Intervenor is entitled to grant of leave to enjoin Appellant in the above referenced litigation, and to seek a temporary restraining order, in accordance with Fed.R.Civ.P. 65.

**WHEREFORE**, under attestation provided in Va. Code § 8.01-271.1, for the reasons above, Intervenor, invoking strict scrutiny, as a member of a suspect class, in redress of violations of a substantive right, *Gray*, 274 Va. at 290, should prevail, and the Trial Court should grant this motion for judgment on the pleadings, and should grant to Intervenor such other equitable and statutory relief as deemed proper by the Reviewing Court, to include imposing sanctions.

Respectfully submitted,

Major Mike Webb, *Pro Se*
3445 Washington Boulevard, Apartment # 306

43

Arlington, Virginia 22201
Phone: (856) 220-1354
Email: Mike.Webb84@gmail.com
October 30, 2025

USCA4 Appeal: 25-2107 Doc: 43 Filed: 10/06/2025 Pg: 46 of 160

# TABLE OF EXHIBITS

## Exhibit A

## Exhibit A



*935 S Columbus Street, #426*
*Arlington, Virginia 22204*
*(802) 468-7589*
*GiveFaithATry@gmail.com*

May 31, 2021

Joseph Biden
President of the United States
Attention: FOIA Team
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20006

Hon. Xavier Becerra
Secretary
Department of Health and Human Services
Attention: Brandon Gaylord, FOIA Officer
Hubert H. Humphrey Building, Room 729H
200 Independence Avenue, SW
Washington, D.C. 20201

Janet Woodcock, M.D.
Director
Attn: FOIA Team
Food & Drug Administration (FDA)
5630 Fishers Lane Room 1061
Rockville, Maryland 20857

Rochelle P. Walensky, M.D.
Director
Attention: FOIA Team
Centers for Disease Control & Prevention
(CDC)
1600 Clifton Rd NE
Atlanta, Georgia 30329

Anthony Fauci, M.D.
Director
National Institute for Allergy & Infectious
Disease (NIAID)
5601 Fishers Lane, MSC 9806
Rockville, MD 20852

Mohammed Norman Oliver, M.D.
State Health Commissioner
Attn: John Hilbert, FOIA Officer
Virginia Department of Health (VDH)
P.O. Box 2448
Richmond, Virginia 23218-2448

Channing D. Phillips, Esq.
United States Attorney's Office-
District of Columbia
Judiciary Center Building
555 4th Street NW
Washington, District of Columbia 20530

Raj Parekh, Esq.
United States Attorney's Office-
Eastern District of Virginia
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314

**RE: *FOIA* Regarding Intriguing Failure to Update the Select List of Toxins and Agents**

Greetings in Pandemic End-Ex:

As we pause to observe the sacrifices of our men and women who rendered service to this
nation in defense of our freedoms and the nation's interests around the world, we would be

-1-

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of October 2025, that I will transmit and deliver this **Emergency Intervenor Motion for Temporary Restraining Order (TRO) & Preliminary Injunction** by hand delivery and/or mail and/or email to the following parties, named in suit.

Timothy Heaphy, Joshua Mitchell, Fiona L. Carroll, & Lindsay Hemminger, Esqs.
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Telephone: (202) 303-1000
Email: theaphy@willkie.com;
jmitchell@willkie.com;
fcarroll@willkie.com;
lhemminger@willkie.com

Breanna Smith-Bonsu, & Chloe Smeltzer, Esqs.
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Telephone: (312)728-9000
Email: bsmith-bonsu@willkie.com;
csmeltzer@willkie.com

Matthew James Mezger, Esq.
Assistant U.S. Attorney
Office of the U.S. Attorney
601 D Street, N.W.
Washington, District of Columbia 20530
Telephone:
Email:

Abhishek Kambli, Esq.
Deputy Associate Attorney General
Office of the Attorney General
950 Pennsylvania Ave NW
Suite 7141
Washington, District of Columbia 20530
Telephone:
Email:

Garry Daniel Hartlieb, Esq.
U.S. Department of Justice Civil Division, Federal Programs
1100 L St. NW
Washington, District of Columbia 20005
Telephone:
Email:

46

Respectfully submitted,

Major Mike Webb
3445 Washington Boulevard, Apartment #306
Arlington, Virginia 22204
Phone: (856) 220-1354
Email: mike.webb84@gmail.com
Date: September 30, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**ARLINGTON SCHOOL BOARD**
**Appellant**

**v.**

**LINDA McMAHON, in her official capacity as Secretary of Education of the United States, and UNITED STATES DEPARTMENT OF EDUCATION,**
**Appellees.**

**Memorandum of Points & Authorities**
**in Support of Emergency Intervenor Motion**
**for Temporary Restraining Order (TRO)**
**And Preliminary Injunction**

**From the U.S. District Court for the Eastern District of Virginia**
**Civil Action No. 1:25-cv-01434-RDA-LRV**

**Rossie D. Alston, Jr., Federal District Judge**

Major Mike Webb
3445 Washington Boulevard
Apartment # 306
Arlington, VA 22201
Phone: (856) 220-1354
Email: Mike.Webb84@Gmail.com
Petitioner-Appellant in *Pro Se*

USCA4 Appeal: 25-2107      Doc: 43      Filed: 10/06/2025      Pg: 50 of 160

# TABLE OF CONTENTS

Table of Contents.................................................................................... i

Emergency Intervenor Motion for Temporary Restraining Order (TRO) &
Preliminary Injunction .......................................................................... 2

    Statement of Facts ................................................ **Error! Bookmark not defined.**

      Unconditional Right .......................................... **Error! Bookmark not defined.**

    Conditions for Grant of Leave to Intervene ......... **Error! Bookmark not defined.**

    Temporary Restraining Order (TRO) ................. **Error! Bookmark not defined.**

    Preliminary Injunction ......................................... **Error! Bookmark not defined.**

      Irreparable Injury ............................................. **Error! Bookmark not defined.**

      Inadequacy of Monetary Damages ................... **Error! Bookmark not defined.**

      Balance of Hardships and Public Interest ......... **Error! Bookmark not defined.**

      Public Interest .................................................. **Error! Bookmark not defined.**

      Likelihood of Success....................................... **Error! Bookmark not defined.**

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF EMERGENCY INTERVENOR MOTION FOR TEMPORARY RESTRAINING ORDER (TRO) & PRELIMINARY INJUNCTION

### Values Instruction

"[T]he great expenditures for education. . . demonstrate our recognition of the importance of education to our democratic society." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954). "It is required in the performance of our most basic public responsibilities, even service in the armed forces"; "[i]t is the very foundation of good citizenship." *Id.* "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.*

While "[s]uch an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms", *Id.*, Appellant has focused only upon the *dicta* noting how "it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Id.* Yet, even to the extent that "[o]ur *Constitution* was made only for a moral and religious People", deemed to be "wholly inadequate to the government of any other", John Adams, *Address to Massachusetts Militia*, October 11, 1798, "[i]n a free government, the security for civil rights must be the same as for religious rights". James Madison, *The Federalist No. 51*, February 6, 1788.

2

"[R]eligion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, & not opinions," an idea that had "contemplate[d] with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between Church & State". Thomas Jefferson, *Letter to Danbury Baptist Association*, January 1, 1802. "[I]n the one case in the multiplicity of interests, and in the other, in the multiplicity of sects", in an "extended republic", one Founder had espoused the notion that "[t]he degree of security in both cases will depend on the number of interests and sects; and this may be presumed to depend on the extent of country and number of people comprehended under the same government." James Madison, *The Federalist No. 51, supra.*

Hence, "'if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the *Constitution*'". *Jacobson*, 197 U.S. at 11 (quoting *Mugler v. Kansas*, 123 U.S. 623 (1887); *Minnesota v. Barber*, 136 U.S. 313 (1890); *Atkin v. Kansas*, 191 U. S. 207 (1907)). "If there is any fixed star in our constitutional constellation,

3

it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein", *West Virginia State Bd. of Educ. v. Barnett*, 319 U.S. 624 (1943), and "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds", "*Stanley v. Georgia*, 394 U.S. 557 (1969). Furthermore, "[w]hen the Supreme Court has invalidated a statute because of an illegitimate purpose, '[i]n each case, the government's action was held unconstitutional only because *openly available data supported a commonsense conclusion that a religious objective permeated the government's action.*" *Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009), *aff'd* 624 F.3d 157 (5th Cir. 2010) (quoting *McCreary County v. ACLU*, 545 U.S. 844 (2005)) (emphasis added).

Nonetheless, "[t]he purpose requirement is rarely determinative, 'presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion.'" *Id.* (quoting *Ibid.*). And, while, at APS, "[s]tudents utilize appropriate pronouns when engaging classmates and teacher(s)", implementing a policy that "prohibits discrimination on the basis of race, national origin, creed, color, religion, gender, age, economic status, sexual orientation, marital status, genetic information, gender identity or expression, and/or disability", seeking to "provide[] equal access to courses and programs,

4

counseling services, physical education and athletics, vocational education, instructional materials and extra-curricular activities", Editors, 2 DEI 10, May 8, 2023, "[u]nder our *Constitution*, [even] anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent", providing "*a shield from the tyranny* of the majority." *McIntyre v. Ohio Elections Comm'n (93-986)*, 514 U.S. 334 (1995) (emphasis added); *see generally* J. Mill, *On Liberty and Considerations on Representative Government* 1, 3-4 (R. McCallum ed. 1947), clearly not applicable at APS with regard to its nonbinary policy.

"It thus exemplifies the purpose behind the *Bill of Rights*, and of the *First Amendment* in particular: *to protect unpopular individuals from retaliation*-and their ideas from suppression-at the hand of an intolerant society", and, even in secrecy of ballot choice, protected within the restricted confines of a polling precinct, "[t]he right to remain anonymous may be abused when it shields fraudulent conduct"; however, "political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." *Id. See also Abrams v. U.S.*, 250 U.S. 616 (1919) (Holmes, J., dissenting). Moreover, while "people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life", *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, Civil No. 2:11-

5

CV-15481, 2013 WL 3148272 (E.D. Mich. June 19, 2013) (citing : *Nuxoll Ex Rel.*

*Nuxoll v. Indian Prairie Sch. Dist.*, 523 F.3d 668 (7th Cir. 2008)) (citing *R.A.V. v.*

*City of St. Paul*, 505 U.S. 377 (1992) & *Boos v. Barry*, 485 U.S. 312 (1988)), a

"[l]isteners' reaction to speech is not a content-neutral basis for regulation."

*Forsyth Cnty. v. Nationalist Movement*, 550 U.S. 123 (1992) (citations omitted).

*Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503 (1969), generally

applied, "straight-forwardly tells us that, in order for school officials to justify

prohibition of a particular expression of opinion, they must be able to show that

this 'action was caused by something more than a mere desire to avoid the

discomfort and unpleasantness that always accompany an unpopular viewpoint.'"

*Glowacki*, Civil No. 2:11-CV-15481, *supra* (quoting *Nuxoll*, 523 F.3d at 668

(Rovner, J., concurring) (quoting *Tinker*, 393 U.S. at 503)). With respect to just

free speech, "[s]imply put, the law does 'not establish a generalized 'hurt feelings'

defense to a high school's violation of the *First Amendment* rights". *Id.* (quoting

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874 (7th Cir.2011)).

### Churning

"Timothy Heaphy", "based in Willkie's Washington, DC office", "is a

partner in Willkie's Litigation Department, and Co-Chair of the Investigations &

Enforcement Practice." Editors, "Timothy Heaphy: Partner, Litigation," *Wilkie*,

https://www.willkie.com/professionals/h/heaphy-timothy (accessed September 27,

6

2025). "Tim has extensive experience in complex government investigations, compliance, crisis management and white-collar litigation, developed in public service, in-house and private law firm practice", and "[h]is clients include private companies and public entities across a wide array of industries facing federal investigations, as well as business and reputational crises." *Id.* "Tim is a well-known commentator on government investigations and enforcement topics", and "[h]e has been a frequent guest on broadcast radio and television networks, including MSNBC, CNN, CBS, ABC and NPR, and has been interviewed in leading business publications such as The New York Times, Washington Post, and The Wall Street Journal, among others." *Id.*

Similarly, "Josh Mitchell is an experienced regulatory and appellate litigator and a member of Willkie's Regulatory Litigation Practice Group and the Strategic Motions & Appeals Practice Group. He is based in the Firm's Washington, DC office", and "Josh offers comprehensive legal strategy to address clients' regulatory issues—including regulatory challenges, rulemaking comments, and court challenges under state and federal administrative-procedure acts." Editors, "Joshua N. Mitchell: Counsel, Litigation," *Wilkie*, https://www.willkie.com/professionals/m/mitchell-joshua (accessed September 27, 2025). "He regularly represents clients in investigations, adjudications, and litigation before and involving DOJ, EPA, FDA, ITC, CFPB, USPTO, and other

7

federal agencies", and "Josh also has an active appellate practice spanning multiple industries and subject matters, which has involved successfully representing clients before the U.S. Supreme Court and state and federal appellate courts"; "Josh's experience includes providing strategic advice during trials to preserve favorable issues for appellate review." *Id.*

Yet, Fiona L. Carroll and Lindsay Hemminger, associates in the D.C. Office, and Breanna Smith-Bonsu and Chloe Smeltzer, associates in the Chicago Office, had been brough in, seeking *pro hac vice* admission, to prepare just a 30-page complaint on a preliminary injunction and temporary restraining order, *See* Compl., pp. 30-31, in a matter commenced on August 29, 2025 and dismissed, with explicit instructions stating that "jurisdiction appropriately lies with the Court of Federal Claims,' Judge Rossie D. Alston Jr. wrote." Dan Egitto, "Federal judge dismisses APS lawsuit over Education Dept. funding," September 8, 2025.

"By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or

8

by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." Fed.R.Civ.P. 11(b).

"On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)", Fed.R.Civ.P. 11(c); and while, as of September 16, 2025, retained counsel have filed 11 pleadings on appeal, including motions for *pro hac vice* admission, Editors, "Arlington School Board v. Linda McMahon," *Case Monitor*, September 16, 2025, Intervenor had, as in evidence at Exhibit A, on September 6, 2025, had advised retained counsel with respect to their untoward actions, and had signaled his intention to intervene, therefor, in the still pendent action in the Trial Court; however, undaunted, after dismissal, the school board published a press release, to announce that "Arlington Public Schools maintains a non-discrimination policy and transgender student procedures that allow students to use restrooms and locker rooms that align with their gender identity", and to state that "[o]n Sep. 10, 2025, APS appealed the jurisdictional dismissal in order to protect funding for essential student services." Press Release, "Arlington Public Schools Files Appeal on Court

Decision Related to Title IX," *APSVA*, September 13, 2025.

"Our decision to appeal is to protect funding for essential services—free meals, counseling, and academic support—for the students who rely on them most." *Id.* However, "[g]ood motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight." *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (citation omitted). "In short, good faith would be presumed in the absence of a showing to the contrary in the manner permitted by our cases." *University of California Regents v. Bakke*, 438 U.S. 265 (1978) (citations omitted).

Just "three hallowed words reverently dictate what you ought to be, what you can be, what you will be", serving as "your rallying points: to build courage when courage seems to fail; to regain faith when there seems to be little cause for faith; to create hope when hope becomes forlorn". Douglas MacArthur, *Sylvanus Thayer Award Acceptance Address*, May 12, 1962. And, all parties to an action possess a "duty to mitigate damages and minimize losses", *Rev-Lyn Contracting Co. v. Patriot Marine*, LLC, 760 F. Supp. 2d 162 (D. Mass. 2010) (citation omitted).

Moreover, "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is

10

responsible for the violation." Fed.R.Civ.P. 11(c)(1). "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.* "A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)", and "must be served under Rule 5 , but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed.R.Civ.P. 11(c)(2).

"If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." *Id.* At least in the Commonwealth of Virginia, if a defendant has a duty to speak, he or she must, and, as the Court observed in *Hill v. Woodward*, 78 Va. 765 (1884):

> By her conduct, as disclosed by the record, the appellant is estopped from questioning the verity of the record. Her evident knowledge of the pendency of this suit and its object, her seeming acquiescence, and her delay and refusal to speak, though not served with notice in the regular way, makes it proper for her to remain silent now that others have acquired rights while she was standing by in silence, if not in actual acquiescence. It was not only competent for her to speak in time and be made a party if she had not been, but it was her duty.

