No. 25-2087

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

—————————————

**FAIRFAX COUNTY SCHOOL BOARD** and
**ARLINGTON COUNTY SCHOOL BOARD**,

*Plaintiffs-Appellants*,

v.

**LINDA MCMAHON**, in her official capacity as Secretary of Education
of the United States and **UNITED STATES DEPARTMENT
OF EDUCATION**,

*Defendants-Appellees.*

—————————————

On Appeal from the United States District Court
for the Eastern District of Virginia
Nos. 1:25-cv-1432-RDA-LRV & 1:25-cv-1434-RDA-LRV,
Honorable Rossie D. Alston, Jr.

—————————————

**BRIEF OF *AMICUS CURIAE* AMERICA FIRST LEGAL
FOUNDATION IN SUPPORT OF DEFENDANTS-APPELLEES**

Andrew J. Block
Ian D. Prior
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
Phone: (401) 205-9681

*Attorneys for Amicus Curiae
America First Legal Foundation*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* America First Legal Foundation has no parent corporation nor any shares that could be owned by a publicly held corporation. *See* Fed. R. App. P. 26.1.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION ............................................................................. 3

ARGUMENT .................................................................................... 5

I.     Gender identity is not a protected class under Title IX. ............. 5

       A.     The text of Title IX confirms that gender identity is
              not a protected class under the statute. .......................... 5

       B.     Context confirms Title IX's plain meaning...................... 9

       C.     History confirms Title IX's plain meaning. ................... 11

       D.     Nothing in *Bostock* undermines the straightforward
              text of Title IX.............................................................. 15

II.    *Grimm* does not insulate the School Boards' policies................ 17

       A.     *Grimm*'s narrow holding is limited to transgender
              students who "consistently, persistently, and
              insistently" identify as the opposite sex. ..................... 17

       B.     The policies here exceed *Grimm*'s strict
              guardrails...................................................................... 20

III.   The School Boards' policies jeopardize student safety. ............. 23

CONCLUSION.................................................................................. 25

CERTIFICATE OF COMPLIANCE ..................................................... 26

CERTIFICATE OF SERVICE ............................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) ..................................................6, 12

*Alabama v. U.S. Sec'y of Educ.*,
    No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ............11

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) .................................... 5, 15, 16, 18, 19

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ........................................................13

*Carroll Indep. Sch. Dist. V. U.S. Dep't of Educ.*,
    741 F. Supp. 3d 515 (N.D. Tex. 2024) .............................11

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ...........................................................9

*Dep't of Educ. v. Louisiana*,
    603 U.S. 866 (2024) (per curiam) ...................... 8, 9, 15, 16

*Edwards' Lessee v. Darby*,
    25 U.S. 206 (1827) ............................................................11

*Faulkner v. Jones*,
    10 F.3d 226 (4th Cir. 1993) ............................................12

*Feliciano v. Dep't of Transp.*,
    605 U.S. 38 (2025) ..............................................................5

*Fischer v. United States*,
    603 U.S. 480 (2024) .........................................................11

*Folwell v. Kadel*,
    145 S.Ct. 2838 (2025) ....................................................................20

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .........................................................................8

*Gaines v. NCAA*,
    No. 1:24-cv-1109-MHC (N.D. Ga. June 26, 2024) ..........................24

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ................................................. *passim*

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) .......................................................................16

*Jane Doe v. Fairfax Cnty. Sch. Bd.*,
    No. 1:25-cv-1662 (E.D. Va. Oct. 3, 2025) ..........................................1

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ........................................................20

*King v. Burwell*,
    576 U.S. 473 (2015) .........................................................................9

*Little v. Hecox*,
    145 S.Ct. 2871 (2025) ....................................................................20

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ...............................................................11, 14

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
    370 F.3d 275 (2d. Cir. 2004) ....................................................12, 13

*N. Haven Bd. of Educ. v. Bell*,
    456 U.S. 512 (1982) .......................................................................11

*O'Connor v. Bd. of Educ. of Sch. Dist. 23*,
    449 U.S. 1301 (1980) .....................................................................13

*Roe v. Critchfield,*
137 F.4th 912 (9th Cir. 2025)....................................................14, 19