Generally, "[a]bsent aggravating or mitigating circumstances, and upon application of the factors set out in Rule 15.02[1]," Tex. R. Disc. P. 15.07, an

---

[1] "In imposing a sanction after a finding of Professional Misconduct, the disciplinary tribunal should consider the following factors: (a) the duty violated;

11

attorney may be subject to sanctions, to include disbarment, suspension or reprimand, for, *inter alia*, "cases involving false or misleading communication about the lawyer or the lawyer's services", and "unconscionable, illegal, or improper fees", "improper withdrawal from representation", "failure to supervise" and/or "improper conduct in the role as advisor or evaluator." Under Tex. R. Disc. P. 1.04, "[a] lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee", and "[a] fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable."

In the District of Columbia, "[a] lawyer's fee shall be reasonable", and "factors to be considered in determining the reasonableness of a fee include. . . [t]he time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; . . . [t]he likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; . . [t]he fee customarily charged in the locality for similar legal services; . . . [t]he amount involved and the results obtained; . . . "[t]he limitations imposed by the client or by the circumstances; . . . [t]he nature and length of the professional relationship with the client"; and "[t]he experience, reputation, and ability of the lawyer or lawyers performing the

---

(b) the Respondent's level of culpability; (c) the potential or actual injury caused by the Respondent's misconduct; and (d) the existence of aggravating or mitigating factors." Rule 15.02.

12

services. R. Prof'l. Cond. 1.5(a).

"Arlington Public Schools is going to court over a $23 million freeze in funding from the U.S. Department of Education", and "[t]he school system filed a 30-page complaint. . . challenging the Department of Education's decision to designate APS and four other Northern Virginia school systems as 'high risk' because of a legal dispute about their policies around transgender students." Dan Egitto, "DEVELOPING: APS challenges freeze on $23M in federal funding over transgender policy," *ARL Now*, August 29, 2025. While almost 30 residents had appeared to make a two-minute speech at the last meeting of the school board, including "Vell Rives (APS parent and School Board Candidate)", the "President of Equality Arlington", "Monique Bryant (APS parent and School Board Candidate)", "Winsome Earl Sears (Candidate for Governor, current Lt. Gov)" and "[f]ormer school board member, [Christina] Diaz-Torres," most raising their voices, briefly, and symbolically, in support of the current school board, today, as the school board asserts that "'the Department's funding freeze violates Title IX, the *Administrative Procedures Act*, and the Spending Clause of the U.S. Constitution,'" according to "Superintendent Francisco Durán and School Board Chair Bethany Zecher Sutton", "in a letter to parents", to raise this complaint, not brought by any parent, that "'the Department is incorrectly interpreting Title IX'", the cash-strapped municipal authority has retained a law firm outside the

13

Commonwealth of Virginia that is "recognized among the top 10 firms on The American Lawyer's A-List," which "has continued to place among the industry's elite firms in 2024, ranking 9th among the market leaders 'that are operating on all cylinders, showing high performance not just on financial metrics, but across talent, diversity and social responsibility as well'" and that has "climbed 22 spots since 2019, including four places in the last year alone", as "highlighted" by *The American Lawyer* for "emergence as an A-List standout". Editors, "Willkie Ranked as a Top 10 Firm in *The American Lawyer's* 2024 A-List" *Wilkie*, August 6, 2024.

"The A-List recognizes the most well-rounded firms that have achieved strong financial results while affirming their bedrock values", and "*The American Lawyer* ranks firms based on a combination of five factors: revenue per lawyer, pro bono commitment, associate satisfaction, racial diversity and the percentage of equity partners who are women, with revenue per lawyer and pro bono given double weight"; "[e]ach metric measures Am Law 200 firms' relative performance, with a firm's score in a given category being based on its ranking among all 200 firms." *Id.* "The well renowned law firm DLA Piper ha[d] reached a confidential settlement in its highly controversial suit stemming from unpaid legal fees", Editors, "DLA Piper Settles $22.5M Suit Over Accused Overbilling of Legal Bills," *Legal Fee Advisors*, August 20, 2014.

14

"The duly appointed or elected members shall constitute the school board",

and "[e]very such school board is declared a body corporate and, in its corporate

capacity, is vested with all the powers and charged with all the duties, obligations

and responsibilities imposed upon school boards by law and may sue, be sued,

contract, be contracted with and, in accordance with the provisions of this title,

purchase, take, hold, lease and convey school property, both real and personal."

Va. Code § 22.1-71. "School board members appointed or elected by district or

otherwise shall have no organization or duties except such as may be assigned to

them by the school board as a whole." *Id.*

And, while the Fourth Circuit, with respect to "peculiar institution", *See*

Kenneth Stampp, *The Peculiar Institution: Slavery in the Ante-Bellum South*, New

York: Vintage Books (1956); Frederick Douglass, *American Anti-Slavery Society*,

Boston (May 10, 1865), had "held for further examination and study the cases of

twenty six additional Negro students as to whom the denial of transfers to white

schools by the County School Board of Arlington County was approved by the

District Judge", "find[ing] evidence in the record that their applications for transfer

were subject to tests that were not applied to the applications of white students

asking transfers", *Hamm v. Cty. Sch. Bd. of Arlington Cty., Va.*, 264 F.2d 945 (4th

Cir. March 19, 1959), clearly, today, at least as to non-Black litigants, "'Arlington

County Public Schools' is not a legal entity with the power to be sued", *see M.S. v.*

15

*Fairfax County School Bd.*, 2006 WL 721372 (E.D. Va. Mar. 20, 2006); *but see Cheski v. Arlington Cty. Pub. Sch.*, 16 Va. App. 936 (August 24, 1993); *Schweitzer v. Arlington Cty. Pub. Sch.*, Civil Action No. 1:23-cv-01747 (E.D.Va. February 27, 2024); *Natal v. Arlington Cty. Pub. Sch.*, Civil Action No. 1:18-cv-01178 (E.D.Va. June 12, 2019), just as a legal entity named "School Board for the County of Arlington" does not exist. *Doe v. Sch. Bd. For the Cy of Arlington*, Civil Action No. 1:20-cv-00817 (E.D.Va. November 30, 2020). *But see* Exhibit **B**. Only "[i]n the absence of fraud or a special relationship between them, which is not alleged, publishers owe no duty of due care to readers or to the public at large", and "[n]o cause of action therefore arises (absent fraud) even if published information is false and the falsity results in injury to the plaintiff when the plaintiff. . . is merely a reader or member of the public." *McMillan v. Togus Regional Office, Dept. of Veterans Affairs*, 120 Fed.Appx. 849 (2005) (citing *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175 (2d Cir.1989)).

Moreover, mindful that "[t]he signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary

16

delay or needless increase in the cost of litigation", in another litigation, the "Arlington School Board (ASB)" persists, in pure fantasy, to "cobble[] together a claim", Board Br. in Spt. Of Demurrer & Plea in Bar, *Webb v. Washington Post*, Case No. CL24002622-00, p. 1, ¶ 1 (Richmond Cir. September 15, 2025), that a matter had been commenced against "Arlington County School Board ('ACPS')", *Id.*, p. 1, *supra*, which "is not a legal entity capable of being sued." *Id.* (citing Va. Code § 22.1-71, *M.S. v. Fairfax County Sch. Bd.*, 2006 WL 721372 (E.D.Va. 2006).

## Conspiracy

"'Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff' through an overt action done pursuant to the Agreement", *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 622–37 (W.D. Va. 2015) (quoting *William v. AES Corp.*, 28 F.Supp.3d 553 (E.D.Va.2014) (citing *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F.Supp.2d 610 (E.D.Va.2009)). "Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself". *Kian v. Kefalogiannis*, 158 Va. 129 (1932) (quoting *Cordova v. Hood*, 84 U.S. 1 (1872).

At least in criminal law, "[c]onsiderations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered

17

testimony, and whether leads of the witness's possible location were competently explored,' and not just the validity of a subpoena for his appearance." *People v. Martin*, No. B239366, 32 (Cal. Ct. App. Jul. 30, 2014) (quoting *People v. Wilson*, 36 Cal.4th 309 (2005)). *A priori*, "[t]o constitute criminal negligence essential to a conviction. . . , an accused's conduct 'must be of such reckless, wanton or flagrant nature as to indicate a callous disregard for human life and of the probable consequences of the act'", *Davis v. Commonwealth*, 230 Va. 201 (1985) (citing *Lewis v. Commonwealth*, 211 Va. 684 (1971)).

In criminal law, the task of the court is "to determine whether the record contains enough evidence for the triers of the facts to find beyond a reasonable doubt each element of the offenses involved. *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973) (citing *U.S. v. Papenheim*, 19 U.S.C.M.A. 203 (1970); *U.S. v Wilson*, 13 U.S.C.M.A. 670 (1963)). In the Commonwealth of Virginia, "the general standard or duty is the duty of reasonable care, that is, the duty to avoid negligent conduct", 2 Dan B. Dobbs, *The Law of Torts* § 251, at 2–3 (2d ed.2011), while "[t]his general duty is owed to those within reach of a defendant's conduct" *RGR, LLC v. Settle*, 288 Va. 260 (2014) "[a] reasonable jury could find that Defendants [had[ breached their. . . duty of care for various reasons". *Situ v. O'Neill*, 124 F. Supp. 3d 34 (D.P.R. 2015).

## A. **An Agreement**

18

Generally, "a failure to disclose material information necessarily requires that the defendant have known the information and have failed to bring it to the plaintiff's attention." *Doe v. Boys Clubs of Greater Dallas Inc.*, 907 S.W.2d 472 (Tex. 1995) (citing Tex.Bus.Com.Code § 17.46(b)(23); *Robinson v. Preston Chrysler-Plymouth, Inc.*, 633 S.W.2d 500 (Tex. 1982)). However, "[t]here is also no duty *if a defendant fails to disclose material facts it should have known*", *Id.* (citing *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156 (Tex. 1995)), but "[t]his is not a case", as here, "in which the defendant willfully maintained a state of ignorance in order to avoid a duty of disclosure." *Id.*

In the typical case, "[t]he issue whether a legal duty in tort exists is a pure question of law." *Kellermann v. McDonough*, 278 Va. 478 (2009). However, while expressly limited to the at least partisan-charged context of "'strongly disagree[ing] with the U.S. DOE's assertion that our policy violates Title IX'", Superintendent Durán, has affirmed, admitted and conceded that "APS has a duty to our community of students, families and educators to defend the resources they deserve, and policies designed to protect students of all backgrounds". Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra.*

"The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on

19

notice of a potential claim", and "[a] key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings." *Hobson*, 737 F.2d at 1. And "[n]otice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity", *In re Gault*, 387 U.S. 1 (1967) (internal quotation marks omitted), while "[t]he particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations". *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009). "By 'notice,' we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud." *Hobson*, 737 F.2d at 1. "We do not mean the kind of notice-based on hints, suspicions, hunches or rumors-that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit." *Id.* "When a plaintiff receives information sufficient to put him on inquiry notice, the statute of limitations will begin to run if the plaintiff does not reasonably exercise due diligence in conducting the inquiry"; "[i]n other words, he is held tort, a constitutional violation or a claim of fraud." *Id.*

And courts, at least in the Commonwealth of Virginia, have recognized that, when alleging a *prima facie* case for patent defect, it is material finding where the

20

product had been "defective when it left the manufacturer's hands", *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949 (1979). In the District of Columbia, a patent defect exists where "it is an obvious omission, inconsistency, or discrepancy of significance." *Inserso Corp. v. U.S.*, 961 F.3d 1343 (Fed. Cir. 2020) (citing *Per Aarsleff A/S v. U.S.*, 829 F.3d 1303 (Fed. Cir. 2016)[2].

## B. **An Unlawful Purpose or Act**

"'There is no such defect in the law,' it was said, 'as that the person who intentionally inflicts a wound calculated to destroy life, and from which death ensues, can throw responsibility for the act upon either the carelessness or ignorance of his victim, or shield himself behind the doubt which disagreeing doctors may raise as to the treatment proper for the case'", *Clark v. Commonwealth*, 90 Va. 360 (1893) (quoting *Commonwealth v. Hackett*, 84 Mass. 136 (1861). Still, Courts must be careful not to go beyond the facts to "speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008). And just as "by either words or action," the

---

[2] "A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties. By contrast, [a] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary" *Id.* (quoting *Blue & Gold Fleet, L.P. v. U.S.*, 492 F.3d 1308 (Fed. Cir. 2007), care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Id.*

21

defendant's actions must have "objectively manifested an agreement to participate directly or indirectly", *Buchanan County, Virginia v. Blankenship*, 496 F. Supp. 2d 715 (W.D. Va. 2007) (citing *U.S. v. Tillett*, 763 F.2d 268 (4th Cir. 1985)), and "[i]t need not be shown 'that each conspirator had knowledge of all of the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan'", *Id.* (quoting *Ibid.*), "[p]laintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions". *Baker v. Carr*, 369 U.S. 186 (1962).

"The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (citing *Golden v. Zwickler*, 394 U.S. 103 (1969); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941); *Massachusetts v. Mellon*, 262 U.S. 447 (1923)). And "[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", *Doe v. Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d 823 (E.D. La. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)).

"[I]t can hardly be doubted that the constitutional guarantee has its fullest

and most urgent application precisely to the conduct of campaigns for political office", *Monitor Patriot Co*, 401 U.S. at 265. According to only recent local press reports, Intervenor "acknowledged he was in the race mostly to provide a forum for his views, largely focused on the response to the Covid pandemic." Scott McCaffery, "School Board candidates tackle budget and impact of Trump administration," *ARL Now*, , September 4, 2025. While generating not one refutation or even comment, shortly after qualification for the November ballot, Intervenor had begun running a simple advertisement in Arlington Patch with respect to known carcinogenic properties associated with mRNA and adenovirus. Major Mike Webb, "NARC! NARC! Mammogram!" *Arlington Patch*, https://patch.com/virginia/arlington-va/calendar/event/20251104/1d019726-b6bb-42e0-9090-db4bed05e65d/narc-narc-mammogram (accessed September 30, 2025).

In one infamous case brought before this Court, "[p]laintiffs [had] asked th[e] Court to enjoin DoD from inoculating them without their informed consent", and "[o]n December 22, 2003, th[e] Court issued a Preliminary Injunction enjoining inoculations under the *AVIP* in the absence of informed consent or a Presidential waiver", observing that "[b]ecause the record was devoid of an FDA final decision on the investigational status of *AVA*, the Court was persuaded that *AVA* was an investigational drug being used for an unapproved purpose in violation of 10 U.S.C. § 1107, Executive Order 13,139, and DoD Directive

23

6200.2." *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003).

"Six plaintiffs, known as John and Jane Doe #1 through #6, . . . [had brought an] action to challenge the lawfulness of the government's Anthrax Vaccination Immunization Program ('AVIP')", who had been "members of the active duty or National Guardsmen components of the Armed Forces and civilian contract employees of the Department of Defense ('DoD') who ha[d] submitted or ha[d] been instructed to submit to anthrax vaccinations without their consent pursuant to AVIP". *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 3 (D.D.C. 2004).

"21 C.F.R. § 601.25 21 C.F.R. § 601.25 established a two-stage process for reviewing biological products licensed prior to July 1, 1972", and "[i]t directs FDA's Commissioner ('Commissioner') to appoint an advisory panel (1) to evaluate the safety and effectiveness of the previously licensed product, (2) to review the labeling of the product, and (3) to advise the Commissioner 'on which of the biological products under review are safe, effective, and not misbranded', *Id.* (citing 21 C.F.R. § 601.25(a)), a process not followed during the COVID-19 countermeasures distribution program, or "American Rescue Plan". Briefing Room, " Remarks by President Biden on the Anniversary of the COVID-19 Shutdown ," *supra*.

In the anthrax litigations, "the President signed Executive Order 13,139, pursuant to which DoD must obtain informed consent from each individual

24

member of the armed forces before administering investigational drugs and under which waivers of informed consent are granted only 'when absolutely necessary'", Exec. Order No. 13,139, 64 Fed. Reg. 54,175 (Sept. 30, 1999), and "DoD formally adopted these requirements in DoD Directive 6200.2." *Rumsfeld*, 341 F. Supp. 2d at 1.