*S.W. v. Loudon Cnty. Sch. Bd.,*
No. 1:25-cv-1536 (E.D. Va. Oct. 29, 2025)....................................1, 2

*Soule v. Conn. Ass'n of Sch., Inc.,*
90 F.4th 34 (2d Cir. 2023) ..............................................................16

*State Farm Fire & Cas. Co. v. United States ex rel. Rigsby,*
580 U.S. 26 (2016) ....................................................................10, 11

*Tennessee v. Cardona,*
No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024)................11

*Texas v. Cardona,*
743 F. Supp. 3d 824 (N.D. Tex. 2024) ..............................................7

*United States v. Skrmetti,*
605 U.S. 495 (2025) .......................................................15, 16, 19, 20

*West Virginia v. B.P.J.,*
No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) ...........................20

**Statutes**

Education Amendments of 1972 ("Title IX"), Pub. L. No. 92-318,
86 Stat. 235 (June 23, 1972), codified at 20 U.S.C. § 1681 et
seq. .........................................................................................*passim*

Education Amendments of 1974, Pub. L. No. 93-380, 88 Stat. 484
(1974)..............................................................................................14

20 U.S.C. § 1689(a)(6) ..........................................................................10

5 U.S.C. § 706..........................................................................................4

## Constitutional Provisions

Va. Const. Art. 1, § 11 ..................................................................12

## Regulations

34 C.F.R. § 106.33 ......................................................................10

40 Fed. Reg. 24128 (June 4, 1975) ...........................................14

85 Fed. Reg. 30026 (May 19, 2020) .......................................9, 10

## Other Authorities

118 Cong. Rec. 5804 (1972) ......................................................13

*About the Series*, The Associated Press (May 1, 2017) .........................24

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH
    LANGUAGE (1976) .................................................................6

Emily Schmall, Reese Dunklin, Robin McDowell & Justin Pritchard,
    *AP reveals hidden horror of school sex assaults*, The Associated
    Press (May 12, 2017) .......................................................23

MERRIAM-WEBSTER.COM DICTIONARY (2025) ...............................8

Nick Minock, *Child Sex Offender Visited 2 Schools, 2 Rec Centers in
    Arlington and Fairfax Counties*, NBC News (Feb. 6, 2025) ............24

OXFORD ENGLISH DICTIONARY (re-issue ed. 1978) .........................6

Press Release, *U.S. Department of Education Places Five Northern
    Virginia School Districts on High-Risk Status and
    Reimbursement Payment Status for Violating Title IX*, U.S.
    Department of Education (Aug. 19, 2025) ....................................4

W. Burlette Carter, *Sexism in the 'Bathroom Debates': How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227 (2019)................................................................12

WEBSTER'S NEW WORLD DICTIONARY (1972) ...........................6, 8

WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1969) ....7

## INTEREST OF *AMICUS CURIAE*

America First Legal Foundation ("AFL") is a national nonprofit organization dedicated to promoting the rule of law in the United States by ensuring due process and equal protection for every American citizen.

AFL is involved in a wide range of litigation regarding the contours of Title IX as applied to school bathroom and locker room policies. For example, AFL represents the plaintiff in *Jane Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:25-cv-1662 (E.D. Va. Oct. 3, 2025, where the plaintiff alleges that the appellant school board discriminated against her on the basis of sex by allowing a male to use a female restroom and telling her that if he objected, she would need to find a different restroom. In that litigation, the school board invokes the same arguments it pushes here—that the discriminatory policy is required by *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).

AFL also represents the plaintiffs in *S.W. v. Loudon Cnty. Sch. Bd.*, No. 1:25-cv-1536 (E.D. Va. Oct. 29, 2025. Here, AFL's clients allege that the Loudon County School Board discriminated against them and punished them after they spoke out against being required to share a locker room with a female student who engaged in strepitous recordings

of male students on several occasions. AFL obtained a preliminary injunction preventing the school board from imposing punitive punishments on these high school students. *See* Order, *S.W. v. Loudon Cnty. Sch. Bd.*, No. 1:25-cv-1536, ECF No. 45 (E.D. Va. Oct. 10, 2025).

In sum, AFL has a substantial interest in this case, both on behalf of its clients and on behalf of its institutional mission of ensuring that public schools comply with Title IX and its implementing regulations.