Furthermore, it is a matter of public record that the "COVID-19 countermeasures", *Id.*, had previously been approved under the *Emergency Use Authorizations (EUA)*, *see* Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Pfizer)*, November 20, 2020; Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (ModernaTX, Inc., Application 27073)*, November 30, 2020; Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Janssen Biotech, Inc., Application 27205)*, February 4, 2021 pursuant to the declaration by Health & Human Services (HHS) Secretary Alex Azar, on March 27, 2020, and, "on the basis of. . . [his] determination of a public health emergency that has a *significant potential* to affect *national security* or the health and security of United States citizens living abroad and that involves the novel (new) coronavirus, . . . [the HHS Secretary had] declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID–19 pandemic, pursuant to section

25

564 of the *FD&C Act*, subject to the terms of any authorization issued under that section". 85 Fed. Reg. 63, *supra* (emphasis added). "If a person brings, or accumulates, on his land anything which, if it should escape, may cause damage to his neighbour, he does so at his peril. If it does escape, and cause damage, he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent the damage." *Rylands v. Fletcher*, 3 HL 330 (July 17, 1868).

"[A]lthough an overt act by itself (whether or not injury ensues) is not a requisite element of a. . . criminal conspiracy violation," *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) (citing *U.S. v. Teitler*, 802 F.2d 606 (2d Cir.1986)), an "injury from an overt act is necessary and sufficient to establish civil standing for a. . . conspiracy violation." *Id.* Moreover, "[b]ecause of the nature of the offense, an agreement often may only be established by circumstantial and indirect evidence including the overt actions of the parties", *Jones v. Commonwealth*, 279 Va. 295 (2010) (citing *Floyd v. Commonwealth*, 219 Va. 575 (1978), and, accordingly, "[p]roof of an agreement to commit the overall objective of the. . . offense 'may be established solely by circumstantial evidence.'" *Solomon v. Am. Web Loan*, No. 4:17CV145, 2019 WL 1320790, at *1–22 (E.D. Va. Mar. 22, 2019) (quoting *Hecht*, 897 F.2d, at 21).

Generally, "one would 'have to find premeditation, simply because the method. . . employed", on rationale that such "could not have been implemented

26

without an enormous amount of planning." *U.S. v. McVeigh*, 153 F.3d 1166 (10th Cir.1998), *cert. denied*, 526 U.S. 1007 (1999). "It is the rule that the existence of a conspiracy may be established by inferences from circumstantial evidence", *Prichard v. U.S.*, 181 F.2d 326 (6th Cir.), *aff'd sub nom. Prichard v. United State of Am.,* 339 U.S. 974 (1950) (citing *Johnson v. U.S.*, 82 F.2d 500 (6th Cir. 1936), and may be established where there is credible, convincing evidence that "'[t]he alleged conspiracy could not have been carried out by [only] one person". *Id.*

"[O]nce the conspiracy has been established, the government need show only 'slight evidence' that a particular person was a member of the conspiracy." *U.S. v. Elliott*, 571 F.2d 880 (5th Cir. 1978 (quoting *U.S. v. Morado*, 454 F.2d 167 (5th Cir. 1972)). To establish a *prima facie* case of conspiracy, a complainant must "prove. . .that an agreement existed between the ... men by some concerted action", *Fortune v. Commonwealth*, 12 Va. App. 643, 406 S.E.2d 47 (1991) (quoting *Reed v. Commonwealth*, 213 Va. 593, 194 S.E.2d 746 (1973)), and "[b]ecause most conspiracies are 'clandestine in nature,' 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(a), at 266 (2d ed. 2003), by 'the very nature of the offense, it often may be established only by indirect and circumstantial evidence". *Roy v. Commonwealth*, No. 1403-15-2, 2017 WL 894622, at *1–3 (Va. Ct. App. Mar. 7, 2017) (quoting *Wright v. Commonwealth*, 224 Va. 502, 297 S.E.2d 711 (1982)).

"[W]hen 'it has been shown that the defendants 'by their acts pursued the

same object, one performing one part and the others performing another part ..., the [fact finder] will be justified in concluding that they were engaged in a conspiracy ....'" *James v. Commonwealth*, 53 Va. App. 671, 674 S.E.2d 571 (2009) (quoting *Charity v. Commonwealth*, 49 Va. App. 581, 643 S.E.2d 503 (2007)). "Without more, mere 'proof of overt acts in themselves is not sufficient, for it must be established that the conspiracy or agreement which is charged to have existed ... had been formed before and was existing at the time of the commission of [any] overt act or acts.' " *Poole v. Commonwealth*, 7 Va. App. 510, 375 S.E.2d 371 (1988) (quoting *Harms v. U.S.*, 272 F.2d 478 (4th Cir. 1959)).

And, at least with regards to conspiracy, "[a]bsent an actual agreement between two or more persons, a bilateral meeting of the minds, Virginia law precludes a finding that a conspiracy exists." *Fortune*, 12 Va. App. at 643, 406 S.E.2d at 47. A complainant "may prove the defendant's knowing participation in a conspiracy through circumstantial evidence, including: (1) the defendant's association with conspirators in furtherance of the conspiracy; (2) his or her presence at 'critical stages of the conspiracy that cannot be explained by happenstance'; (3) his or her 'possession of items that are of essential significance to the conspiracy'; and (4) acts that show a consciousness of guilt, including false exculpatory statements", *U.S. v. Climico*, No. S2 11 CR. 974-08 CM, 2014 WL 4230320, at *1–7 (S.D.N.Y. Aug. 7, 2014) (quoting *U.S. v. Anderson*, 747 F.3d 51,

60 (2d Cir.2014).

"[M]ere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy *unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding* it," *Luteran v. U.S.*, 93 F.2d 395 (8th Cir. 1937) (quoting *Burkhardt v. U.S.*, 13 F.2d 841, 842 (6th Cir. 1926). (emphasis added). Moreover, "a defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of 'withdrawal, abandonment, or defeat of the conspiratorial purpose,'" *U.S. v. Heard*, 709 F.3d 413 (5th Cir. 2013)(quoting U.S. v. Mann, 161 F.3d 840 (5th Cir.1998) (quoting *United States v. Puig–Infante,* 19 F.3d 929 (5th Cir.1994)), while "[m]ere cessation of activity in furtherance of the conspiracy is not sufficient to show withdrawal." *Id. (citing  U.S. v. Torres*, 114 F.3d 520 (5th Cir.1997) (citing *U.S. v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)).

When "reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003). *See also Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854 (D.C. Cir. 2021) (citing *City of Waukesha*, 320 F.3d 228). "Starting with history, the alleged intangible harm here-emotional distress-

29

has long been accepted as a basis for certain 72 types of suits in American courts." *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. February 18, 2022).

"Emotional harm has long-standing recognition as a compensable injury as a parasitic harm to personal injury or property damage claims, usually referred to as a claim for pain and suffering." Betsy J. Grey, *The Future of Emotional Harm*, 83 Fordham L. Rev. 2605, p. 2610 (2015). "Additionally, '[c]ommon law ... traditionally recognized emotional harm claims as a component of trespassory torts like assault, false imprisonment, and defamation, allowing a presumption of damages without a showing of related physical injury." *Thompson*, 590 F. Supp. 3d at 46 (quoting *Ibid.*). "This common law tradition dovetails with the plain text of § 1985(1) and Congress's reasons for enacting it." *Id.* "The statute creates a cause of action for a person 'injured in his person or property" due to a proscribed conspiracy." *Id.* (quoting 42 U.S.C. § 1985(3)).

Moreover, "[t]he statute makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury." *Id.*[3] "Every person who, having knowledge that any of the wrongs

---

[3] "And, though the statute 'was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War,' *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977), courts have broadly interpreted § 1985(1) consistent with its 'terms and legislative intent ... , which [ are J directed against efforts to impede

USCA4 Appeal: 25-2107      Doc: 43      Filed: 10/06/2025      Pg: 80 of 160

conspired to be done, and mentioned [in section 1985 of this title], are about to be

committed, and having power to prevent or aid in preventing the commission of

the same, neglects or refuses so to do, if such wrongful act be committed, shall be

liable to the party injured, or his legal representatives, for all damages caused by

such wrongful act, which such person by reasonable diligence could have

prevented." *Id.* (quoting 42 U.S.C. § 1986).

## C. <u>Resultant Damage</u>

In specific application to female breast cancers, medical researchers have

acknowledged that "[b]reast cancer is a heterogeneous disease involving complex

cellular interactions between the developing tumor and immune system, eventually

resulting in exponential tumor growth and metastasis to distal tissues and the

collapse of anti-tumor immunity", and "[m]any useful animal models exist to study

breast cancer, but none completely recapitulate the disease progression that occurs

in humans." Melanie R. Rutkowski, *et al., Initiation of metastatic breast*

*carcinoma by targeting of the ductal epithelium with adenovirus-cre: a novel*

*transgenic mouse model of breast cancer*, 85 J. Vis. Exp., pp. 51171, March 26,

---

governmental operations by interfering with officials in the discharge of their
duties' *Lawrence v. Acree*, 665 F.2d 1319, 1329 (D.C. Cir. 1981) (Wald, J.,
concurring) (citing *Stern*, 547 F.2d 1329).
Permitting recovery for emotional harm arising from such interference is consistent
with that intent. The court thus concludes that 'history and the judgment of
Congress" support recognizing emotional harm as a concrete injury to establish
standing to bring claims under § 1985(1) and § 1986." *Id.*

USCA4 Appeal: 25-2107    Doc: 43    Filed: 10/06/2025    Pg: 81 of 160

2014.

It is not "subject to reasonable dispute", Fed.R.Evid. 201(b), that expression of an oncogenic form of K-ras was achieved by the delivery of an adenovirus expressing Crerecombinase into the mammary duct of sexually mature, virgin female mice"; "[t]umors begin to appear 6 weeks after the initiation of oncogenic events", and " "[a]fter tumors become apparent, they progress slowly for approximately two weeks before they begin to grow exponentially." *Id.*

It is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned", Va. S. Ct. R. 2:201(b), that, "using the TALEN method to produce knockout mice is efficient in 49–77% of cases (87), which can be increased with a greater concentration of TALEN mRNA"; and "[t]his method has been primarily used to increase the efficiency of gene targeting, and compared to ZNFs, TALENs yield higher mutation efficiencies and survival rates." Ursa Lampreht Tratar, Simon Horvat, & Maja Cemazar, *Transgenic Mouse Models in Cancer Research*, 8 Front Oncol., pp. 268 (July 20, 2018).

It is not "subject to reasonable dispute", Fed.R.Evid. 201(b), that, despite claims about and "policies designed to protect students of all backgrounds", Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra*, when 900 teachers from Arlington Public Schools

32

received their first dose of the COVID-19 vaccine", Arlington Dems, "VAX FOR TEACHERS!", *Facebook*, January 17, 2021, no person with standing or responsibility had enjoined Board "from inoculating them without their informed consent." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004). *But see Webb v. Virginia State Bar*, Case No. CL25-830 (Arlington Cir. 2025), *on appeal*, Record No. 1556-25-4 (Va.App. 2025).

Because of the increasing risk and better prognosis for patients with cancers detected early "[w]omen should have the opportunity to begin annual screening between the ages of 40 and 44", and "[w]omen should undergo regular screening mammography starting at age 45", while "[w]omen ages 45 to 54 should be screened annually." Staff, "Cancer Prevention & Early Detection: Facts & Figures Tables and Figures 2022," *American Cancer Society* (2022)[4]. However, while "[i]ndividuals with new or concerning symptoms associated with cancer, including

---

[4] "One study of diagnostics data reported that among people who received medical testing for any reason, there was a 46% decline in diagnoses of six common cancers (breast, colorectal, lung, pancreas, stomach, and esophagus) during March 1 to April 18, 2020, compared with January 6, 2019, to February 29, 2020, ranging from a 25% drop for pancreatic cancer to 52% for breast cancer.[footnote omitted] Another analysis reported that new CRC diagnoses were down by 30% from January to mid-April 2020 compared to that time period in 2019. [footnote omitted] Likewise, an analysis of 20 US health care institutions that included more than 28 million people reported that patient encounters related to new cancer diagnoses were 40% to 50% lower in April 2020 compared to April 2019.21 Similar declines have been observed around the world, including in the Netherlands29 and the United Kingdom." Staff, "Special Section: COVID-19 and Cancer," *American Cancer Society* (2021).

33

lumps in the breast or elsewhere, abnormal vaginal bleeding, blood from the rectum or in stool, unexplained weight loss, fever, fatigue, or skin changes, should promptly seek medical attention and undergo diagnostic evaluation", during the COVID-19 pandemic, "[o]ne electronic medical record company reported an estimated 80% to 90% decline in screening for breast, colorectal, and cervical cancers among their patient population during March and April of 2020 compared to the same time period in 2019." Staff, "Special Section: COVID-19 and Cancer," *American Cancer Society* (2021).

"Approximately 1 in 8 women in the US (13.1%) will be diagnosed with invasive breast cancer, and 1 in 43 (2.3%) will die from the disease", according to the American Cancer Society; "[i]n 2024, an estimated 310,720 new invasive breast cancers and 56,500 cases of ductal carcinoma *in situ* will be diagnosed among women in the US [table omitted], and an additional 2,790 cases will be diagnosed in men." Staff, "Breast Cancer Facts & Figures 2024-2025," *American Cancer Society* (2024). Underlining the seriousness of this disease, "[i]n 2024, approximately 42,250 women [table omitted] and 530 men are expected to die from breast cancer", and "[b]reast cancer incidence increased during the most recent decade of data (2012-2021) by 1 % annually overall, with a steeper increase among women younger than 50 years (1.4% per year) than in those 50 or older (0.7% per year)." *Id.*

34

While cancer diagnoses and mortality have been steadily increasing for almost a decade, prior to the COVID-19 pandemic, researchers had indicated that "[e]merging data [had] suggest[ed] that the incidence of early-onset cancers, defined as cancers diagnosed in people younger than 50 years, is increasing". Benjamin Koh, *et al.*, *Patterns in Cancer Incidence Among People Younger Than 50 Years in the US, 2010to2019*, 6 JAMA Netw Open 8, pp. e2328171, August 16, 2023. However, researches project that,"[i]n 2024, approximately 310,720 new cases of invasive breast cancer and 56,500 cases of DCIS will be diagnosed among US women, and 42,250 women will die from breast cancer", and "[t]he majority of invasive breast cancer cases (84%) and deaths (91%) occur among women aged 50 years and older, with about one half (52%) of all deaths in women aged 70 years or older"; "[t]he median age at diagnosis for breast cancer in women is 62 years overall, but it is younger for Hispanic (57 years), AAPI (57 years), Black (60 years), and AIAN (60 years) women compared with White women (64 years),8 partly because these populations are younger." *Id.* "The median age at breast cancer death is 69 years overall, ranging from 63 to 64 years for Hispanic, AAPI, and Black women to 70 years among White women", *Id.* (citation omitted); "[a]lthough breast cancer predominantly affects women, 2790 cases and 530 deaths (approximately 1% of all breast cancer cases and deaths) are expected in men in 2024." *Id.*

35

However, while between 2019 and 2021, new case diagnoses of female breast cancer had remained close to a baseline of with a median of 26,557, these new cases nearly doubled to 47,550 in 2022 and continued to rise to 48,780 in 2023, and yet, reporting estimated new cases of female breast cancer, the American Cancer Society had alarmingly projected a total of 297,790, a tenfold increase from the prior baseline, American Cancer Society, *Table 2. Estimated Number\* of New Cases for Selected Cancers by State, US, 2023*. They do, at least make clear that "[e]stimated number of new cancer cases for 2023, exclude[e] basal cell and squamous cell skin cancers and *in situ* carcinoma except urinary bladder", that "[i]ncidence counts are [*only*] model-based projections and should be interpreted with caution" and that "[s]tate estimates may not equal US total due to rounding." American Cancer Society, *Cancer Facts & Figures 2023*, but still a tenfold increase above baseline is a significant variance even in cost accounting, when calculating the "delta", or variance, between that which had been budgeted and actuals.