## INTRODUCTION

These consolidated cases concern the unlawful and dangerous restroom and locker room policies maintained by the Fairfax County School Board and the Arlington School Board (collectively, "the School Boards"). The School Boards' policies allow students to access restrooms and locker rooms that accord with their gender identity.

Specifically, the Fairfax County School Board's policy provides that, "Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity." J.A. 64. It defines "gender-expansive" as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." J.A. 86.

Similarly, the Arlington School Board's policy states that, "Access to facilities that correspond to a student's gender identity will be available to all students." J.A. 278. It defines "gender identity" as "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." J.A. 278.

Earlier this year, the U.S. Department of Education ("the Department") determined that the School Boards' policies violate Title IX of the Education Amendments of 1972.[1] Accordingly, in August 2025, the Department announced that it was placing the School Boards "on high-risk status," and as a result, "all Department funds including formula funding, discretionary grants, and impact aid grants" would be "done by reimbursement only." *See* Press Release, *U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX*, U.S. DEP'T OF EDUC. (Aug. 19, 2025), https://perma.cc/FTB9-AEFV

In response, the School Boards sued the Department and the Secretary of Education under the Administrative Procedure Act, alleging that the Department's actions were arbitrary and capricious. *See* 5 U.S.C. § 706. They argue, *inter alia*, that Title IX *affirmatively requires* schools to allow students to access restrooms and locker rooms that accord with their gender identity and that the Department is requiring them to violate binding Fourth Circuit case law interpreting Title IX.

---

[1] Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (1972 codified at 20 U.S.C. § 1681 *et seq*.

AFL recognizes that the immediate question before this Court is whether the district court had jurisdiction to resolve the merits of the School Boards' claims. But if this Court reaches the merits of the case now or in the future, it should find that the School Boards' policies violate Title IX and resolve all claims in favor of Defendants-Appellees.

## ARGUMENT

## I. Gender identity is not a protected class under Title IX.

The text, context, and pre- and post-enactment history of Title IX, as well as recent Supreme Court decisions, make clear that Title IX does not prohibit discrimination based on gender identity.

### A. The text of Title IX confirms that gender identity is not a protected class under the statute.

Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). To determine the ordinary public meaning of the words in a statute, courts routinely consult dictionaries from the time of the statute's enactment. *See, e.g.*, *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 44 (2025).

The text of Title IX provides a general prohibition on sex discrimination in federally-funded education programs and activities:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

When Congress passed Title IX in 1972, the "overwhelming majority" of contemporaneous dictionaries defined "sex" to mean biological sex—that is, the sex that accords with an individual's reproductive functions. *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022); *see, e.g.*, *Sex*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976 ("The property or quality by which organisms are classified according to their reproductive functions"); *Sex*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1979) (same); *Sex*, *Female*, *Male*, OXFORD ENGLISH DICTIONARY (re-issue ed. 1978 (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," "female" as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation"); *Sex*, WEBSTER'S NEW WORLD DICTIONARY (1972 ("[E]ither of the two divisions, male or female,

into which persons, animals, or plants are divided, with reference to their reproductive functions"); *Sex*, *Female*, *Male*, WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1969 (defining "sex" as "either of two divisions of organisms distinguished respectively as male or female," "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function"). As other courts have concluded, "The common theme running through these definitions of 'sex' is the focus on reproduction and the associated anatomical differences of men and women." *Texas v. Cardona*, 743 F. Supp. 3d 824, 872 (N.D. Tex. 2024.

It follows that "sex" in Title IX means biological sex—that is, male or female and nothing else. Biological sex does not include "a wider, more flexible range of gender identity and expression than typically associated with" a binary gender system. J.A. 86 (Fairfax County School Board's policy). Nor does it encompass "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." J.A. 278 (Arlington School Board's policy). The School Boards seem to agree, as they explicitly contrast biological sex with the

concept of gender identity. *See, e.g.*, J.A. 86 (drawing a distinction between "gender identity" and a "binary (two discreet and opposite categories of male and female) gender system").