Looking back to 2019, when estimated new cases for female breast cancer had been 268,600, associated with 41,760 deaths, a difference of 11,190 new cases and a corresponding differential of 7,020 deaths, it is clear that American Cancer Society had expected an increase to warrant their reported figures; however, explaining their calculation of the projection, it is only stated that "[t]hese

36

probabilities are estimated based on cancer occurrence in the general population and *may overestimate or underestimate individual risk* because of differences in exposures (*e.g.*, smoking), family history, and/or genetic susceptibility", American Cancer Society, *Cancer Facts & Figures 2019*, of little assistance in comprehension for a layman or average viewer. Understandably, "[f]or most types of cancer, risk is higher with a family history of the disease", on the rationale that "[t]his is thought to result primarily from the inheritance of genetic variations that confer low or moderate risk and/or similar exposures to lifestyle/environmental risk factors among family members, as opposed to inheritance of genetic alterations that confer a very high risk, which occurs much more rarely", while "[r]elative risk is the strength of the relationship between exposure to a given risk factor and cancer", *Id.*[5], but what this adds to explaining the overestimated figures reported on female breast cancer, tenfold over the baseline, is unclear.

However, and further, in 2024, the American Cancer Society had changed their reporting format, for unarticulated reasons, expanding the age range to 49,

---

[5] "It is measured by comparing cancer occurrence in people with a certain exposure or trait to cancer occurrence in people without this characteristic. For example, men and women who smoke are about 25 times more likely to develop lung cancer than nonsmokers, so the relative risk of lung cancer among smokers is 25. Most relative risks are not this large. For example, women who have a mother, sister, or daughter with a history of breast cancer are about twice as likely to develop breast cancer as women who do not have this family history; in other words, their relative risk is about 2." *Id.*

37

and reporting 13,900 new cases of breast cancer between the ages of 15 to 19, and

a total of 50,830 for women age 49 and below, American Cancer Society, *Cancer*

*Facts & Figures 2024*, a significant departure from what had been the *status* quo,

or within the range of normal, before the pharmacological interventions mandating

the COVID-19 countermeasures, *i.e.*, an aberrant spike amongst an age-group

generally not prone to cancers, but hidden amongst the general trend for all cancers

in decline, along with an estimated a total of 310,720 new cases, associated with

42,250 deaths. *Id.* Accordingly, in due diligence and in a duty in mitigation of

damages, Affiant/Relator had, on November 28, 2024, sought clarification from

the American Cancer Society, which clearly has not headlined nor highlighted

what is clearly a doubling of new cases for female breast cancer over the past two

years in the demographic of women age 45 and below, but the response to that

inquiry is still pending.

Generally, a potential defendant must, in a duty of reasonable care, "exercise

the diligence toward making the premises safe that a good business person is

accustomed to use in such matters", and such "includes inspecting the premises to

discover possible dangerous conditions of which the owner/occupier does not have

actual knowledge, and taking reasonable precautions to protect invitees from

dangers foreseeable from the arrangement or use of the premises." *Robinson v.*

*Kroger Co.,* 268 Ga. 735 (1997). "The statutory provision is unique", as "[i]t

requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative actions to do so." *Id.* "A person who", as here, "refuses or neglects to exercise such power is liable for damages to those persons whose injuries could have been prevented." *Id.*

Although Intervenor had qualified for the November ballot for school board in January, as in evidence at Exhibit **C**, residents of Arlington County were only told in February that "Arlington Democrats now have two candidates vying for an open School Board seat." Scott McCaffery, "Democratic School Board contenders, challenger to Del. Hope kick off campaigns," *ARL Now*, February 6, 2025. "Monique 'Moe' Bryant and June Prakash formally kicked off campaigns Wednesday night (Feb. 5) at the monthly Arlington County Democratic Committee meeting." *Id.* And, also in February, "[s]everal Northern Virginia school districts, including Fairfax County Public Schools," had been "in the crosshairs of the U.S. Department of Education after a conservative legal group filed a complaint challenging their transgender-inclusive bathroom and locker room policies." James Jarvis, "DEVELOPING: FCPS facing federal investigation over transgender policies," *FFX Now*, February 14, 2025. "The Department of Education's Office for Civil Rights (OCR) opened an investigation this week into Fairfax, Arlington, Alexandria, Loudoun and Prince William schools in response to the complaint from America First Legal, a nonprofit founded by former Trump advisor Stephen

Miller." *Id.*

"In Arlington, Democrats hold almost all levers of power", and "[t]he voters there are so solidly blue that they are among the Northern Virginians who usually provide the margin of victory for Democrats who win statewide." Patricia Sullivan, "Arlington County Democrats continue to dominate region's politics," *Washington Post*, November 7, 2017. However, this year, "[t]he chair of Arlington's GOP is seeking 15% more local votes for statewide candidates in 2025 than the party received in 2021", Scott McCaffrey, "Arlington GOP seeks 15% more votes for statewide ticket than in 2021," *ARL Now*, September 24, 2025. "Party chair Matthew Hurtt hopes the ticket with gubernatorial candidate Winsome Earle-Sears, alongside lieutenant governor candidate John Reid and incumbent Attorney General Jason Miyares, can earn more than the 21,548 Arlington votes that Republican Glenn Youngkin earned in the 2021 governor's race." *Id.*

Glen "Youngkin trailed Democrat Terry McAuliffe by a significant margin in Arlington, as McAuliffe received 73,013 votes — 76.7% of the total", and "Youngkin carried the statewide vote by a mere 66,000 out of nearly 3.3 million ballots cast." *Id.* "The seats are almost guaranteed to remain in Democratic hands, but having Republican challengers helps build GOP enthusiasm, party leaders believe", and "[t]hat, in turn, supports the statewide ticket." *Id.* "'The raw votes from Arlington matter,' Hurtt said." *Id.* And, it would not be until after, "[w]ith the

Democratic endorsement in hand, Bryant [had] become[] the odds-on favorite to win the general election", that it would only be mentioned that "[t]o date, only independent Major Webb (formerly known as Mike Webb) ha[d] filed the required paperwork to get on the School Board ballot, county elections director Gretchen Reinemeyer told ARLnow", with no reference to Intervenor's record-breaking, early qualification. Scott McCaffery, "Bryant wins 69% in Democratic School Board caucus, advances to general election," *ARL Now*, May 12, 2025.

**WHEREFORE**, under attestation provided in Va. Code § 8.01-271.1, for the reasons above, Intervenor, invoking strict scrutiny, as a member of a suspect class, in redress of violations of a substantive right, *Gray*, 274 Va. at 290, should prevail, and the Trial Court should grant this motion for judgment on the pleadings, and should grant to Intervenor such other equitable and statutory relief as deemed proper by the Reviewing Court, to include imposing sanctions.

Respectfully submitted,

Major Mike Webb, *Pro Se*
3445 Washington Boulevard, Apartment # 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: Mike.Webb84@gmail.com
October 30, 2025

41

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of October 2025, that I will transmit and deliver this **Emergency Intervenor Motion for Temporary Restraining Order (TRO) & Preliminary Injunction** by hand delivery and/or mail and/or email to the following parties, named in suit.

Timothy Heaphy, Joshua Mitchell, Fiona L. Carroll, & Lindsay Hemminger, Esqs.
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Telephone: (202) 303-1000
Email: theaphy@willkie.com;
jmitchell@willkie.com;
fcarroll@willkie.com;
lhemminger@willkie.com

Breanna Smith-Bonsu, & Chloe Smeltzer, Esqs.
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Telephone: (312)728-9000
Email: bsmith-bonsu@willkie.com;
csmeltzer@willkie.com

Matthew James Mezger, Esq.
Assistant U.S. Attorney
Office of the U.S. Attorney
601 D Street, N.W.
Washington, District of Columbia 20530
Telephone:
Email:

Abhishek Kambli, Esq.
Deputy Associate Attorney General
Office of the Attorney General
950 Pennsylvania Ave NW
Suite 7141
Washington, District of Columbia 20530
Telephone:
Email:

Garry Daniel Hartlieb, Esq.
U.S. Department of Justice Civil Division, Federal Programs
1100 L St. NW
Washington, District of Columbia 20005
Telephone:
Email:

Respectfully submitted,



_____

Major Mike Webb
3445 Washington Boulevard, Apartment #306
Arlington, Virginia 22204
Phone: (856) 220-1354
Email: mike.webb84@gmail.com
Date: September 30, 2025


# TABLE OF EXHIBITS

## Exhibit A



Define Intervention in Vexatious Nonentity Litigation   Inbox ×

Mike Webb <mywealthwry@gmail.com>
to timothy, John, jmanvenprice, jmschea, koeroff, inemminger, tzsheth-bonsu, cursulizes, John, Mike, june prakash, meruqoit, DrRives, seanperryman, Robert, Reed, Thickey, com, NAACP, Arlington, /

Wikie, Wibe, Wilde (in my best Sergeant Waters voice)!

According to the news, which, under Mirror v. Sinclair Television, as recently relied upon by the Washington Post, owes no duty to their viewers or the general public, the Arlington Public School (APS) Board has, during a bellwether election, to sue the current presidential administration over the controversial issue involving restroom facilities and extracurricular activities.

My good friend, John Cafferty, a Harvard Law Man, can tell you, upon a prima facie examination of the recently filed complaint in federal court that there is no legal entity known as "Arlington School Board", even if the students enjoy the freedom to decide their personal pronoun preferences, albeit students, 30% of whom graduate illiterate, and probably cannot distinguish between a participle and a predicate. They don't even have the Little Brown Handbook at the Satan Appreciation Week celebrating library in the most educated municipality in Virginia.

As you know, in our most progressive progeny on education, Chief Justice Warren had claimed that education was perhaps the most important function of state and local governments, as demonstrated, in part, by the exorbitant expenditure, accounting in Arlington for the largest single line item, the largest per-student expenditure in the state, for the 13th largest public school district, which only buys us a rank of second in the entire state.

Now, our fair community that boasts median home values exceeding $850,000, send 90% of the school-age children to these free schools, from which 30% graduate illiterate in a community in which 94% hold at least a high school diploma, and clearly like not even one parent or any school board candidate, present company excluded, brought a case when the school board had failed to develop a safe school reopening plan to respond to the Section 664 public health emergency involving an attack employing a CBRN agent or agents, or brought a case when the schools decided to close a month after China was being praised for reopening after only a month of closure, not one parent or concerned citizen, even weaving colorful signs that attract news attention when a gubernatorial candidate arrives to speak for two minutes, brought a case. And to think of a school board complaining about being strapped for cash and retaining a top nine law firm where attorneys bill $2,000 per hour, it's outrageous

And while the self-declared nonessential church once more gets mighty silent, we wish to inform you of our intention to present a motion to intervene and enjoin this "churning" transaction that has brought as many as five pro hac admissions and one licensed attorney to this affair. It does somewhat conflict with current interventions in the Next Star and TEGNA merger, as well as several matters pending in state trial and appellate courts, while delaying more our action against Zuckerberg under the FACE Act, unlike top partners at Orrick and even the White House most recently, we can only say, the Lord never gives us more than we can bear. Buy the power of grade school!

We look forward to your objections or welcome arms, and look forward to proceeding on arguments under the Establishment Clause not of any concern to anyone but the porn tab guy.

AI Reader Score

43

## Exhibit B



My Son, the Attorney!

"Arlington County Public Schools" is not a legal entity with the power to be sued. See, e.g., M.S. v. Fairfax County School Bd., 2006 WL 721372, at *3 (E.D. Va. Mar. 20, 2006)" APS Demurrer, Page 2.

44

<u>**Exhibit C**</u>



**Eric Olsen**     11:03
**To:** Mike.Webb84@gmail.com >

# Candidate Qualification

Mr. Webb,

This email is to let you know that you have qualified as a candidate for Member, School Board in the November 4, 2025 General Election. Please let me know if you have any questions.

Thank you,
Alyssa

**Alyssa Myers|**(she/her/hers)
Deputy Director of Elections | Arlington County
**Office:** 703.228.3456 | **Direct:** 703.228.3462
2100 Clarendon Blvd Ste 320 • Arlington, VA 22201
https://vote.arlingtonva.gov/Home



Book time to meet with me

45

Case Number Record No. 25-2107

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**ARLINGTON SCHOOL BOARD**
**Appellant**

**v.**

**LINDA McMAHON, in her official capacity as Secretary of**
**Education of the United States, and UNITED STATES**
**DEPARTMENT OF EDUCATION,**
**Appellees.**

**Affidavit in Support of**
**Emergency Intervenor Motion for**
**Temporary Restraining Order (TRO)**
**And Preliminary Injunction**

**From the U.S. District Court for the Eastern District of Virginia**
**Civil Action No. 1:25-cv-01434-RDA-LRV**

**Rossie D. Alston, Jr., Federal District Judge**

Major Mike Webb
3445 Washington Boulevard
Apartment # 306
Arlington, VA 22201
Phone: (856) 220-1354
Email: Mike.Webb84@Gmail.com
Petitioner-Appellant in *Pro Se*

-i-

# AFFIDAVIT IN SUPPORT OF EMERGENCY INTERVENOR MOTION FOR TEMPORARY RESTRAINING ORDER (TRO) & PRELIMINARY INJUNCTION

1. This day, the undersigned, Affiant in the above referenced action, Major Mike Webb, hereinafter referred to as "Webb," or "Affiant", personally appeared before me, the undersigned Notary Public in my jurisdiction below, and, being duly sworn, stated:

## Whistleblower

2. "By email of March 23, 2021, OMB [had] acknowledged receipt of. . . [a] request and [had] assigned it tracking number 21-220", Walsh Decl., p. 2, ¶ 3 (August 29, 2024), and that designated simple[1] search for documents had, "at the time of classification," Executive Order (E.O.) 12,958, *Classified National Security Information*, Sect. 1.7(a)(1) & (5), April 17, 1995, "an individual authorized in writing, either by the President, or by agency heads or other officials designated by the President, to classify information in the first instance", or "original classification authority (OCA), E.O. 12,958, *Classified*

---

[1] A designated "simple" request describes where the "agency[,] using multi-track processing[,] places [it] in its fastest (nonexpedited) track based on *the volume and/or simplicity of records requested*"; in contrast, a "complex" request connotes "a *FOIA* request that an agency using multi-track processing places in a slower track based on the *volume and/or complexity of records requested*". Office of Information Policy (OIP), *Guidance XVIII FOIA Update 3*, "*FOIA* Update: OIP Guidance: Guidelines for Agency Preparation and Submission of Annual *FOIA* Reports," January 1, 1997.

2

*National Security Information*, Sect. 1.1(g), had been determined to have "warranted classification at the Confidential", Walsh Decl., p. 3, ¶ 7, *supra*, a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is *able to identify or describe*". E.O. 12,958, *Classified National Security Information*, Section 1.3(a)(3), *supra* (emphasis added).

3. Prompting nine months of planning, coordination with the National Security Council (NSC), and a two year search on unclassified and classified email systems, Walsh Decl., *supra*, "the situation had changed", *People v. Pruitt*, 278 Ill. App. 3d 194 (Ill. App. Ct. 1996), suggesting potentially "an unprecedented scandal at the highest levels of government, for most of the defendants had held major positions in the. . . administration." *U.S. v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976). *See Webb v. Executive Office of the President (EOP)*, Civil Action No. 1:23-cv-00816 (D.C.C. 2023), *on appeal* Record No. 25-5127 (D.C. Cir. 2025).

4. Intervenor, who, as in evidence at Exhibit A, had received from the Congregation for the Causes of Saints at the Vatican, "regarding the grace that Almighty God has bestowed", Angel Amato, *Letter to Petitioner*, November 28, 2016; *but see* Major Mike Webb for VA, "Letters of the Law: Postage

3

Due," *YouTube*, July 27, 2017, https://youtu.be/Ywp8bgBi8GM, had been amongst the first to raise an alarm regarding the emergence of the novel virus, transmitting an intelligence estimate to the Senate Select Committee on Intelligence. Major Mike Webb, "Warner Pandemic Report: Director's Cut," *YouTube*, March 27, 2020, https://youtu.be/iZlNrCariEc.