The drafters of Title IX likely did not define "sex" in the statute because its meaning was obvious in 1972. Sex meant—and still means— "either of the two divisions, male or female, into which persons … are divided, with reference to their reproductive functions." *See Sex*, WEBSTER'S NEW WORLD DICTIONARY (1972); *Sex*, MERRIAM-WEBSTER.COM, https://perma.cc/M33R-Q45L (2025) (defining "sex" as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures"). Courts, too, have understood "sex" to carry this meaning since the 1970s. *See, e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality opinion) (explaining one year after Title IX's passage that "sex" is "an immutable characteristic determined solely by the accident of birth").

Given the clarity of Title IX's plain text, it is unsurprising that "all Members of the [Supreme] Court" recently agreed that an agency rule purporting to extend the term "sex" in Title IX to gender identity is likely

unlawful. *See Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (per curiam).

In sum, nothing in the text of Title IX indicates or even suggests that the prohibition on sex discrimination encompasses discrimination based on gender identity. That fact alone is outcome-determinative. When statutory text is clear and unambiguous, the interpretive inquiry is complete. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

**B.    Context confirms Title IX's plain meaning.**

When interpreting statutes, courts "must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 486 (2015). Here, context confirms what the plain text makes clear: Title IX's prohibition on sex discrimination does not extend to gender identity.

"Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations … reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026, 30178 (May 19, 2020). For example, Section 1681(a)(2)

distinguishes between "institution[s] which admit[] only students of one sex" and "institution[s] which admit[] students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphasis added). Similarly, Section 1681(a)(8) refers to sex in binary terms, specifying that if father-son and mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "*the other sex*." *Id.* § 1681(a)(8 (emphasis added). Title IX's implementing regulations also describe "sex" in binary terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes.").

What is more, other provisions in Title IX *do* extend protections beyond sex—showing that Congress knows how to do so when it intends this result. For example, Title IX provisions adopted in 2022 refer to "consideration" of "transgender" status. 20 U.S.C. § 1689(a)(6. "Congress' use of 'explicit language'" in Section 1689(a)(6) "cautions against

inferring" coverage "in another provision." *See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 34 (2016.

Thus, as several courts have concluded, context shows that "sex" in Title IX refers to biological sex and does not include "gender identity." *See, e.g.*, *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024 ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'"); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520–25 (N.D. Tex. 2024).

**C.    History confirms Title IX's plain meaning.**

The pre-enactment history of a statutory provision can shed light on its meaning. *See Fischer v. United States*, 603 U.S. 480, 491 (2024) (interpreting a statute "in light of the history of the provision"). Contemporaneous constructions are also "authoritative expressions concerning the scope and purpose of Title IX", *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982), and are "entitled to very great respect." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827)). Here, all available

historical evidence confirms that "sex" in Title IX refers to biological sex and not gender identity.

Throughout American history, schools have maintained the "unremarkable" and "nearly universal" practice of "separating school bathrooms based on biological sex." *Adams*, 57 F.4th at 796 "In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Id.* at 805 (quoting W. Burlette Carter, *Sexism in the 'Bathroom Debates': How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019)); *see also Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) ("[Society has given its] undisputed approval of separate public rest rooms for men and women based on privacy concerns.").

Indeed, such practice is enshrined in the Constitution of the Commonwealth. The Constitution of Virginia, the current version of which was adopted by referendum in 1970 and took effect in 1971, explicitly states that "the mere separation of the sexes shall not be considered discrimination." VA. CONST. Art. 1, § 11.

Nothing in Title IX's history suggests that it was designed to disturb this longstanding historical tradition. "Title IX was enacted in

response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d. Cir. 2004); *accord Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979); 118 CONG. REC. 5804 (1972) (statement of Sen. Birch Bayh) (noting that the hearings included, "Over 1,200 pages of testimony document[ing] the massive, persistent patterns of discrimination against women in the academic world"). To achieve that end, Title IX expressly authorizes schools to consider sex in some circumstances—specifically, when different treatment on the basis of sex is necessary to ensure equal opportunity for female students. *See, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23,* 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events.").

Contemporaneous post-enactment history further confirms that Title IX does not include discrimination based on "gender identity." Approximately two years after Title IX was enacted, Congress passed the Javits Amendment, directing the Department of Education's predecessor

to create regulations implementing Title IX. Education Amendments of 1974, Pub. L. No. 93-380, 88 Stat. 484, 612 (1974). The agency issued regulations that allow sex separation in many contexts—including bathrooms. 40 Fed. Reg. 24128, 24141–43 (June 4, 1975). These contemporaneous regulations, nearly all of which remain in effect today, are strong evidence that Title IX does not preclude bathrooms that are segregated on the basis of biological sex. *See Loper Bright*, 603 U.S. at 394 ("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.").