5. Intervenor, whose second of a dozen petitions docketed for certiorari has been included among "historical documents" by one law school, Editors, "Historical and Topical Legal Documents: *Webb v. Fauci*," *Santa Clara Law Digital Commons*, July 12, 2021, although neither a licensed attorney nor law school graduate, nonetheless has been known for his unique "passion", even by the former President, Joe Biden, *Letter to Appellant*, September 15, 2022, as in evidence at Exhibit **B**, and has been identified by Article III Courts as a federal "whistleblower," Order, *Webb v. Dep't of the Army*, Civil Action 1:22-cv-02236 (UNA) (D.D.C. Oct. 7, 2022); *see also* has been described as a "litigation hobbyist", Order, *U.S. Navy SEALs v. Biden*, Civil Action No. 4:21-cv-01236-O (N.D.Tex. May 23, 2022); Order, *State of Missouri v. Biden*, Record No. 22-30531 (5th Cir. August 1, 2022), with a penchant for "hot-button issues", Informal App. Opp. Brief, *Webb v. Garland*, Record No. 2022-2065(Fed. Cir. 2022).

6. "Absent a claim of need to protect military, diplomatic, or sensitive national

security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide." *U.S. v. Nixon*, 418 U.S. 683 (1974). However, that second matter docketed for certiorari had found its proximal origin in a search that had compelled the U.S. Solicitor General to transmit a waiver form to the U.S. Supreme Court, indicating that "[t]he Government waives its right to file a response in this case, unless requested by the Court", as in evidence at Exhibit **C**, arguably that presumptive assertion of executive privilege, suggesting a matter of "accountability and openness in the highest echelons of government", *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998); "they cannot have it both ways." *Connecticut v. Teal*, 457 U.S. 440 (1982).

7. And "[i]t shall be the policy of the Commonwealth that citizens of the Commonwealth and employees of governmental agencies be freely able to report instances of wrongdoing or abuse committed by governmental agencies or independent contractors of governmental agencies." Va. Code § 2.2-3009.

8. "'Abuse' means an employer's or employee's conduct or omissions that result in substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." Va. Code § 2.2-

5

3010.

9. And, generally, conduct in public schools "cannot be prohibited unless it 'materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school.'" *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503 (1969) (quoting *Burnside v. Byars*, 363 F.2d 744 (1966)).

## <u>**Establishment of Religion**</u>

10. To state a claim for official capacity liability, the plaintiff must identify some 'policy or custom' followed by the defendant's employer that 'played a part in a violation of law'". *McSheffrey v. Wilder*, Case No. 2:21cv630 (E.D.Va. Nov. 16, 2023) (quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)).

11. Accordingly, Intervenor had taken exception, with respect to the Appellant's meeting display of suggestive rainbow paraphernalia, worn by Debbie De Franko, speaking on behalf of the staff, and action officer, Dr. Steven Marku, the Director, Policy and Legislative Affairs, as in evidence at Exhibit **D**.

12. While "[f]reedom of speech serves many valuable purposes," *Murthy v. Missouri*, Record No. 23-411, 603 U.S. ____ (June 26, 2024) (Alito, J. dissenting, joined by Thomas, J. & Gorsuch, J.), "[s]peech involves *a matter of public concern* when it involves an issue of social, political, or other interest to the community", *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440 (4th Cir.

6

2004) (emphasis added).

13. And, "[i]n order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of 'paramount importance or national scope.'" *Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009) (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997).

14. Broadly, "as a general matter, the *First Amendment* means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564 (2002) (internal quotation marks omitted).

15. And where content is deemed to have been "'presumptively invalid,'... the Government bears the burden to rebut that presumption." *U.S. v. Stevens*, 559 U.S. 460 (2010) (quoting *U.S.* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000) (quoting *R. A. V.* v. *St. Paul*, 505 U.S. 377 (1992)).

16. "The mere fact that... [one] may not approve of publications..., or may not desire... to discuss... [another's] activities or publish... [another's] spoken words, does not give rise to an action cognizable under the law", and "[t]he *First Amendment* freedoms of speech and press are too precious to be eroded or undermined by the likes and dislikes of persons who invite attention and publicity by their own voluntary actions", *Falwell v. Penthouse Int'l, Ltd.*, 521

7

F. Supp. 1204 (W.D. Va. 1981).

17. And Courts have warned that "cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the [proper] scope of the *First Amendment*," *Stevens*, 559 U.S. at 460.

18. However, where a "policy violates the *Establishment Clause* because its purpose is 'the promotion of Christianity' and its primary effect is 'advancing religion by conveying a message of endorsement to elementary school children'", it will not survive a litigation challenge. *Roark v. South Iron R-1 School Dist.*, 573 F.3d 556 (2009) (quoting *Roark v. S. Iron R–1 Sch. Dist.*, 540 F.Supp.2d 1047 (E.D.Mo.2008)).

19. While the *Religious Freedom Restoration Act (RFRA)* "prohibits the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means", *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (citing 107 Stat. 1488, 42 U.S.C. §2000bb *et seq.*), even a "court's decision that the prior practice of distributing Bibles in fifth grade classrooms should be permanently enjoined as violative of the *Establishment Clause*, [is] a ruling consistent with our discussion of the merits of this issue". *Roark*, 573 F.3d at 556 (citing *Doe v. S. Iron R–1 Sch. Dist.*, 498 F.3d 878 (8th Cir.2007)).

20. The Appellant has argued strenuously in other matters that, with respect

"specifically [to] protections of an individual's right to freedom of speech,
Plaintiff's allegations that certain Board members [had] personally displayed or
supported LGBT causes do not, and cannot, as a matter of law, form the basis
of a claim asserting a violation of freedom of speech", The Board Demurrer,
*Webb v. Washington Post*, Case No. CL24002622-00, p. 3 (Richmond Cir. July
3, 2025), and, "[t]o the extent the Complaint asserts a claim for violation of the
*First Amendment. . .Establishment Clause*, Plaintiff's Allegations that certain
Board members personally displayed or supported lesbian, gay, bisexual and
transexual ('LGBT') causes do not, and cannot, as a matter of law, form the
basis of an *Establishment Clause* claim." *Id.*, p.2, *supra*.

21. "The Supreme Court has not settled the question whether a concern about a
possible *Establishment Clause* violation can justify viewpoint discrimination",
*Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.*,
386 F.3d 514 (2004) (citing *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98
(2001)), "[t]he Supreme Court has repeatedly 'rejected the position that the
*Establishment Clause* even justifies, much less requires, a refusal to extend free
speech rights to religious speakers who participate in broad-reaching
government programs neutral in design.'" *Id.* (quoting." *Rosenberger v. Rector
and Visitors of Univ. of Va.,* 515 U.S. 819 (1995)).

22. Considering not private actors, but State Action, where "[a] poster of the *Ten*

9

*Commandments* hangs prominently in a gilded frame in a Court of Common Pleas in Richland County, Ohio", on the issue of "whether this display violates the *Establishment Clause* of the *First Amendment* to the *United States Constitution*", "[t]he Court holds that it does." *ACLU of Ohio Foundation, Inc. v. Ashbrook*, 211 F.Supp.2d 873 (N.D. Oh. June 11, 2002).

23. Where simply "an elementary school's class practice and scheduled performance of a song entitled 'In God We Still Trust'", "set to be performed at an end-of-the-year assembly", even "Defendants' declaration that it has no intention of resuming classroom practices or Assembly performance of the Song does not strip Plaintiffs' of their standing to move for a preliminary injunction barring such conduct." *S.D. v. St. Johns Cy. Sch. Dist.*, 632 F.Supp.2d 1085 (2009).

24. While "[f]rom colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom", *Marsh v. Chambers,* 463 U.S. 783 (1983): *see also Cnty. of Allegheny v. ACLU,* 492 U.S. 573 (1989), "the general principles animating the *Establishment Clause* remain relevant even in the context of legislative prayer." *Lund v. Rowan Cy., North Carolina*, 863 F.3d 268 (2017).

25. "First, the *Constitution* 'affirmatively mandates accommodation, not merely

10

tolerance, of all religions, and forbids hostility toward any.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668 (1984)).

26. "Second, the government 'may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"" *Id.* (quoting *Lee v. Weisman*, 505 U.S. 577 (1992) (quoting *Lynch*, 465 U.S. at 668)).

27. "By 'ensuring governmental neutrality in matters of religion,'" *Id.* (quoting *Gillette v. U.S.*, 401 U.S. 437 (1971)), "the *Establishment Clause* safeguards religious liberty and wards off 'political division along religious lines'". *Id.* (quoting *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

28. "An instrument of social peace, the *Establishment Clause* does not become less so when social rancor runs exceptionally high." *Id.*

29. "That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths"; So long as the town maintains a policy of nondiscrimination, the *Constitution* does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Town of Greece v. Galloway*, 572 U.S. 565 (2014)).

30. The relevant inquiry revolves around "allowing some individuals to give prayers at a legislative session but not others due to 'an aversion or bias ...

11

against minority faiths' or other 'impermissible motive' is discrimination in violation of the *Establishment Clause*." *Satanic Temple, Inc. v. City of Boston*, 684 F.Supp.3d 21 (2023) (quoting *Ibid.*; Marsh, 463 U.S. 783).

31. "Arlington Public Schools (APS) [had] filed a complaint in federal court and moved for an injunction seeking to reverse the U.S. Department of Education (U.S. DOE)'s designation of APS as a 'high risk' grantee." Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *APSVA*, August 29, 2025.

32. "Bethany Zecher Sutton, Chair, Arlington School Board", had stated in a press release, "'We are calling for judicial intervention to unfreeze approximately $23 million in federal funds to ensure our public education system provides students with the tools and resources they rely on for successful academics and personal wellbeing." *Id.*

33. "APS has a duty to our community of students, families and educators to defend the resources they deserve, and policies designed to protect students of all backgrounds. . . ," said Dr. Francisco Durán, Superintendent, Arlington Public Schools", adding, "'We strongly disagree with the U.S. DOE's assertion that our policy violates Title IX.'" *Id.*

34. However, to raise this complaint, not brought by any parent, guardian or custodiam with standing, under Va. Code § 22.1-71, that "'the Department is

12

incorrectly interpreting Title IX'", Catherine Ashby, "Arlington Public Schools Seeks Federal Court's Relief to Unfreeze Federal Funds," *supra*, the cash-strapped municipal authority has retained a law firm outside the Commonwealth of Virginia that is "recognized among the top 10 firms on The American Lawyer's A-List," which "has continued to place among the industry's elite firms in 2024, ranking 9th among the market leaders 'that are operating on all cylinders, showing high performance not just on financial metrics, but across talent, diversity and social responsibility as well'" and that has "climbed 22 spots since 2019, including four places in the last year alone", as "highlighted" by *The American Lawyer* for "emergence as an A-List standout". Editors, "Willkie Ranked as a Top 10 Firm in *The American Lawyer's* 2024 A-List" *Wilkie*, August 6, 2024.

35. This issue suggests more than a staff member exercising free speech.

### In Loco Parentis Litigation

36. "The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless

13

increase in the cost of litigation." Va. Code § 8.01-271.1.

37. "Familiar illustrations of the [proper] use of a plea would be: the statute of limitations, absence of proper parties (where this does not appear from the bill itself), *res judicata*, usury, a release, an award, infancy, bankruptcy, denial of partnership, *bona fide* purchaser, denial of an essential jurisdictional fact alleged in the bill, *etc.*", *Tomlin*, 251 Va. at 478; however, tragically, on appeal Appellants' "stream of consciousness complaint fails to state any viable claim". Arlington Votes Plea in Bar and Demurrer, *Webb v. Washington Post*, Case No. CL24002622-00, p. 1, ¶ 2 (Richmond Cir. September 3, 2025)

38. In the Commonwealth of Virginia, "[t]he authorities which allow a recovery on the theory of implied contract seem to us to place the marriage relation on too much of a commercial basis, and to treat the marital relation as any other business association, whereby each expects to obtain material advantage from the marriage", and "[t]his is not, in our opinion, the true concept of the relation." *Alexander v. Kuykendall*, 192 Va. 8 (1951).

39. "Marriage, as defined by Mr. Justice Story, in his Conflict of Laws, sec. 108, is 'more than a mere contract'"; "[i]t is rather to be deemed an institution of society founded upon the consent and contract of the parties, and in this view it has more peculiarities in its natural character, operation, and extent of obligation different from what belongs to ordinary contracts.'" *Id.* (citing *Ibid.*)

14

**40.** "'Unlike other contracts, it is one instituted by God himself, and has its foundation in the law of nature'"; "'[i]t is the parent, not the child, of civil society.'" *Id.* (citing 1 *Fras.Dom.Rel.* 87).

**41.** "The *Constitution* gives federal courts the power to adjudicate only genuine Cases and Controversies." *Kerr v. Polis*, 20 F.4th 686 (10th Cir. 2021) (en banc) (cleaned up).

**42.** "This case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . [and] requires a party seeking relief to have suffered, or be threatened with, an actual injury traceable to the appellee and likely to be redressed by a favorable judicial decision by the appeals court." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868 (10th Cir. 2019) (cleaned up).

**43.** "'[I]t is this court's role to apply laws as the. . . [Legislative Authority] has written them, not as we would have . . . written them ourselves.'"; "[t]o do otherwise is to usurp a core legislative prerogative", and, "[i]n construing the. . . [Legislative Authority]'s words, however, our lodestar must be actual legislative intent." *Holiday v. U.S.*, 683 A.2d 61 (D.C. 1996).

**44.** "'[T]he courts are the final authorities on issues of statutory construction'' and ''must reject administrative constructions of [a] statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.'"" *Medicines Company v. Kappos*, 731 F. Supp. 2d 470 (E.D. Va.

15

2010) (quoting *Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988) (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981)).

45. Clearly, when considering decedents, trusts and estates, where "[i]t is apparent that a mistake. . . occurs, which calls for correction in a court of equity, since it is not possible, consistently with the testator's intention, . . . [t]he power and duty of the court to make the proper correction is not denied." 1 *Story's Eq.*, sections 179, 180.

46. Similarly, "there is no doubt that courts of equity have jurisdiction to correct them, when they are *apparent upon the face* of the will, or may be made out by a due construction of its terms; for in cases of wills *the intention will prevail over the words*." *Id.*

47. Similarly, least in the Commonwealth, the legislative authorities, and presumably extending to even unrepresented litigants, are "presumed to have known. . . the definition and interpretation already attributed to the term[s]", and "[t]he principles of statutory construction require us to ascertain and give effect to the legislative intent". *Branch v. Commonwealth*, 14 Va. App. 836 (Va. Ct. App. 1992) (citing *Scott v. Commonwealth*, 14 Va. App. 294 (1992); *Crews v. Commonwealth*, 3 Va. App. 531 (1987)).

48. Hence, generally, "[t]he plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction; a statute

16

should never be construed so that it leads to absurd results." *Id.* (citing *Scott*, 14 Va. App. at 294; *Walthall v. Commonwealth*, 3 Va. App. 674 (1987)).

49. The *rem* had been brought "before the Court in the above-captioned actions on. . . Plaintiff Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order, Civil Action No. 1:25-cv 1434 ("ASB"), Dkt. 2"; "however, Defendants [had] raise[d] the threshold question of this Court's subject matter jurisdiction. Under controlling Supreme Court and Fourth Circuit precedent, this Court lacks subject matter jurisdiction." Order, September 5, 2025.

50. "Standing is a threshold requirement because it derives from the *Constitution's* limit on. . . courts' authority to resolve 'cases' and 'controversies.'" *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274 (7th Cir. 2020) (quoting *Const.*, Art. III, § 2, Cl. 1).

51. "Standing is 'essential;' without it, . . . courts have no subject-matter jurisdiction over a case", *Maly v. Pritzker*, 22-cv-04778 (N.D. Ill. Sep. 30, 2024), and "there is no exception to the necessity of standing, even if the plaintiffs argue that a government action would otherwise be exempt from challenge." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013))[2].

---

[2] "[T]he assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Id.* (quoting *Valley Forge*

And, in the Commonwealth of Virginia, "[a]ny parent, custodian, or legal guardian of a pupil attending the public schools in a school division who is aggrieved by an action of the school board may, within thirty days after such action, petition the circuit court having jurisdiction in the school division to review the action of the school board". Va. Code § 22.1-87.

52. No person with standing had brought suit on the issue of school closures, nonmedical grade facial coverings mandates or even the "the authorization of emergency use of drugs and biological products during the COVID–19 pandemic, pursuant to section 564 of the *FD&C Act*". 85 Fed. Reg. 63, April 1, 2020.