In sum, and as the Ninth Circuit recently recognized, "from the time of the enactment of Title IX and its implementing regulations, the scheme has authorized schools to maintain sex-segregated facilities." *Roe v. Critchfield*, 137 F.4th 912, 929 (9th Cir. 2025). This history offers persuasive evidence that under Title IX, "sex" means biological sex and not gender identity.

14

**D.    Nothing in *Bostock* undermines the straightforward text of Title IX.**

In *Bostock*, the Supreme Court held that Title VII's prohibition on "sex" discrimination in the workplace precludes discrimination on the basis of sexual orientation or transgender status. 590 U.S. at 683. But in so holding, the Court proceeded on the assumption that "sex" in Title VII means biological sex. *Id.* at 655. The Court simply determined that one cannot discriminate on the basis of sexual orientation or transgender status without intentionally discriminating on the basis of biological sex. *Id.* at 669. The Court did not hold that Title VII precludes discrimination on the basis of gender identity—a distinct concept.

By its own terms, *Bostock* offers no guidance on the meaning of Title IX. The *Bostock* Court explicitly stated that it was not "prejudg[ing]" the interpretation of any statute beyond Title VII. *Id.* at 681. The Court also made clear that it did not "purport to address" any matters related to "bathrooms, locker rooms, or anything else of the kind," even insofar as Title VII bears on those issues. *Id.* If there were any doubt, the Supreme Court clarified just last Term that it has never held that "*Bostock*'s reasoning reaches beyond the Title VII context." *United States v. Skrmetti*, 605 U.S. 495, 520 (2025). And the Court also suggested that

15

if it took up that question, it would hold that *Bostock*'s reasoning does not apply to Title IX. *See Louisiana*, 603 U.S. at 867.

There are good reasons to refrain from extending *Bostock*'s reasoning to Title IX. "Title VII … is a vastly different statute from Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). While Title VII *prohibits* the consideration of sex in hiring and firing decisions because those traits are generally irrelevant in the workplace, Title IX *requires* schools to consider sex when necessary to ensure that women and girls have equal opportunities in school.

Thus, "while an employer risks Title VII liability when it makes distinctions among employees based on sex," an education program risks Title IX liability when it *fails* to distinguish between students on the basis of sex in some circumstances. *See Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 63 (2d Cir. 2023) (Menashi, J., concurring). These substantial differences between Title VII and Title IX suggest that *Bostock*'s reasoning should not extend beyond the Title IX context. *See Skrmetti*, at 519–20 (Thomas, J., concurring) (offering additional reasons why *Bostock*'s reasoning should not extend beyond the Title VII context).

II.    ***Grimm*** **does not insulate the School Boards' policies.**

Seemingly recognizing the merits of the analysis above, the School Boards go all in on the argument that this Court's decision in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), requires their policies. *See* J.A. 15, J.A. 236. But *Grimm* did not opine on the operative legal question, and the policies here are factually distinct from the policies at issue in *Grimm*.

### A.    ***Grimm*'s narrow holding is limited to transgender students who "consistently, persistently, and insistently" identify as the opposite sex.**

The legal principle of *Grimm* is that students who "consistently, persistently, and insistently" identify as the opposite biological sex should be treated as such. 972 F.3d at 596. In that case, a Virginia school board, in response to backlash about a transgender male student's use of the boys' restroom, implemented a policy in which students could use only the restroom that matched their biological sex. *Id.* at 593.

Grimm, a biological female who had undergone gender reassignment surgery and had for years "consistently and persistently identified as male," sued the school board, alleging that the restroom policy, as applied to Grimm specifically, constituted impermissible

17

discrimination in violation of Title IX and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 601, 619. Relying on the Supreme Court's analysis of Title VII in *Bostock*, this Court held that the policy discriminated against Grimm "on the basis of sex" under Title IX because "Grimm was treated worse than students with whom he was similarly situated because he could not use the restroom corresponding with his gender." *Id.* at 616–18.