53. "The question of whether a. . . [person], standing *in loco parentis*, may claim parental immunity from liability for personal injuries sustained", in this context "is a matter of first impression with this court", and prior to *Smith v. Kauffman, Adm'r.*, 212 Va. 181 (1971), "parental immunity had been a complete defense to any personal injury action brought by a child against his parent." *Lyles v. Jackson*, 216 Va. 797 873 (April 23, 1976) (citing *Norfolk Southern R. R. v. Gretakis*, 162 Va. 597 (1934)).

54. "The basis for the rule was that litigation by a child against his parent would

---

*Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)).

18

tend to disturb the peace and tranquility of the home or disrupt the family finances"; "[m]oreover, such litigation might tend to promote collusion and corruption." *Id.*

55. "This same reasoning applies to one standing *in loco parentis.*" *Id. See also Fountain v. Fountain*, 214 Va. 347 (1973).

56. Nonetheless, had such been timely challenged by any parent, custodian or legal guardian, "[s]uch review shall proceed upon the petition, the minutes of the meeting at which the school board's action was taken, the orders, if any, of the school board, an attested copy of the transcript, if any, of any hearing before the school board, and any other evidence found relevant to the issues on appeal by the court", and "[t]he action of the school board shall be sustained unless the school board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion." *Id.*

57. However, when the Office for Civil Rights (OCR) had "called for APS, Fairfax County Public Schools, Alexandria City Public Schools, Loudoun County Public Schools and Prince William County Public Schools to take. . . actions", "Arlington Public Schools spokesperson Frank Bellavia" had issued a statement: "'APS remains committed to providing all students with safe, supportive and inclusive learning environments.'" Dan Egitto, "Education Department pushes APS to strike transgender policy, alleging Title IX

19

discrimination," *ARL Now*, July 25, 2025.

58. The school board, all women, has not had a Black member since 2021, when it had been reported that "School Board Chair Monique O'Grady will not be seeking reelection after her term ends this December". Jo Devoe, "School Board Chair Monique O'Grady to Step Down in December, Says Return to School is Top Priority," *ARL Now*, January 21, 2021.

59. And, in February, when June Prakash, who had become "Arlington Education Association president in the wake of a financial scandal that rocked the organization", had pitched herself to Arlington Democrats, distinguishing herself from her opponent, she has stated: "'I didn't come out of nowhere'", adding "I've been quietly doing the work," and emphasizing that "she understands school operations 'inside and out.'" *Id.*

60. However, also in February, "[s]everal Northern Virginia school districts, including Fairfax County Public Schools," had been "in the crosshairs of the U.S. Department of Education after a conservative legal group filed a complaint challenging their transgender-inclusive bathroom and locker room policies." James Jarvis, "DEVELOPING: FCPS facing federal investigation over transgender policies," *FFX Now*, February 14, 2025.

61. "The Department of Education's Office for Civil Rights (OCR) opened an investigation this week into Fairfax, Arlington, Alexandria, Loudoun and Prince

William schools in response to the complaint from America First Legal, a nonprofit founded by former Trump advisor Stephen Miller." *Id.*

62. "In Arlington, Democrats hold almost all levers of power", and "[t]he voters there are so solidly blue that they are among the Northern Virginians who usually provide the margin of victory for Democrats who win statewide." Patricia Sullivan, "Arlington County Democrats continue to dominate region's politics," *Washington Post*, November 7, 2017.

63. However, this year, "[t]he chair of Arlington's GOP is seeking 15% more local votes for statewide candidates in 2025 than the party received in 2021", Scott McCaffrey, "Arlington GOP seeks 15% more votes for statewide ticket than in 2021," *ARL Now*, September 24, 2025.

64. "Party chair Matthew Hurtt hopes the ticket with gubernatorial candidate Winsome Earle-Sears, alongside lieutenant governor candidate John Reid and incumbent Attorney General Jason Miyares, can earn more than the 21,548 Arlington votes that Republican Glenn Youngkin earned in the 2021 governor's race." *Id.*

65. Glen "Youngkin trailed Democrat Terry McAuliffe by a significant margin in Arlington, as McAuliffe received 73,013 votes — 76.7% of the total", and "Youngkin carried the statewide vote by a mere 66,000 out of nearly 3.3 million ballots cast." *Id.*

66. "The seats are almost guaranteed to remain in Democratic hands, but having Republican challengers helps build GOP enthusiasm, party leaders believe", and "[t]hat, in turn, supports the statewide ticket." *Id.*

67. "'The raw votes from Arlington matter,' Hurtt said." *Id.*

68. Although, with the Washington-Lee Alumni Association footing the bill and coordinating, "Sydney Dodini, a rising senior at Washington-Lee", "and Will Johnson, also a rising senior," were "two of three students suing Arlington County Public Schools and the school board over its action". Peggy Fox, "Washington-Lee students sue Arlington Co. Schools over renaming high school," *WUSA9*, July 20, 2018. *But see also* John Henry, "Washington-Lee students sue Arlington Co. Schools over renaming high school," *WUSA9*, January 22, 2020.

69. However, during a Section 564 public health emergency, 85 Fed. Reg. 26, *supra*; 85 Fed. Reg. 63, *supra*, "[a] petition to mandate coronavirus vaccines for all eligible students and staff in Virginia schools has accumulated nearly 6,000 comments online — setting a record for the Virginia Department of Health's typically sleepy regulatory process", but the former Virginia Governor, the nation's only physician serving as a state governor during the global public health crisis, Alan Suderman, "Northam, Nation's Only Doctor Governor, Offers Sober Voice on Coronavirus," *NBC Washington*, April 9, 2020.

22

70. Similarly, organize "[n]early 1,000 people ha[d] signed an online petition calling on Arlington Public Schools to require masks for in-person instruction in the fall", when it was reported, "They're in luck: that's precisely what APS is planning to do." Scott Broadbeck, "APS to Require Masks, Daily Health Checks in Schools This Fall," *ARL Now*, July 2, 2020[3].

71. Hence, it was not surprising that, when "Monique 'Moe' Bryant defeated June Prakash in the Arlington County Democratic Committee caucus, moving on to the Nov. 4 general election", Scott McCaffrey, "Bryant wins 69% in Democratic School Board caucus, advances to general election," *ARL Now*, May 12, 2025, with a candidate who even artificial intelligence confuses with a member of the school board in Detroit, as in evidence at Exhibit **E**, the school board put out a series of press releases and statements on this controversial issue, when "[t]wo Northern Virginia school systems sued the Education Department to challenge Trump administration threats to their federal funding over their policies for transgender students' access to restrooms and locker rooms." Juan Perez, Jr., "Virginia schools sue Trump administration over transgender student funding fight," *Politico*, August 29, 2025.

---

[3] "'Moving forward we will be requiring all staff and students to wear face coverings while in school and at work as medically appropriate,' Superintendent Dr. Francisco Durán said in a presentation on Wednesday, adding that APS based its mask policy on guidance from the Centers for Disease Control." *Id.*

23

**72.** "'It's disturbing that these Virginia school division leaders are fighting harder to keep boys in girls sports and bathrooms than they are to improve outcomes for students,' Education Secretary Linda McMahon said in a social media post". *Id.*

**73.** And, in this matter of purported urgency, the Trial Court made clear that "[e]arlier this year, in *Department of Education v. California*, the Supreme Court of the United States granted a stay of a federal district court order4 which had (1) enjoined the Department from terminating various education-related grants and (2) required the Department to pay out past-due grant obligations and continue paying obligations as they accrued." Order (citing 145 S. Ct. 966 (2025)).

**74.** "In so doing, the Supreme Court held that the Department was likely to succeed in showing that the district court 'lacked jurisdiction to order the payment of money under the APA' because '[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Id.* (quoting *Ibid.* (quoting 5 U.S.C. § 702)).

**75.** The Trial Court had made clear that, "[d]espite the recency of the California decision, the Fourth Circuit has already applied California in other cases", *Id.*, noting that, "[b]ecause this forum shopping circumvents a primary purpose of

the *Act*— to ensure that a central body adjudicates most claims against the United States Treasury, we have stated that 'jurisdiction under the *Tucker Act* cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief.'" *Id.* (quoting *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal citations omitted)). *See also Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471 (4th Cir. 1983).

76. "Thus, even if Plaintiffs had avoided pleading an explicit request for money damages (which they did not, as their Complaints seek to compel Defendants to 'immediately pay'), their avoidance of those words would not overcome the direct connection that their Motions and Complaints draw between the relief sought here and the disbursement of federal funds", and "[t]his connection compels the Court to find that, under the *Tucker Act*, jurisdiction is lacking here." *Id.*

77. "'The lack of subject matter jurisdiction cannot be waived,' 'cannot be conferred on a court by the litigants,' and 'may be raised at any time.'" *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors*, 285 Va. 87 (Va. 2013) (quoting *Virginian–Pilot Media Cos., LLC v. Dow Jones & Co., Inc.*, 280 Va. 464 (2010).

78. "[T]he want of such jurisdiction of the trial court will be noticed by this [C]ourt

25

*ex mero motu*", *Afzall v. Commonwealth*, 273 Va. 226 (2007); "[a] judgment or order entered by a court that lacks jurisdiction of the subject matter is a nullity." *Virginian–Pilot*, 280 Va. at 464.

79. "A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, is forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought." Va. S. Ct. R. 1:6(a).

80. "A claim for relief pursuant to this rule includes those set forth in a complaint, counterclaim, cross-claim or third-party pleading." *Id.*

81. While neither *res judicata* nor collateral estoppel should serve as a bar to redress for grievances in at least some instances, *McDonald v. City of W.Branch*, 466 U.S. 284 (1984), "this is not that case". *U.S. v. Rickmon*, No. 19-2054 (7th Cir. 2020). "We are not the first court to see things this way." *Webb v. Meta Platforms, Inc.*, Civil Case No. 1:23-cv-00816 (D.D.C. July 28, 2023).

82. Even in other American jurisdictions the practically universal doctrine has been

26

described as a claim of preclusion that "bars the re-litigation of claims that were raised or could have been raised in a prior proceeding," *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882 (2013) (citing *Jaffree v. Wallace*, 837 F.2d 461 (11th Cir. 1988), and most trained in the law and experienced in its practice know, or should have known that one asserting *res judicata* must establish four elements: "(1) the prior decision must have been rendered by a court of competent jurisdiction", as here, "(2) there must have been a final judgment on the merits", as here, "(3) both cases must involve the same parties or their privies", as here, "and (4) both cases must involve the same causes of action." *Id.* (citing *In re: Piper Aircraft*, 244 F.3d 1289 (11th Cir. 2001). And Courts of the Commonwealth have been upheld, rightfully, for imposing sanctions against litigants who persist in bringing claims "barred by *res judicata* from relitigating". *Switzer v. Switzer*, 273 Va. 326 (2007).

### Equal Protection

83. Without express exception, "[a]ll persons. . . shall have the same right in every State and Territory. . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), and, with respect to education, "[s]uch an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954).

84. However, "[i]f two or more persons conspire to injure, oppress, threaten, or

27

intimidate any person. . . in the free exercise or enjoyment of any right or privilege secured to him by the *Constitution* or laws of the United States, or because of his having so exercised the same. . . [,] '[t]hey shall be fined under this title or imprisoned not more than ten years, or both". 18 U.S.C. § 241.

85. Moreover, "[w]hoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this title or imprisoned not more than ten years, or both; and shall be incapable of holding any office under the United States." 18 U.S.C. § 2383.

86. In plain view, it is it "subject to reasonable dispute", Fed.R.Evid. 201(b), that Board had failed to address a threat posed by a CBRN agent or agents, 85 Fed. Reg. 26, February 7, 2020; 85 Fed. Reg. 63, April 1, 2020, placing in danger 90% of school-age children. *Webb v. Virginia State Bar*, Case No. CL25-830 (Arlington Cir. 2025), on appeal, Record No. 1556-25-4 (Va.App. 2025).

87. Still, "[t]he *Equal Protection Clause* of the *Fourteenth Amendment* commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202 (1982)).

88. From currently 28,006 students enrolled in PreK to 12, 27,064 enrolled in K to

28

12, Staff, "Membership Summary," APSVA, February 28, 2025, including

13,419 female students (47.81%), only 65 (0.23%) are designated as nonbinary.

Staff, "Student Demographics (2024-2025)," APSVA,

analytics.apsva.us/public/equity/aps_membership.html (accessed March 12,

2025).

89. "While *Tinker* stands for the proposition that a student in a public school has

First Amendment rights which he may freely exercise, it likewise stands for the

proposition that, in exercising those rights, he may not do so in a manner which

would materially and substantially interfere with discipline and good order in

the operation of the school of with the rights of others." *Commonwealth v.*

*Pleasants*, 214 Va. 646 (March 4, 1974).

90. That established, "Arlington is a diverse community in terms of ethnicity, race

and country of origin", and "[t]he student body of Arlington Public Schools

speaks a total of 90 languages from 149 countries of origin." Editors, "Diversity

in Arlington: A Community with International Influence," *Arlington Economic*

*Development*, https://www.arlingtoneconomicdevelopment.com/Life-in-

Arlington/Diversity-Inclusivity (accessed September 27, 2025).

91. "People of color make up 41% of the Arlington population." *Id.* However,

"[w]henever. . . an aggrieved person institutes a proceeding under any statute to

enforce the voting guarantees of the *[F]ourteenth* or *[F]ifteenth [A]mendment* .

. . the *court shall authorize* the appointment of Federal observers by the Director of the Office of Personnel Management". 52 U.S.C. § 10302(A) (emphasis added).

92. "A plaintiff alleging denial of equal protection under 42 U.S.C. § 1983 must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." *Dobson v. Vail*, No. C10-5233 RBL/KLS, 2012 WL 1067223 (W.D. Wash. February 16, 2012), *report and recommendation adopted*, No. C10- 5233 RBL/KLS, 2012 WL 1067208 (W.D. Wash. Mar. 28, 2012) (citing *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022 (9th Cir.1998)).

93. "Plaintiff must demonstrate that state actors 'acted with the intent to discriminate.'" *Id.* (quoting *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104 (9th Cir.1991)).

94. "This 'discriminatory purpose' must be clearly shown", *Id.* (quoting *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142 (9th Cir.2007)), and "plaintiffs must demonstrate that they were 'treated differently ... because [they] belonged to a protected class.'" *Id.* (quoting *Seltzer–Bey v. Delo*, 66 F.3d 961 (8th Cir.1995) (citing *Divers v. Dep't of Correction*, 921 F.2d 191 (8th Cir.1990)).

95. "Indeed, showing that different persons are treated differently is not enough

without more, to show a denial of equal protection." *Griffin v. Cty. Sch. Bd. of Prince Edward Co.*, 377 U.S. 218 (1964)). *See also Village of Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252 (1977).

96. Clearly, "it would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians"; however, as here, "schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, making studying impossible, block entrances, or incite children to leave the schoolhouse." *Grayned City of Rockford*, 408 U.S. 104 (1972).

## A Dream Deferred

97. "We review the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government." *U.S. v. McVeigh*, 153 F.3d 1166 (10th Cir.1998), *cert. denied*, 526 U.S. 1007 (1999). And it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned", Va. S. Ct. R. 2:201(b), that, with a population of 234,162, median incomes of $140,219, and median home values of $850,900,  Staff, "Arlington County, VA," *Census Reporter*, https://censusreporter.org/profiles/05000US51013-arlington-county-va/ (accessed September 27, 2025), with 30,738 residents are between the ages of 5 and 18, in 2020, Staff, "QuickFacts: Arlington County,

31

Virginia," *U.S. Census Bureau*, July 1, 2023, APS Board is responsible for "the 13th largest among Virginia's 132 school divisions" , Staff, "About APS," *APSVA*, https://www.apsva.us/about-aps/ (accessed October 28, 2024), at which 90%, or 27,586 children, Staff, "APS Quick Facts," *APSVA*, March 31, 2023, are not enrolled in private or parochial school.

98. Similarly, it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned", Va. S. Ct. R. 2:201(b), that 92% of those enrolled students had "Plan[ned] to Continue to Post Secondary Education", Staff, "APS Quick Facts," *supra*; however, Harvard University accepts less than five percent of those who apply, Staff, "Harvard University," *U.S. News & World Report*, https://www.usnews.com/best-colleges/harvard-university-2155 (accessed July 4, 2023), and, in the Class of 2022, the second best public schools in the Commonwealth, Staff, "2024 Best School Districts in Virginia," *Niche*, https://www.niche.com/k12/search/best-school-districts/s/virginia/ (accessed October 1, 2023), only 1 of 96 students had been validated as "Harvard Material." Editors, "Where Arlington's Class of 2022 Applied to College and Got In," *Arlington Magazine*, September 13, 2022, far less than five percent, indicative of a safe and effective vaccine against infection for that Ivy League College.