The majority explained that "there have always been people who 'consistently, persistently, and insistently' express a gender that, on a binary, we would think of *as opposite to their assigned sex*." *Id.* at 594 (emphasis added). The Court also explained that "there are other gender-expansive youth who may identify as nonbinary, youth born intersex who do or do not identify with their sex-assigned-at-birth, and others whose identities belie gender norms." *Id.* at 596. The Court then clarified that its decision was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a *binary* gender." *Id.* (emphasis added).

By its own terms, *Grimm* did not address policies for students with "gender expansive" or non-binary gender identities. Instead, *Grimm*'s

holding is limited to the context in which a student has "consistently, persistently, and insistently" identified as the opposite biological sex. *Id.* at 596. *Grimm* also did not address policies regarding locker rooms, *id.* at 601, where privacy interests might be even greater than in a restroom. *See Critchfield*, 137 F.4th at 925 ("the privacy interest … is most strongly implicated in locker rooms and communal shower rooms that lack curtains or stalls."). *Grimm* simply does not speak to the operative legal questions in this case.

In any event, *Grimm*'s analysis is deeply flawed and undermined by recent Supreme Court decisions. *Grimm*'s Title IX analysis hinged on its equal-protection analysis—specifically, the conclusion that a sex-separated bathroom policy classifies based on sex. *Grimm*, 972 F.3d at 618. But that analysis has been abrogated by *Skrmetti*, which made clear that the key question in an equal-protection challenge is whether the policy "prohibit[s] conduct for one sex that it permits for the other." *Skrmetti*, 605 U.S. at 514–15.

Sex-segregated bathrooms do not run afoul of that test, as neither sex may use the bathroom of their choosing; both sexes must use the restroom consistent with their biological sex. Moreover, *Grimm* relied

19

heavily on *Bostock*, which it imported to the Title IX context. *Grimm*, 972 F.3d at 616 ("Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." (citation omitted)). But as explained above, the Supreme Court has never held that *Bostock* applies in the Title IX context. *See Skrmetti*, 605 U.S. at 620. And even if it did, *Bostock* does not establish that a sex-separated bathroom policy discriminates based on sex in violation of Title IX.

*Grimm* is relevant only insofar as its rationale has not been abrogated by intervening Supreme Court decisions. Earlier this year, the Supreme Court granted, vacated, and remanded the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which relied heavily on *Grimm*. *See Folwell v. Kadel*, 145 S.Ct. 2838 (2025). Thus, this Court must carefully consider what—if anything—remains of *Grimm* after *Skrmetti*.[2]

### B. The policies here exceed *Grimm*'s strict guardrails.

The policies maintained by the School Boards in these consolidated cases are materially different from the policy at issue in *Grimm*.

---

[2] *Grimm* may be further undermined in the near future, as the Supreme Court will decide this Term whether Title IX or the Equal Protection Clause prevents a State from having sex-separated sports teams. *West Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025); *Little v. Hecox*, 145 S.Ct. 2871 (2025).

First, the School Boards' policies apply to students who identify as *any gender* that departs from their biological sex—even if that gender is not male or female. The Fairfax County School Board allows students who are "gender expansive" and "non-binary," to use opposite sex restrooms, despite defining those other gender identities as ones that go beyond a male-female binary system. *See* J.A. 86 (defining "gender-expansive" as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system"). Likewise, the Arlington School Board permits students to access the facilities that correspond with their "gender identity," which encompasses "one's sense of self as male or female, or an alternative gender." J.A. 278. The *Grimm* Court, by contrast, limited its holding to students who 'consistently, persistently, and insistently' express a *binary gender*." *Grimm*, 972 F.3d at 596 (emphasis added).

The School Boards' policies also allow students to access opposite-sex restrooms and locker rooms regardless of how "consistently, persistently, and insistently" the student has identified as a different gender. *Id.* at 596. And the policies apply to locker rooms, which the

21

*Grimm* Court explicitly did not address. *Id.* at 601. The School Boards'
expansive policies are exactly what the Court in *Grimm* stated was
beyond the confines of its holding.