99. "In 2022, Arlington Public School seniors collectively reported having sent out

32

10,583 college applications—a 28% increase over applications from just four years prior". Editors, "The 20 Most Popular Colleges for Arlington's Class of 2022," *Arlington Magazine*, January 20, 2023.

100.  And, at least according to one popular magazine, "Northern Virginia is chock full of high-achieving parents whose high-achieving kids have set their sights on the uppermost echelons of higher education." Tamara Lytle, "Who Actually Gets Into the Ivy League and Other Elite Colleges?" *Arlington Magazine*, September 16, 2025.

101.  "They've taken the toughest classes, turbo-loaded their extracurriculars and sacrificed sleep to position themselves for success." *Id.*

102.  However, with an average graduation rate of 87%, at Wakefield High School, only 65% graduate proficient in math, 66% proficient in reading, and the median SAT score is only 1240. Editors, "Wakefield High School: #3 in Best Public High Schools in Arlington County," *Niche*, https://www.niche.com/k12/wakefield-high-school-arlington-va/ (accessed September 27, 2025)[4].

---

[4] Overall, APS students are 77% proficient in reading, but only 65% proficient in mathematics, with a median SAT score of 1290, and a median ACT score of only 30. Editors, "Arlington Public Schools," *Niche*, https://www.niche.com/k12/d/arlington-public-schools-va/academics/ (accessed September 26, 2025).

**103.** At the other end of the spectrum, boasting a 95% graduation rate, at

Yorktown High School, 94% graduate with proficiency in reading, but only

83% with proficiency in mathematics, and attain a median SAT score of only

1310. Editors, "Yorktown High School: #12 in Best Public High Schools in

Virginia," *Niche*, https://www.niche.com/k12/yorktown-high-school-arlington-

va/ (accessed September 27, 2025).

**104.** "Harvard University has an acceptance rate of 4%", and "[h]alf the

applicants admitted to Harvard University who submitted test scores have an

SAT score between 1510 and 1580." Editors, "Harvard University

Admissions," *U.S. News & World Report*, https://www.usnews.com/best-

colleges/harvard-university-2155/applying (accessed September 26, 2025).

**105.** At least as to any perceived mental impairment, or dysphoria, about which

the Fourth Circuit has recently advised that, "[l]eft untreated, . . . can cause,

among other things, depression, substance use, self-mutilation, other self-harm,

and suicide." *Grimm v. Gloucester Cy/ Sch. Bd.*, No. 19-1952 (4th Cir. 2020)

(citing Br. of Medical Amici 11). Virginia Commonwealth University (VCU)

accepts 91%, far less competitive but has a 44% four-year graduation rate.

Staff, "Virginia Commonwealth University," *U.S. News & World Report*,

https://www.usnews.com/best-colleges/vcu-3735 (accessed August 6, 2024),

however, in the Class of 2022, 43% of APS graduates had defied the gravity of

34

hitting the floor, after falling from a chair, failing to catch an invitation to matriculate there in the "fall". Editors, "Where Arlington's Class of 2022 Applied to College and Got In," *supra.*

106. "'You're not going to win if you don't have the right information,'" according to the Secretary of Defense; "rosying up intelligence doesn't help us be successful in this fight." Howard Altman, "Defense Department IG report finds no intelligence falsification at CentCom," *Tampa Bay Times*, February 2, 2017.

107. "[L]awmakers, elections officials, and community advocates testified that ballot collection tends to be used more by communities that lack easy access to secure, outgoing mail services; the elderly, homebound, and disabled; the poor; those who lack reliable transportation; those who work multiple jobs or lack childcare; and less educated voters who are unfamiliar with or more intimidated by the voting process." *DNC. v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018).

108. "In turn, data shows that these socioeconomic circumstances are disproportionately reflected in minority communities." *Id.* (citation omitted).

109. "It stands to reason, then, that prior to H.B. 2023's enactment minorities generally were more likely than non[-]minorities to give their early ballots to third parties." *Id.*

110. "Due to their lower levels of literacy and education, minority voters are

35

more likely to be unaware of certain technical rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *Id.* (citation omitted).

111.  "In this enclave of left-leaning affluence a few miles from the U.S. Capitol, 8th District Democrats could have selected a new, more progressive course from their ballot choices, which included two openly gay candidates and two blacks"; however, "[i]nstead, they nominated a white man who just turned 64, a veteran of politics whose car dealerships are ubiquitous in Northern Virginia and who touts himself as a progressive, even though he was known as a pragmatist when he was the state's lieutenant governor." Paul Schwartman, "After his political resurrection, candidate Beyer adopts high-minded approach," *Washington Post*, June 28, 2014.

112.  And, "[i]n a district where 48 percent of residents are minorities," Megan Flynn, "Don Beyer's first primary challenger asks him to 'pass the torch'," *Washington Post*, April 24, 2022.

113.  Yet, in 2022, 86% of graduates had failed to gain acceptance to Kamala Harris' *alma mater*, Howard University, Editors, "Where Arlington's Class of 2022 Applied to College and Got In," *supra*, suggesting reasonably that the next president is not coming from a Virginia public school.

114.  Within Virginia's Eighth Congressional District, it is widely acknowledged

36

that "[i]n Arlington, Democrats hold almost all levers of power", and "[t]he voters there are so solidly blue that they are among the Northern Virginians who usually provide the margin of victory for Democrats who win statewide." Patricia Sullivan, "Arlington County Democrats continue to dominate region's politics," *Washington Post*, November 7, 2017.

115.  "APS is fortunate to have financial resources at its disposal in order to make the requisite investments in its diversity infrastructure", and "vast diversity that already exists within the school division." Julian R. Williams, "Arlington Public Schools Infrastructure Assessment of Diversity: Final Report & Recommendations," March 3, 2019.

116.  "Arlington Public Schools (APS) has been ranked as one of the best school systems in the country"; Matthew Herrity, *Report: APS Minority Achievement*, February 27, 2017; however, "APS personnel have difficulty discerning language and cultural barriers from the cognitive needs of ELLs." Public Consulting Group, *Final Report: Evaluation of APS Services for Students with Special Needs* (January 2013).

117.  "Over the past 60 years, beginning with the integration of Stratford Junior High and extending to the current day with plans for new buildings and revisioning the high school experience, Arlington Public Schools has considered the changing needs of its school population through periods of

37

expansion and decline, changing demographics, technology growth and evolving instructional approaches." APS, *The Changing Face of Arlington Public Schools Over the Past Six Decades* (March 2013).

118. "Arlington is one of the most diverse cities in the metropolitan D.C. area and this diversity, if properly leveraged, presents numerous opportunities." *Id.*

119. However, while "[t]here was a strong sense of belief in the passion, sincerity, and intentionality that exists within APS", "additional visioning and goal setting concerning diversity needs to be defined by the Board", and, "[u]ntil some level of Board consensus is reached it will be difficult for APS leadership and 'ground-level' practitioners to craft a direction around key issues." *Id.*

120. "This work will likely need to be facilitated by a third-party for optimal results." *Id.*

121. "It is a 'cardinal constitutional command' that government coercion, even when indirect, cannot constitutionally compel individuals to 'mouth support' for religious, political, or ideological views that they do not believe." *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504 (2023) (quoting *Janus v. American Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878 (2018)).

122. Yet, the County of Arlington had formerly been "billed as the most educated city in the U.S., in a Forbes analysis, thanks to 76% of adults 25 and older

holding a bachelor's degree", in a community where "[n]early 42% of Arlington residents hold a graduate degree"; however, even "Forbes [had] noted a racial gap in bachelor's degrees, with 10.5% of non-white residents holding degrees". Cuneyt Dil, "Arlington is the most educated city in the country, study finds," *Axios*, October 26, 2023.

**123.** Tragically, while "Arlington has added another bragging right to its growing list of accolades: second most educated city in the country", boasting proudly that "Arlington has the highest bachelor's degree completion rate in the country, with 78.22% of adults 25 and older earning one", a community in which "42.56% of Arlingtonians hold graduate degrees, and the county has the nation's lowest high school dropout rate, at 4.28%", Stephanie Kanowitz, "Arlington Named Second Most Educated City in the U.S.," *Arlington Magazine*, September 5, 2025 just "a hair above last year's percentages", Dan Egitto, "Arlington drops to second most educated 'city' in America," *ARL Now*, September 9, 2024, in disparate outcomes, even where, most recently, "a Circuit Court judge overturned the Arlington County Board's adoption of the Expanded Housing Options (EHO) zoning amendments", Staff, "Missing Middle Housing," *Arlington County*, https://www.arlingtonva.us/Government/Programs/Housing/Housing-Arlington/Tools/Missing-Middle (accessed February 11, 2025), quite tragically,

39

"the racial gap between White and non-white degree holders" had grown wider,

falling to 10.18% for non-white degree holders. Stephanie Kanowitz,

"Arlington Named Second Most Educated City in the U.S.," *supra.*

### The Elections Must Go On

124.  "Today, education is perhaps the most important function of state and local

governments", *Brown*, 347 U.S. at 483. However, "[t]he most recent Roanoke

College poll, taken in the middle of August, showed Spanberger's lead had

shrunk by a whopping 10 points in the span of three months"; "[l]ikewise,

another poll from co/efficient, a polling firm affiliated with Republicans,

showed Spanberger with only a 5-point lead." Jeremiah Poff, "Education

returns to center stage in Virginia gubernatorial race," *Washington Examiner*,

September 2, 2025.

125.  The shift had "coincided with the beginning of the new school year and,

with it, a host of new headlines that have reminded voters that the problems in

the education system didn't just go away when Youngkin was elected." *Id.*

126.  Yet beyond politically charged social issues, "Virginia recently ranked last

among all states and Washington, D.C. in math recovery and No. 41 in reading

recovery, making education a topic of interest in the gubernatorial race." Ella

Vangundy, "Next Virginia governor will inherit education system issues,"

*Henrico Citizen*, September 30, 2025.

40

127. "Republican gubernatorial nominee and current Lt. Gov. Winsome Earle-Sears has not [even] released an education plan and did not respond to three attempts by phone and email to contact her." *Id.*

### The Most Important Function of State & Local Government

128. "Virginia students will soon face tougher academic expectations", as "the State Board of Education voted. . . to support raising the benchmarks — or cut scores — for math and English, setting off a debate over how the changes will affect classrooms." Nathaniel Kline, "Youngkin's education board moves to toughen proficiency standards," *Virginia-Mercury*, September 26, 2025. While "Arlington's overall pass rate in reading and math was 79%,", Scott McCaffery, "APS had second-best test scores in N. Va. last school year, trailing Loudoun County," *ARL Now*, September 23, 2025, in broader context, "[u]nder the current cut scores, 73% of students passed their reading SOL exam"; "[h]owever, under the newer cut scores, only 40% of fourth graders are projected to pass", and, "[i]n math, the projections show a similar story." Tyler Englander, "Projections show more than 50% of VA students could fail SOLs because of new cut scores," *WRIC*, September 26, 2025.

129. "The current pass rate for fourth graders in math is 73%. However, only 43% of the students are projected to pass under the new cut scores." *Id.*

130. "'Virginia is the absolute lowest-scoring state in terms of proficiency cut

41

score than any other state in the country,' said Board Member Amber Northern", and "[t]he board said it's to better align Virginia's standards with a prominent national exam known as The Nation's Report Card, or NAEP." *Id.*

131.    While "[t]he current SOL pass rate is 73%", "the new cut scores would lower that to 43%, more in line with the 40% of Virginia fourth-graders who passed the NAEP exam, according to the most recently released data." *Id.*

### Rear View Mirror Issues

132.    "Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law". *Reynolds v. U.S.*, 98 U.S. 145 (1878).

133.    "A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*, 245 Va. 107,425 S.E.2d 512 (1993) (citing *Winn v. Aleda Constr. Co.*, 227 Va. 304 (1984)).

134.    "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic", and "[i]t does not even protect a man from an injunction against uttering words that may have all the effect of force". *Schenck v. U.S.*, 249 U.S. 47 (1919) (citation omitted).

135.    It "can be accurately and readily determined from sources whose accuracy

42

cannot reasonably be questioned", Fed.R.Evid. 201(b)(2), that "[b]efore an *EUA* may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of four determinations". 85 Fed. Reg. 26, February 4, 2020.

136. The War Secretary and Homeland Security Secretary both hold an original classification authority (OCA) up to Top Secret, 75 Fed. Reg. 2, December 29, 2009, a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is *able to identify or describe*", E.O. 12,958, *Classified National Security Information*, Sect. 1.3(a)(1), *supra* (emphasis added), and may issue an *EUA*; however, they did not exercise this discretionary authority.

137. Yet, the HHS Secretary possesses OCA only up to "Secret", 75 Fed. Reg. 2, *supra*, a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is *able to identify or describe*", E.O. 12,958, *Classified National Security Information*, Sect. 1.3(a)(2), *supra*. And, "[o]n February 4, 2020, pursuant to section 564 of the *FD&C Act*," he had "determined that there is a public health emergency that has a significant potential to affect national security or the health and security of

43

United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019-nCoV)" and had "declared that circumstances exist justifying the authorization of emergency use of *in vitro* diagnostics for detection and/or diagnosis of the novel coronavirus (2019-nCoV) pursuant to section 564 of the *FD&C Act*, subject to the terms of any authorization issued under that section." 85 Fed. Reg. 26, *supra*.

138. An Agency "bears the initial burden of proving feasibility based on the best available evidence, and substantial evidence must be introduced to support the finding", and Agencies possess a "duty to present and explain its evidence and the analysis which led it to find the standard feasible for an industry." *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980).

139. Further, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action'", *Department of Homeland Security v. Regents of University of California*, 591 U.S. 1 (2020) (citation omitted), and, "[i]f those grounds are inadequate, a court may remand for the agency to . . . offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" *Id.* (citation omitted).

140. "Written messages are not communicated unless they are read, and reading

44

requires an affirmative act." *Banzhaf v. F.C.C.*, 405 F.2d 1082 (D.C. Cir. 1968).
"As always, we must begin with the words of the statute creating the
*[c]ommission* and delineating its powers", *Nat'l Petroleum Refiners Ass'n v.
FTC*, 482 F.2d 672 (D.C. Cir. 1973).

141.    Generally, legislative authorities are "presumed to have known. . . the
definition and interpretation already attributed to the term[s]", and "[t]he
principles of statutory construction require us to ascertain and give effect to the
legislative intent". *Branch v. Commonwealth*, 14 Va. App. 836 (Va. Ct. App.
1992) (citation omitted).

142.    The HHS Secretary, under Section 564, is only authorized to render this
determination if "there is a public health emergency, or a significant potential
for a public health emergency, that affects, or has a significant potential to
affect, national security or the health and security of United States citizens
living abroad, and that involves a CBRN agent or agents, or a disease or
condition that may be attributable to such agent or agents." 85 Fed. Reg. 26,
*supra*.

143.    "[I]f the legislature had meant. . . [any other factor] to be considered. . . , it
would have said so explicitly", *Brown v. Payton*, 544 U.S. 133 (2005).

144.    "[T]he traditional rule [dictates] that ignorance of the law is no excuse;
knowledge that the conduct is unlawful is all that is required.'" *U.S. v. Trevino*,

45

CR 2:23cr0066 RB (D.N.M. Apr. 23, 2024) (*Bryan v. U.S.*, 524 U.S. 184 (1998)).

145. "The working definition of the term 'chimera' is a new hybrid microorganism created by joining nucleic acid fragments from two or more different microorganisms in which each of at least two of the fragments contain essential genes necessary for replication" Richard E. Hill, Jr., Center for Veterinary Biologics Notice No. 05-23, December 8, 2005.