What is more, the School Boards' policies raise additional concerns
not implicated in *Grimm* because they overtly discriminate on the basis
of sex against students who object to sharing private facilities with
students of the opposite biological sex. Both policies provide that if a
student is uncomfortable sharing a restroom with a member of the
opposite sex, the uncomfortable student's remedy is to use a private
restroom. J.A. 64, J.A. 278. But that policy discriminates on the basis of
sex against the uncomfortable student. For example, if a biological female
is limited to using a private restroom, then the biological female no longer
has access to female-only facilities, while a similarly situated biological
male student has access to male-only facilities. Such a policy plainly
discriminates on the basis of sex. And denying access to male students
who use to use male-only spaces by allowing females to enter does not
save this policy. The Equal Protection Clause requires equal treatment,
not equal discrimination.

In sum, the policies at issue in these consolidated cases are factually distinct from the policy at issue in *Grimm*. Thus, to resolve the instant claims, this Court will need to consider issues that the *Grimm* Court did not address even in passing.

## III. The School Boards' policies jeopardize student safety.

By allowing students to invade the intimate sex-segregated restroom and locker room facilities of the opposite sex, the School Boards expose their students to an unreasonable risk of sexual assault.

In 2017, The Associated Press ("AP") reported that student-on-student sexual harassment happens with alarming frequency. Relying on state education records and federal crime data, AP uncovered roughly 17,000 official reports of sexual assaults by students at K-12 schools over a four-year period, from fall 2011 to spring 2015. *See* Emily Schmall, Reese Dunklin, Robin McDowell & Justin Pritchard, *AP reveals hidden horror of school sex assaults*, THE ASSOCIATED PRESS (May 12, 2017), https://perma.cc/P66M-5ATT. And the final tally is undoubtedly an undercount, as some States do not track on-campus sex assaults and those that do vary widely in how they classify such incidents. *See id.*

The AP also found that student-on-student assaults "occurred anywhere students were left unsupervised: buses and bathrooms, hallways and locker rooms." *About the Series*, THE ASSOCIATED PRESS (May 1, 2017), https://perma.cc/RHT4-WC6B. And the assaults happened to students of almost every age and grade. The AP noted that "victims and offenders were as young as 5 or 6" years old. *Id.*

Allowing biological males to enter female restrooms and locker rooms will only exacerbate this problem. For example, the NCAA has been sued for allowing a biological male "complete and unrestricted access to the women's locker rooms, showers, and restrooms," causing girls to be anxious, "stressed out," and feeling that their "privacy and sense of safety was violated." Am. Compl. ¶ 477, *Gaines v. NCAA*, No. 1:24-cv-1109-MHC, ECF No. 64 (N.D. Ga. June 26, 2024). And in Virginia, a "registered child sex offender" was granted access to a women's locker room at a public pool where he "exposed his fully naked body in front of" a nine-year-old girl. Nick Minock, *Child Sex Offender Visited 2 Schools, 2 Rec Centers in Arlington and Fairfax Counties*, NBC NEWS (Feb. 6, 2025), https://perma.cc/39R2-3Z7H. The pool was located in Washington Liberty High School and open to the public after hours,

and it followed the Arlington School Board's policy of permitting locker room access based on gender identity. The staff granted the man access simply because he told them that he "identified as transgender." *Id.* These examples demonstrate the real consequences that flow from the policies maintained by the School Boards in this case.

Policies like those maintained by the School Boards are as dangerous as they are unlawful. Allowing these policies to persist exposes the most vulnerable among us to considerable and unnecessary risk.

## CONCLUSION

If this Court reaches the merits of this case, it should hold that the School Boards' policies violate Title IX.

DATED: December 12, 2025       Respectfully submitted,

                        */s/ Andrew J. Block*

                        Andrew J. Block
                        Ian D. Prior
                        AMERICA FIRST LEGAL FOUNDATION
                        611 Pennsylvania Ave SE #231
                        Washington, DC 20003
                        Phone: (401) 205-9681
                        andrew.block@aflegal.org
                        ian.prior@aflegal.org

                        *Attorneys for Amicus Curiae*
                        *America First Legal Foundation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Rule 32(a)(7)(B) because it contains 4,737 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook typeface.

*/s/ Andrew J. Block*

Andrew J. Block

## CERTIFICATE OF SERVICE

I certify that on December 12, 2025, I electronically filed this brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Andrew J. Block*
Andrew J. Block