146. By the end of the pandemic emergency declaration, there had been 2,323,255 cases of COVID-19 infections reported in Virginia, Editors, "Virginia coronavirus cases and deaths," *USA Facts*, July 23, 2023, a state with a population of 8,631,393 in 2020, Staff, "VIRGINIA: 2020 Census," *U.S. Census*, https://www.census.gov/library/stories/state-by-state/virginia-population-change-between-census-decade.html (accessed October 23, 2024), discounting for cases or reinfection rolled into the dashboard totals, that represents 26.9% of the state's population, while there have been 23,769 deaths, Editors, "Virginia coronavirus cases and deaths," *supra*, enough to replace almost every live resident of the city of Staunton, Virginia, population 25,915. Staff, "QuickFacts: Staunton. . . , Virginia," *U.S. Census*, July 1, 2023.

147. However, "[f]ive years after the pandemic began, Americans largely see COVID-19 through the rear-view mirror." Alec Tyson, Michael Lipka &

Claudia Deane, 5 Years Later: America Looks Back at the Impact of COVID-19, "1. Americans' views on COVID-19 risk and the country's response to health emergencies," Pew Research Center, February 12, 2025.

148. Yet, one school board member, a father of biracial students at Wakefield High School, his *alma mater*, departing after only one term, had lamented "'We will always be linked to Covid and our response to it'". Scott McCaffery, "Departing School Board members lauded for service to students," *ARL Now*, December 14, 2024.

149. "Compulsory school attendance laws. . . demonstrate our recognition of the importance of education to our democratic society", *Brown*, 347 U.S. at 483; however, "Arlington's absenteeism rate has fluctuated over the past quarter-century, with peaks and valleys", and "[c]hronic absenteeism caused Wakefield High School to fail to receive fully-accredited status from the Virginia Department of Education for the current school year." Scott McCaffrey, "APS's chronic absenteeism dips year over year, but remains well above ultimate goal," *ARL Now*, October 21, 2024.

150. "It was one of two county schools that fell into the accredited-with-conditions category, the other being Carlin Springs Elementary (owing to standardized-test deficiencies in science)." *Id.*

151. "[W]e were hit with a virus that was met with silence and spread

47

unchecked"; "[d]enials for days, weeks, then months that led to more deaths, more infections, more stress, and more loneliness", and, "[w]hile it was different for everyone, we all lost something", sadly including, "whether our government and our democracy can deliver on really hard things for the American people." Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11, 2021.

152. Indeed, "months of discord about the coronavirus epidemic ha[d] transformed the cloth mask into a potent political symbol, touted by Democrats as a key part of communal responsibility, labeled by some GOP leaders as a sign of government overreach and as a scarlet letter pinned on the weak." Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," June 13, 2020[5].

153. Yet, "[n]ew cases of COVID-19 are increasing nationwide, fueled by the Stratus variant, an emerging offshoot of the Omicron variant." Alice Gibbs, "Map Shows Rising COVID Cases as Stratus Variant Spreads," *Newsweek*,

---

[5] "'Our findings suggest, in multiple ways, that the use of masks is highly protective in health-care and community settings,' said the author of the review, Holger Schünemann, an epidemiologist and physician at McMaster University in Ontario.

But that conclusion came with an important caveat: 'We have low certainty in that,' Schünemann said, meaning the authors cannot be strongly confident in the result." *Id.*

August 27, 2025, *updated* August 28, 2025.

154. "According to the Centers for Disease Control and Prevention (CDC), the national test positivity rate hit 9.9 percent in the past week, up 1.4 percent from last week." *Id.* "CDC data show the sharpest increases are in the U.S. South, where test positivity rates in some states have hit 15 percent." *Id.*

155. And, according to local government sources, "[w]ith the emergency phase over, efforts shift from emergency response to managing the ongoing COVID-19 pandemic alongside other infectious diseases", and it is the official position of local government officials that "[w]hile the emergency response has ended, there are no changes to the way we can protect ourselves from COVID-19", and to counter "a CBRN agent or agents", 85 Fed. Reg. 26, *supra*, they recommend that "[y]ou still can slow the spread using layered strategies", suggesting persons "[u]se as many multiple (overlapping) layers of protection as you can – stay up-to-date with vaccines (including boosters), get tested, and stay home when you're sick." Editors, "COVID-19 Data Dashboards," *supra*, while, in "an act of violence", Va. Code §§ 19.2-297.1 and 18.2-46.4, with respect to "a CBRN agent or agents", 85 Fed. Reg. 26, *supra*, seven deaths attributed to this "chimeric virus", 42 CFR § 73.3, the only deaths associated with a respiratory illness in the state, in the week ending August 16, 2025, along with three additional deaths, also the only deaths associated with a respiratory illness in

49

the week ending August 23, 2025, continuing to be the leading cause of death

associated with respiratory illness, Staff, "Respiratory Disease Data: Deaths:

Death Data (For Week Ending September 6, 2005), *VDH*,

https://www.vdh.virginia.gov/epidemiology/respiratory-diseases-in-

virginia/data/#Deaths (accessed September 10, 2025), are, even amongst

gubernatorial candidates, "met with silence and spread unchecked", with

"[d]enials for days, weeks, then months that le[a]d to more deaths, more

infections, more stress, and more loneliness". Briefing Room, "Remarks by

President Biden on the Anniversary of the COVID-19 Shutdown," *supra*.

**156.** However, on the campaign trail, "Virginia Lt. Gov. Winsome Earle-Sears,

the Republican nominee for governor in November, called transgender

bathroom policy 'nonsense' outside a Fairfax County Public Schools board

meeting", Charles Creitz, "'Nonsense': Earle-Sears blasts Fairfax transgender

bathroom rules in fiery campaign stop," *Fox News*, September 26, 2025, while,

"[w]ith Election Day just 42 days away, Democratic gubernatorial candidate

Abigail Spanberger made campaign stops across the area, including in

Roanoke", and, "[a]s part of her campaign, Spanberger addressed her stance on

the contentious issue of transgender women participating in female sports and

using female bathrooms." Alexia Stanbridge (13 ABC), "Spanberger addresses

stance on transgender women in sports and bathrooms," *WSET*, September 23,

2025.

### Values Instruction

157.  "[T]he great expenditures for education. . . demonstrate our recognition of the importance of education to our democratic society." *Brown*, 347 U.S. at 483. "It is required in the performance of our most basic public responsibilities, even service in the armed forces"; "[i]t is the very foundation of good citizenship." *Id.*

158.  "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.*

159.  While "[s]uch an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms", *Id.*, Appellant has focused only upon the *dicta* noting how "it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Id.*

160.  Even to the extent that "[o]ur *Constitution* was made only for a moral and religious People", deemed to be "wholly inadequate to the government of any other", John Adams, *Address to Massachusetts Militia*, October 11, 1798, "[i]n a free government, the security for civil rights must be the same as for religious rights". James Madison, *The Federalist No. 51*, February 6, 1788.

161.  "[R]eligion is a matter which lies solely between Man & his God, that he

51

owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, & not opinions," an idea that had "contemplate[d] with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between Church & State". Thomas Jefferson, *Letter to Danbury Baptist Association*, January 1, 1802.

162. "[I]n the one case in the multiplicity of interests, and in the other, in the multiplicity of sects", in an "extended republic", one Founder had espoused the notion that "[t]he degree of security in both cases will depend on the number of interests and sects; and this may be presumed to depend on the extent of country and number of people comprehended under the same government." James Madison, *The Federalist No. 51, supra.*

163. Hence, "'if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the *Constitution*'". *Jacobson*, 197 U.S. at 11 (quoting *Mugler v. Kansas*, 123 U.S. 623 (1887); *Minnesota v. Barber*, 136 U.S. 313 (1890); *Atkin v. Kansas*, 191 U. S. 207 (1907)).

52

164. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein", *West Virginia State Bd. of Educ. v. Barnett*, 319 U.S. 624 (1943), and "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds", "*Stanley v. Georgia*, 394 U.S. 557 (1969).

165. Furthermore, "[w]hen the Supreme Court has invalidated a statute because of an illegitimate purpose, '[i]n each case, the government's action was held unconstitutional only because *openly available data supported a commonsense conclusion that a religious objective permeated the government's action.*" *Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009), *aff'd* 624 F.3d 157 (5th Cir. 2010) (quoting *McCreary County v. ACLU*, 545 U.S. 844 (2005)) (emphasis added).

166. Nonetheless, "[t]he purpose requirement is rarely determinative, 'presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion.'" *Id.* (quoting *Ibid.*).

167. And, while, at APS, "[s]tudents utilize appropriate pronouns when engaging classmates and teacher(s)", implementing a policy that "prohibits discrimination on the basis of race, national origin, creed, color, religion, gender, age,

USCA4 Appeal: 25-2107   Doc: 43   Filed: 10/06/2025   Pg: 148 of 160

economic status, sexual orientation, marital status, genetic information, gender identity or expression, and/or disability", seeking to "provide[] equal access to courses and programs, counseling services, physical education and athletics, vocational education, instructional materials and extra-curricular activities", Editors, 2 DEI 10, May 8, 2023, "[u]nder our *Constitution*, [even] anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent", providing "*a shield from the tyranny* of the majority." *McIntyre v. Ohio Elections Comm'n (93-986)*, 514 U.S. 334 (1995) (emphasis added); *see generally* J. Mill, *On Liberty and Considerations on Representative Government* 1, 3-4 (R. McCallum ed. 1947), clearly not applicable at APS with regard to its nonbinary policy.

168.    "It thus exemplifies the purpose behind the *Bill of Rights*, and of the *First Amendment* in particular: *to protect unpopular individuals from retaliation*-and their ideas from suppression-at the hand of an intolerant society", and, even in secrecy of ballot choice, protected within the restricted confines of a polling precinct, "[t]he right to remain anonymous may be abused when it shields fraudulent conduct"; however, "political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." *Id. See also Abrams v. U.S.*, 250 U.S. 616 (1919) (Holmes, J., dissenting).

54

169. Moreover, while "people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life", *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, Civil No. 2:11-CV-15481, 2013 WL 3148272 (E.D. Mich. June 19, 2013) (citing : *Nuxoll Ex Rel. Nuxoll v. Indian Prairie Sch. Dist.*, 523 F.3d 668 (7th Cir. 2008)) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) & *Boos v. Barry*, 485 U.S. 312 (1988)), a "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 550 U.S. 123 (1992) (citations omitted).

170. *Tinker*, 393 U.S. at 503, generally applied, "straight-forwardly tells us that, in order for school officials to justify prohibition of a particular expression of opinion, they must be able to show that this 'action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Glowacki*, Civil No. 2:11-CV-15481, *supra* (quoting *Nuxoll*, 523 F.3d at 668 (Rovner, J., concurring) (quoting *Tinker*, 393 U.S. at 503)).

171. With respect to just free speech, "[s]imply put, the law does 'not establish a generalized 'hurt feelings' defense to a high school's violation of the *First Amendment* rights". *Id.* (quoting *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874 (7th Cir.2011)).

55

# TABLE OF EXHIBITS

## Exhibit A



CONGREGAZIONE
DELLE CAUSE DEI SANTI

*Il Cardinale Prefetto*

The Vatican, 28 November 2016

Mr. Webb,

I have received your recent letter regarding the graces that Almighty God has bestowed upon you at various times in your life.

I join you in thanking Him for His wonderful kindness and wish to assure you that I will remember you and your loved ones in prayer as we approach the Feast of Christmas and the new year of 2017.

With prayerful best wishes, I am

Sincerely in Christ,

Cardinal Angel Amato, S.D.B.
Prefect

Mr. Michael D. Webb
4600 S Four Mile Run Dr, Unit 1128
Arlington, VA 22204
United States of America

56

## Exhibit B



THE WHITE HOUSE
WASHINGTON

September 15, 2022

Mike Webb
Arlington, Virginia

Dear Mike,

Thank you for taking the time to share your thoughts with me. Hearing from passionate individuals like you inspires me every day, and I welcome the opportunity to respond to your letter.

Our country faces many challenges, and the road we will travel together will be one of the most difficult in our history. Despite these tough times, I have never been more optimistic for the future of America. I believe we are better positioned than any country in the world to lead in the 21st century not just by the example of our power but by the power of our example.

While we may not always agree on how to solve every issue, I pledge to be a President for all Americans. I am confident that we can work together to find common ground to make America a more just, prosperous, and secure Nation.

As we move forward to address the complex issues of our time, I encourage you to remain an active participant in helping write the next great chapter of the American story. We need your courage and dedication at this critical time, and we must meet this moment together as the United States of America. If we do that, I believe that our best days still lie ahead.

Sincerely,

57

## Exhibit C

IN THE SUPREME COURT OF THE UNITED STATES

WEBB, MICHAEL D.
   Petitioner

vs.

No: 21-6868

ANTHONY S. FAUCI, ET AL.

### WAIVER

The Government hereby waives its right to file a response to the petition in this case, unless requested to do so by the Court.

ELIZABETH B. PRELOGAR
Solicitor General
Counsel of Record

January 21, 2022

cc:

MIKE WEBB
955 S. COLQUMBUS ST.
APT. 426
ARLINGTON, VA 22204

58

## Exhibit D



59

Content was generated with AI. <u>Learn more</u>

monique bryant

🌐 **See all links**

# Monique Bryant is a dedicated education advocate, non-profit executive, and elected school board member in Detroit, with active engagement in Arlington, Virginia, school board politics.

## Background and Education

Monique Bryant is a Detroit native and mother of two children. She attended local schools including Priest Elementary, Ruddiman Middle School, and graduated

60

Content was generated with AI. **Learn more**

major mike webb

🌐 **See all links**

# Major Mike Webb is a retired U.S. Army officer, political activist, and independent candidate who has been actively involved in Virginia politics and litigation related to public health mandates.

## Background and Education

Major Mike Webb was born in Jersey City, New Jersey, and attended **The Bergen School** and **Saint Peter's Prep** before earning an undergraduate degree from

61

Content was generated with AI. Learn more

james vell rives iv

🌐 See all links

# James "Vell" Rives IV is an independent physician and psychiatrist who has served as a candidate for the Arlington County School Board in Virginia and has extensive experience in adolescent and adult mental health care.

## Personal and Family Background

James Vell Rives IV has been a resident of **Arlington County, Virginia, for over 26**

## CERTIFICATION

Plaintiff and Relator declares under penalty of perjury that no attorney has

prepared or assisted in the preparation of this document.

Major Mike Webb, 3445 Washington Boulevard, #306, Arlington, Virginia 22201
Name of *Pro Se* Party (Print or Type)

_____MCC_____ Executed on: _____October 1, 2025_____
Signature of *Pro Se* Party                           (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary

Public in the County of _____Arlington_____, in the Commonwealth of

Virginia, this 1st

day of _____October_____, 20 25 .

**NOTARY PUBLIC**

*[notary seal: JACOB CHRISTOPHER FELLS, NOTARY PUBLIC, REG. #8110537, MY COMMISSION EXPIRES 12/31/2028, COMMONWEALTH OF VIRGINIA]*

172. My commission expires: 12/31/2028 Registration Number: 8110537

—

63





**TED STATES**

**AL SERVICE** ®

US POSTAGE IMI  058351001185115  2000392140
$11.10
SSK
PM

10/01/25   Mailed from 22204   028W2311268

## PRIORITY MAIL ®

R M WEBB
06
WASHINGTON BLVD
NGTON VA 22201-4546

1 lb 10.12 oz

**RDC 03**

EDULED DELIVERY DAY: 10/04/25

C003

CLERK
4TH CIR. CT. OF APP.
STE 501
1100 E MAIN ST
RICHMOND VA 23219-3538

omestic use.

surance (restrictions apply).*

omestic and many international destination

declaration form is required.

regarding claims exclusions see the Domestic

om for availability and limitations of coverage.

OPE
ONAL USE

### USPS TRACKING® NUMBER



9505 5067 1616 5274 0609 84



To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

## TRACKED ■ INSURED



PS00000133100

EP14 July 2022
OD: 15 x 11.625

PRESS FIRMLY TO SEAL

# PRIORITY®
## MAIL

PRIORITY MAIL
POSTAGE REQUIRED



how2recycle.info

PLASTIC BAG

**FROM:**

Webb
3445 Washington Bl
#506
Arlington, VA
22201

**TO:**

Clerk
Fourth Circuit
Court of Appeals
1100 E. Main Street
Richmond VA
25219

RECEIVED
S. MARSHALS

## VISIT US AT USPS.COM®
### ORDER FREE SUPPLIES ONLINE

DuPont™ Tyvek®
Protect What's Inside.™

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This packaging is not for resale. EP14 © U.S. Postal Service; July 2022; All rights reserved.